**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

COLLEGE RETIREMENT EQUITIES FUND, et al.,

Plaintiffs,

v.

THE BOEING COMPANY, et al.,

Defendants.

Case No. 1:22-cv-03845

Hon. Manish S. Shah

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS**

John F. Hartmann, P.C.
Michael B. Slade
KIRKLAND & ELLIS LLP
300 N. LaSalle
Chicago, IL 60654
(312) 862-2000

Craig S. Primis, P.C. (*pro hac vice*)
Katherine Canning (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington D.C. 20004

*Counsel for Defendants*

Dated: February 8, 2023

## TABLE OF CONTENTS

Page


PRELIMINARY STATEMENT .......... 1

FACTS ALLEGED IN THE COMPLAINT AND SUBJECT TO JUDICIAL NOTICE .......... 3

I. Boeing's 737 MAX Aircraft .......... 3

II. Boeing Enters Into a Deferred Prosecution Agreement .......... 6

III. Plaintiffs' Purchases of Boeing Stock .......... 6

ARGUMENT .......... 7

I. Plaintiffs Do Not Plead A False Or Misleading Statement .......... 7

A. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About The Design Of The 737 MAX Were False Or Misleading. .......... 10

B. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About The Safety Of The 737 MAX Were False Or Misleading. .......... 14

C. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About Information Provided To Pilots Were False Or Misleading. .......... 18

D. Plaintiffs Do Not Plead With Particularity That Statements Regarding The 737 MAX's Return To Service Were False Or Misleading. .......... 21

E. Plaintiffs Do Not Plead With Particularity That Any Statements About Boeing's Financial And Operational Performance Were False Or Misleading. .......... 24

F. Plaintiffs Do Not Plead With Particularity That Defendants' Certifications As To Compliance With SEC Filing Requirements Were False. .......... 26

II. Plaintiffs Do Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter. .......... 26

A. Plaintiffs Do Not Plead Facts Giving Rise To A Cogent Inference Of Scienter. .......... 27

1. Plaintiffs Do Not Adequately Plead That Boeing Acted With Scienter. .......... 27

2. Plaintiffs Do Not Adequately Plead That The Individual Defendants Acted With Scienter. .......... 28

**TABLE OF CONTENTS (CONT'D)**

**Page**

3. Plaintiffs' Circumstantial Allegations Do Not Support A Cogent Inference Of Scienter. .... 30

B. The Most Compelling Inference From Plaintiffs' Allegations Is That Defendants Did Not Act With Scienter. .... 34

III. Plaintiffs Do Not Plead Loss Causation .... 35

CONCLUSION .... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)....7

*Alizadeh v. Tellabs*,
2015 WL 557249 (N.D. Ill. Feb. 9, 2015)....25

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001)....25

*Bastian v. Petren*,
892 F.2d 680 (7th Cir. 1990)....35

*Brody v. Transitional Hosps.*,
280 F.3d 997 (9th Cir. 2002)....8

*Carvelli v. Ocwen Financial Corp.*,
934 F.3d 1307 (11th Cir. 2019)....22

*In re Ceridian Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008)....33

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022)....32

*City of Monroe v. Bridgestone*,
399 F.3d 651 (6th Cir. 2005)....8, 16, 17

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003)....4

*Desai v. Gen. Growth Props.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009)....23

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990)....7, 34

*Dura Pharm. v. Broudo*,
544 U.S. 336 (2005)....7, 35, 39

*In re Ford Motor Co. Securities Litigation*,
381 F.3d 563 (6th Cir. 2004)....17, 25

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

*Gillis v. QRX Pharma*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)....17

*Higginbotham v. Baxter Int'l*,
495 F.3d 753 (7th Cir. 2007) ....26, 30

*Hirtenstein v. Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018) ....17

*Katyle v. Penn Nat'l Gaming*,
637 F.3d 462 (4th Cir. 2011) ....38

*In re Maximus Sec. Litig.*,
2018 WL 4076359 (E.D. Va. Aug. 27, 2018)....40

*In re Midway Games, Inc., Sec. Litig.*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) ....8

*Nguyen v. Endologix*,
962 F.3d. 405 (9th Cir. 2020) ....34

*Omnicare v. Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)....9, 18

*In re Omnicom Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)....38

*Phillips v. Scientific-Atlantic, Inc.*,
374 F.3d 1015 (11th Cir. 2004) ....30

*Pugh v. Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ....26, 28, 30, 34

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ....22

*Rowe v. Maremont Corp.*,
850 F.2d 1226 (7th Cir. 1988) ....7

*S.E.C. v. Kelly*,
545 F. Supp. 2d 808 (N.D. Ill. 2008) ....27

*Societe Generale v. Caterpillar*,
2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ....32

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc*,
2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ....23

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**


*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ....................................................................................8

*Tellabs v. Makor Issues & Rights*,
551 U.S. 308 (2007)..............................................................................................7, 26, 34

*In re The Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ............................................................ *passim*

*Tricontinental v. PwC*,
475 F.3d 824 (7th Cir. 2007) ....................................................................................35

*TSC Indus. v. Northway*,
426 U.S. 438 (1976)...................................................................................................20

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
987 F.2d 429 (7th Cir. 1993) ......................................................................................4

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ........................................................................................7

*Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*,
2021 WL 5083756 (N.D. Ill. Nov. 2, 2021), *on reconsideration in part*, 2022
WL 614925 (N.D. Ill. Mar. 2, 2022)..........................................................................23

*In re Yum! Brands Sec. Litig.*,
73 F. Supp. 3d 846 (W.D. Ky. 2014)..........................................................................17

*Zucco Partners v. Digimarc*,
552 F.3d 981 (9th Cir. 2009) ......................................................................................33


**Statutes**


15 U.S.C. § 78u-4(b)(2)(A)...............................................................................................7

15 U.S.C. § 78u-5(i)(1)(B)...........................................................................................9, 22

15 U.S.C. § 78u-5(i)(1)(C)...........................................................................................9, 22

15 U.S.C. § 78u-5(c)(1)(A)(i) ............................................................................................9

15 U.S.C. § 78u-5(c)(l)(B)(ii) .............................................................................................9

49 U.S.C. § 44701 ..............................................................................................................4

Securities Act § 17(a)(2) ...................................................................................................27

Securities Act § 17(a)(3) ...................................................................................................27

**TABLE OF AUTHORITIES (CONT'D)**

**Page(s)**

Securities Act § 10(b) ....................6, 7, 8, 10

**Other Authorities**

Fed. R. Civ. P. 9(b) ....................1, 7

Fed. R. Evid. 407 ....................30

## TABLE OF EXHIBITS

| EX. # | Description |
|---|---|
| 1 | November 6, 2018 Boeing Flight Operations Manual Bulletin |
| 2 | November 7, 2018 FAA Emergency Airworthiness Directive |
| 3 | October 29, 2018 Republic of Indonesia Aircraft Accident Investigation Report |
| 4 | November 12, 2018 Seattle Times Article |
| 5 | April 24, 2019 Boeing Form 10-Q |
| 6 | January 7, 2021 Deferred Prosecution Agreement |
| 7 | Boeing Statement on Lion Air Flight 610 Preliminary Report |
| 8 | December 6, 2019 U.S. House of Representatives Summary of Subject Matter |
| 9 | June 26, 2019 Boeing Form 8-K |
| 10 | July 18, 2019 Boeing News Release |
| 11 | July 24, 2019 Boeing Second-Quarter 2019 Performance Review Presentation |
| 12 | September 11, 2019 Boeing Morgan Stanley Laguna Conference Presentation |
| 13 | June 27, 2019 In Conversation With Boeing CEO Dennis Muilenburg |
| 14 | January 30, 2019 Fourth-Quarter 2018 Performance Review and 2019 Guidance Presentation |
| 15 | February 6, 2019 Cowen Aerospace/Defense & Industrials Conference Presentation |
| 16 | February 8, 2019 Boeing Form 10-K |

## PRELIMINARY STATEMENT

This is a securities fraud action that was filed after two tragic accidents in October 2018 and March 2019 involving the Boeing 737 MAX aircraft. While Plaintiffs' complaint reproduces media reports related to the 737 MAX and its development and certification process, it fails to plead the essential elements of a securities fraud claim—that Defendants intentionally made false statements regarding the 737 MAX that caused Plaintiffs' losses—under the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act (PSLRA). Another court in this district recently dismissed the majority of similar allegations in a similar class action. *In re The Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ("*Aircraft Sec. Litig*."). This Court should follow suit and dismiss the claims based on those allegations as well as the remaining claims.

The 737 MAX accidents in late 2018 and early 2019 have been the subject of intense media, congressional, and regulatory scrutiny. After the second accident, the FAA and foreign regulators issued orders grounding all 737 MAXs and stopping delivery of new aircraft. Thereafter, Boeing worked with regulatory authorities to certify the 737 MAX to return to service. That process took longer than expected, and Boeing revised its estimates of the plane's return to service on several occasions. The 737 MAX accidents and grounding orders had a significant impact on Boeing: it disclosed billions of dollars in lost revenue and profits and, as a result, its stock price declined.

Although the stock price decline is readily explained by these events, Plaintiffs parse the Company's public statements and try instead to attribute the decline to alleged deliberate misstatements. Plaintiffs devote hundreds of paragraphs to a broadside attack on the design and development of the 737 MAX, alleging Boeing made poor judgments about how pilots would react in emergencies and failed to disclose to pilots new software called the Maneuvering Characteristics Augmentation System, or "MCAS." But this is not a product liability case or a regulatory

investigation. Plaintiffs bring claims for securities fraud. They must plead that Defendants deceived purchasers of securities by intentionally or recklessly making false or misleading statements that caused their losses. Allegations that Boeing should have designed the 737 MAX differently, made different engineering judgments, or communicated with pilots differently may be relevant issues in other proceedings, but they do not plead a violation of the securities laws. The flaws in Plaintiffs' complaint are glaring, and each is an independent basis for dismissal.

First, Plaintiffs fail to allege an actionable false or misleading statement. Many of the alleged misstatements, such as those regarding the 737 MAX's safety, are the kinds of highly generalized statements that courts have consistently held cannot support a securities fraud claim. Others are statements of opinion, which are actionable only if the opinion did not fairly align with the information the speaker knew—something Plaintiffs do not allege. And still other alleged misstatements are not actionable because Plaintiffs mischaracterize what the speaker actually said, frequently disregarding other allegations that put the statements in context and demonstrate that they were neither false nor misleading.

Second, the complaint fails to allege that any Defendant acted with the requisite scienter. The complaint lacks any allegation connecting the supposed underlying events—which often relate to technical engineering judgments made at a working level during the 737 MAX's development—with the senior executives who made the subsequent statements Plaintiffs claim are untrue. The Seventh Circuit has repeatedly made clear that securities fraud plaintiffs cannot base their claims on the collective knowledge of all of the company's employees; rather, courts consider only the knowledge of those who made, prepared, or approved the alleged misstatement. Here, Plaintiffs plead no connection at all between allegations purportedly showing Boeing "knew" certain facts and those involved in making alleged misstatements. Plaintiffs thus do not plead with particularity

facts supporting a strong inference of scienter. At a minimum, any inference of scienter is less compelling than the opposing, commonsense inference: Defendants believed the 737 MAX was a safe airplane; that pilots had the necessary information and training to safely operate the airplane; and, after the grounding, estimated in good faith the progress and timing of the its return to service.

Finally, Plaintiffs fail to allege loss causation: that any "corrective disclosure" of the truth of any of the alleged misstatements caused an investment loss. Plaintiffs allege ten days on which information was publicly disclosed and Boeing's stock price declined. But they do not explain how information disclosed on those days corrected any alleged misstatements, and in each case, there is an obvious explanation for the decline other than the correction of alleged fraud.

For each of these reasons, Plaintiffs' complaint should be dismissed for failure to state a claim under the federal securities laws.

## FACTS ALLEGED IN THE COMPLAINT AND SUBJECT TO JUDICIAL NOTICE

### I. Boeing's 737 MAX Aircraft

In August 2011, Boeing announced the launch of the 737 MAX program. (Docket #17 "Compl." ¶ 78) Boeing spent almost six years, from 2011 through 2017, developing, testing, and certifying the 737 MAX. (*Id.* ¶¶ 78, 146)

Early tests showed that the 737 MAX's larger engines, and their position on the plane's wings, created a tendency for the plane's nose to pitch up under conditions not expected to occur in commercial air travel involving a high "angle of attack" and high speeds. (*Id.* ¶¶ 91, 93) To address this potential issue, Boeing added a software function, MCAS, to the aircraft's flight control systems to automatically adjust the plane's nose down in those circumstances. (*Id.* ¶ 96) In 2016, during flight testing of the 737 MAX, the plane "wasn't handling well when nearing stalls at low speeds." (*Id.* ¶ 131) As a result, Boeing modified the design of MCAS to adjust the nose of the plane down when it encountered high angles of attack at low speeds as well. (*Id.*)

On October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff. (*Id.* ¶ 157) During the flight, MCAS activated after receiving inaccurate information from one of the plane's angle of attack ("AOA") sensors, which incorrectly indicated the plane's nose was too high. (*Id.*) Plaintiffs allege that FAA officials "convened an emergency meeting" with Boeing after the accident. (*Id.* ¶ 167) On November 6, 2018, Boeing issued a bulletin to flight crews, explaining that "[t]he Indonesian National Transportation Safety Committee has indicated that Lion Air flight 610 experienced erroneous AOA data." (*Id.* ¶ 171) The bulletin continued:

> Boeing would like to call attention to an AOA failure condition that can occur during manual flight only.... In the event of erroneous AOA data, the pitch trim system can trim the stabilizer nose down in increments lasting up to 10 seconds. The nose down stabilizer trim movement can be stopped and reversed with the use of the electric stabilizer trim switches but may restart 5 seconds after the electric stabilizer trim switches are released. Repetitive cycles of uncommanded nose down stabilizer continue to occur unless the stabilizer trim system is deactivated through use of both STAB TRIM CUTOUT switches in accordance with the existing procedures in the Runaway Stabilizer [Non-Normal Checklist]. (Ex. 1)[1]

The bulletin then elaborated the instructions for pilots if the AOA failure condition occurred. (*Id.*)

The next day, November 7, 2018, the FAA issued an Emergency Airworthiness Directive requiring the guidance in Boeing's bulletin to be included in the 737 MAX flight manual. (Ex. 2)[2] Like the bulletin, the FAA Directive advised that "if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer." (*Id.* at 1) Prompted by "analysis performed by [Boeing]," the FAA determined this was a condition which, "if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude,

---

[1] While the Complaint cites portions of the November 6 Bulletin, it selectively omits others. (*See* Compl. ¶171) The full Bulletin may be considered by the Court. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

[2] The FAA issued that directive pursuant to its statutory rulemaking authority. Ex. 2 at 1; *see* 49 U.S.C. § 44701. The Court should take judicial notice of it and other official documents cited here. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (courts shall take judicial notice of information published by federal agencies).

significant altitude loss, and possible impact with terrain." (*Id.*) Consistent with Boeing's bulletin, the FAA directed pilots to use the Runaway Stabilizer procedure from the existing flight manual to address the condition and concluded that the airplane was safe to remain in service. (*Id.* at 3)

On November 10, 2018, Boeing sent a message to all 737 MAX operators explaining that "[a] pitch augmentation system function called 'Maneuvering Characteristics Augmentation System' (MCAS) is implemented on the 737-8, -9 (MAX) to enhance pitch characteristics with flaps UP and at elevated angles of attack." (Ex. 3 at 53) Plaintiffs acknowledge that Boeing had "disclosed" that the pitch trim system "was MCAS" by November 13. (Compl. ¶¶ 174–175)

On November 12, 2018, the *Seattle Times* published a story stating that pilots had not been told "about a key change to an automatic system that's been linked to the fatal crash of a Lion Air jet last month." (Ex. 4 at 2) The newspaper reported that this change was the addition of MCAS, which the article stated "automatically pushes the nose of the aircraft down when a bladelike sensor [the AOA sensor] that sticks out of the fuselage indicates that the nose is pitched up and putting the plane in danger of a stall." (*Id.* at 2) The same day that this article was published, Boeing's CEO, Dennis Muilenburg, was interviewed on Fox Business Channel, where he explained that "there are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions." (Compl. ¶ 177)

On March 10, 2019, Ethiopian Airlines Flight 302 crashed. (*Id.* ¶ 225) As with the Lion Air accident, MCAS activated during flight based on erroneous data from an AOA sensor and forced the nose of the plane down. (*Id.* ¶ 224) On March 11, Boeing announced that over the past several months it had been in the process of developing an MCAS software update. (*Id.* ¶ 230) On March 13, 2019, the FAA issued an order grounding the 737 MAX fleet. (*Id.* ¶ 232)

On April 5, 2019, Muilenburg noted that both accidents "were caused by a chain of events, with a common chain link being erroneous activation of the aircraft's MCAS function." (*Id.* ¶ 245) He indicated Boeing was taking steps to eliminate the risk of an erroneous MCAS activation. (*Id.*) Periodically between June and November 2019, Muilenburg disclosed estimates of the possible return to service for the 737 MAX. (*Id.* ¶¶ 264-77, 291) The earliest such estimate was the end of summer 2019. (*Id.*) As the certification process proceeded, however, the estimate was revised to early fourth quarter, and later revised again to the end of 2019. (*Id.*) Throughout this period, Boeing repeatedly cautioned that the timetable for certification and the plane's return to service was contingent on the regulatory process. (Ex. 5 at 50; Compl. ¶ 268)

## II. Boeing Enters Into a Deferred Prosecution Agreement

In January 2021, Boeing entered into a deferred prosecution agreement (DPA) with the Department of Justice acknowledging that two technical pilots failed to disclose certain information related to MCAS to the FAA's Aircraft Evaluation Group ("AEG"), the group within the FAA responsible for determining the required level of pilot training. (Ex. 6) The DPA stated that this misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management," and that "others in the Company disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." (*Id.* ¶ 4h)

## III. Plaintiffs' Purchases of Boeing Stock

Plaintiffs allege that Boeing, Muilenburg, and Boeing's CFO, Gregory Smith, made fraudulent public statements regarding the 737 MAX in violation of § 10(b) of the Securities Exchange Act of 1934. (Compl. ¶ 504) Plaintiffs allege that, in reliance on those alleged misstatements, they "purchased Boeing common stock on and/or after July 26, 2017, and held Boeing common stock through and after March 10, 2019." (*Id.* ¶ 46)

## ARGUMENT

To state a §10(b) claim, plaintiffs must allege: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm. v. Broudo*, 544 U.S. 336, 341 (2005). Federal Rule of Civil Procedure 9(b) and the PSLRA heighten the pleading standards for § 10(b) claims. *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007). Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The PSLRA requires a plaintiff to identify the alleged misstatements, plead with particularity why each was misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).[3]

Plaintiffs' claims fail for three independent reasons, each of which is sufficient to dismiss. First, Plaintiffs do not plead with particularity that Defendants made actionable misrepresentations. Second, Plaintiffs do not plead facts creating a strong inference that any misrepresentation was made with scienter. Third, Plaintiffs do not plead that any losses were caused by the correction of an alleged misstatement.

### I. Plaintiffs Do Not Plead A False Or Misleading Statement.

Plaintiffs allege Defendants made more than 60 misstatements between February 2018 and November 2019. The alleged misstatements concern: (1) the design of the 737 MAX; (2) the safety of the airplane; (3) information provided to pilots; (4) progress toward the plane's return to service; (5) Boeing's financial and operational performance; and (6) SEC filing certifications.

[3] Plaintiffs allege they are entitled to a presumption of reliance under the fraud-on-the-market doctrine and *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) (Compl. ¶ 433, 37). But "the *Affiliated Ute* presumption is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig*., 2 F.4th 1199, 1204 (9th Cir. 2021). This case is based primarily on alleged affirmative misstatements, not omissions. The *Affiliated Ute* presumption thus does not apply. *See also Rowe v. Maremont Corp.*, 850 F.2d 1226, 1233 (7th Cir. 1988) (plaintiffs could not rely on *Affiliated Ute* because "this case involves misstatements and half-truths, and not 'pure omissions'").

Each category of alleged misstatements suffers from one or more dispositive defects.

*First*, Plaintiffs simply mischaracterize many of the statements they allege are false or misleading. *See, e.g., infra* at 11, 13, 15, 19.[4]

*Second*, Plaintiffs do not plead with particularity facts showing the alleged misstatements were actually false or misleading. A statement is false if literally inaccurate, and misleading if it "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps.*, 280 F.3d 997, 1006 (9th Cir. 2002). A plaintiff cannot plead falsity by omission, as Plaintiffs repeatedly do, as "mere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). *See, e.g., infra* at 10, 14, 15, 18, 20, 21, 22, 24, 26.

*Third*, many of the alleged misstatements are puffery, "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *In re Midway Games, Inc., Sec. Litig.*, 332 F. Supp. 2d 1152, 1164 (N.D. Ill. 2004); *see also Aircraft Sec. Litig.*, 2022 WL 3595058, at *13 (dismissing "vague, aspirational" claims as nonactionable puffery). Such statements cannot support a § 10(b) claim particularly where, as here, they "lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe v. Bridgestone*, 399 F.3d 651, 671 (6th Cir. 2005). Moreover, this rule has particular force in fraud-on-the-market cases like this one, where the market is expected to discount statements that lack sufficient specificity to alter the total mix of available information. *Id.* at 676; *In re Midway Games*, 332 F. Supp. 2d at 1164. Under these standards, statements like "the 737 MAX is safe" and "safety is a core value for us at Boeing" are not actionable. *Infra* at 16-17.

[4] The appendix to the brief sets out each alleged misstatement in chronological order, which category it falls into, and where within Part I (regarding Plaintiffs' failure to allege an actionable misstatement) the statement is addressed.

*Fourth*, many of the alleged misstatements are opinions. In *Omnicare v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), the Supreme Court held that statements of opinion are analyzed differently than statements of fact—and it "is no small task" to base a claim on a statement of opinion. *Id.* at 194. Opinions can form the basis of a securities fraud claim only if a plaintiff pleads with particularity that the speaker did not actually believe the opinion professed or the opinion did not "fairly align" with the information the speaker had at the time. *Id.* at 185-89. If the latter, "the investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. The statements challenged here fall short of this standard. *Infra* at 12-13, 17, 18, 20, 22, 24, 25.

*Fifth*, several of the alleged misstatements are protected by the statutory safe harbor for forward-looking statements. 15 U.S.C. § 78u-5. Forward-looking statements include statements "of the plans and objectives of management for future operations" and statements "of future economic performance." 15 U.S.C. § 78u-5(i)(1)(B) & (C). The safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if either (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," *id.* § 78u-5(c)(1)(A)(i); or (2) "the plaintiff fails to prove" that the officer who approved the statement had "actual knowledge ... that the statement was false or misleading," *id.* § 78u-5(c)(l)(B)(ii) (emphasis added). *Infra* at 22-24, 25.

Under these principles, Plaintiffs do not plead the first element of their § 10(b) claim—an alleged misstatement.

### A. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About The Design Of The 737 MAX Were False Or Misleading.

Plaintiffs fail to plead with particularity facts establishing that seven statements regarding Boeing's design of the 737 MAX were false or misleading.

**February 16, 2018**: Plaintiffs allege Defendants misled investors by stating "the FAA certification affirms that the airplane's handling, systems and overall performance all comply with required aviation regulations," and that the airplane was designed to offer "the highest efficiency, reliability and passenger comfort in the single-aisle market." (Compl. ¶ 320) Plaintiffs claim it was "misleading for Defendants to tout the certification of the 737 MAX when, in fact, they had defrauded the FAA into certifying the 737 MAX based on incorrect information." (*Id.*) But Defendants' statements are not false and do not create a misleading impression. The FAA *did* certify the 737 MAX, finding it in compliance with aviation regulations, and the airplane was designed with goals of efficiency, reliability, and comfort. Plaintiffs do not and cannot allege otherwise. And, to the extent Plaintiffs are relying on the DPA, they are simply wrong, as that document makes clear that Boeing *did* disclose the full "operational scope of MCAS to [the] FAA personnel responsible for determining whether the design of the 737 MAX met U.S. federal airworthiness standards." (Ex. 6 ¶ 4h)

**March 16, 2018**: Plaintiffs make similar allegations regarding Defendants' statements that "[e]verything we saw during today's flight shows that the MAX 7 is performing exactly as designed," and that it was designed to offer "the highest efficiency, reliability and passenger comfort in the single-aisle market." (Compl. ¶¶ 320-321) But again, Plaintiffs do not and cannot allege that the March 16 test flight *did not* show the plane was functioning as designed, or that the 737 MAX *was not* designed to offer efficiency, reliability, and passenger comfort.

**November 13, 2018**: Plaintiffs claim that Muilenburg "misrepresented that it was pilot error – not MCAS – that caused the Lion Air crash." (*Id.* ¶ 329) This allegation mischaracterizes what Muilenburg actually said; Muilenburg's statement did not say anything about pilot error at all. Instead, in response to the interviewer's question whether "there are [sic] new system that wasn't disclosed to the pilots," Muilenburg responded:

> No. There are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions and those systems operate properly and again in certain failure modes if there is an inaccurate angle of attack sensor feeding information to the airplane there is a procedure to handle that. . . . We're going to make sure that we're providing all the information necessary and appropriate training, and go back to the core value here . . . The airplane is safe. We know how to fly it safely. And we're very confident in that. . . .

(*Id.*) This statement was plainly *not* a representation that pilot error caused the Lion Air crash.

**December 7, 2018**: On December 7, 2018, Muilenburg said in an interview that "we purposely designed the airplane to behave in the same way" as prior 737 models, and that "even though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot." (*Id.* ¶ 339) Plaintiffs claim it was "materially misleading for Defendants to represent that the 737 MAX behaved in the same way as its prior commercial airplanes." (*Id.* ¶ 340) Plaintiffs again ignore what Muilenburg actually said: that Boeing "designed" the 737 MAX to behave like prior models "in the hands of the pilot." (*Id.* ¶ 339) And Plaintiffs disregard that Muilenburg also explained that Boeing designed the 737 MAX that way so that there could be "seamless training and introduction for our customers." (*Id.*) Moreover, as Plaintiffs acknowledge, even before this statement, Boeing had disclosed that MCAS was new, had been linked to the Lion Air accident, and had not behaved as intended. *Supra* at 4-7. As the court in the *Aircraft Sec. Litig* case explained, "the fact that there were differences between the 737 MAX and older models was public knowledge by then—the existence of MCAS had been public information since November 13, 2018." 2022 WL 3595058, at *8.

**February 6, 2019:** Plaintiffs allege Defendant Smith misled investors by stating that Boeing had not seen "anything that's been outside the norm of what we've normally been through in our certification of our other aircraft." (Compl. ¶ 341) This is a non-actionable statement of opinion, and Plaintiffs have not alleged that Defendant Smith did not believe that the certification process had been similar to Boeing's past experiences.

**March 11, 2019**: The day after the second accident, Boeing issued a press release that included the statement "MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope." (Compl. ¶ 343) Plaintiffs claim it was "materially misleading for Defendants to state that MCAS does not control the airplane during normal flight when, in fact, [MCAS] could operate during nearly the entire speed range for the 737 MAX." (*Id.* ¶ 345) But this ignores the entirety of the press release, which *expressly acknowledged* the potential for erroneous activation of MCAS at times other than those for which it was designed. (*Id.* ¶ 343 (the operations manual "already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor")) Boeing's November 6 bulletin and the FAA's Directive had already made the same disclosure. *Supra* at 4-6. Plaintiffs' focus on whether Boeing considered the operation of MCAS to be limited to the "non-normal part of the operating envelope," accordingly is an immaterial distinction.[5] The statement did not create a misleading impression because the key information—that MCAS could be activated erroneously during a normal commercial flight—was clearly publicly known.

[5] The *Aircraft Sec. Litig*. opinion similarly focused on this "normal flight" language without addressing the release's acknowledgment of the possibility of an erroneous activation of MCAS. 2022 WL 3595058, at *16-17. Respectfully, this was error.

**April 25, 2019**: During Boeing's April 25, 2019 earnings call—after the FAA's order grounding the 737 MAX—Muilenburg was asked, "Is there any way you can give us a feeling for how did this slip through the engineering organization?" (Compl. ¶ 361) In context, Muilenburg plainly (and correctly) understood the question to be about MCAS, and he responded:

> [T]here is no technical slip or gap here, right? Again, as I mentioned, we know that both accidents were a series of events, and that is very common to all accidents that we've seen in history. And what we know is that in this case, there was erroneous angle of attack information that came into the airplane from multiple causes. We know [that at] some point during the flight, that activated the MCAS control laws, and we know that ultimately there were actions or actions not taken that contributed to the final outcome . . . .
>
> I can tell you with confidence that we understand our airplane. We understand how the design was accomplished, how the certification was accomplished and remain fully confident in the product that we put in the field. But we also know there are areas where we can improve, and that is the source of the software update. But there was no surprise or gap or unknown here or something that somehow slipped through a certification process. Quite the opposite. We know exactly how the airplane was designed. We know exactly how it was certified. We have taken the time to understand that.

(*Id.*) Plaintiffs assert it was materially misleading for Muilenburg "to state that nothing out of the ordinary happened in connection with the certification of the 737 MAX when, in fact, they had defrauded the FAA into certifying the 737 MAX based on incorrect information." (*Id.* ¶ 363)

Yet again, Plaintiffs mischaracterize Muilenburg's statements. Muilenburg did not say that "nothing out of the ordinary happened in connection with the certification of the 737 MAX," as Plaintiffs suggest. Rather, he said that Boeing understood the risks of erroneous MCAS activation and believed it could be managed by pilots if it occurred. Plaintiffs may criticize this engineering judgment, but that misses Muilenburg's point that there was no technical "slip" or "gap" in the design process. Moreover, whether there was a "slip or gap" is a clear matter of opinion in this context, and Plaintiffs do not allege facts suggesting Muilenburg did not hold the opinion offered. Finally, to the extent this allegation relies on the DPA, that reliance is misplaced. Again, the DPA

makes clear that Boeing did *not* mislead the FAA personnel responsible for determining whether the design of the 737 MAX complied with federal airworthiness standards. (Ex. 6 ¶ 4h)[6]

**April 29, 2019**: At a press conference, Muilenburg stated "[w]e have gone back and confirmed again . . . that we followed exactly the steps in our design and certification processes that consistently produce safe airplanes. It was designed per our standards. It was certified per our standards." (Compl. ¶¶ 256, 364) Plaintiffs allege it was misleading for Muilenburg to represent that "nothing out of the ordinary happened in connection with the certification of the 737 MAX." (*Id.* ¶¶ 363, 365) Plaintiffs again stray far afield of the actual statement. Muilenburg did not say, as alleged in the Complaint, that "nothing out of the ordinary happened in connection with the certification of the 737 MAX." (*Id.* ¶ 365) Rather, he said that Boeing confirmed it had followed the steps in its design and certification processes. Plaintiffs have not alleged that this statement was untrue and, as noted above, to the extent they are relying on the DPA, that reliance is incorrect.

### B. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About The Safety Of The 737 MAX Were False Or Misleading.

The largest category of alleged misstatements concerns Boeing's belief in the safety of the 737 MAX. (Compl. ¶¶ 327, 328, 329, 333, 334, 335, 338, 343, 344, 346, 348, 349, 351, 353, 354) On November 13, 2018, Muilenburg said "Safety remains our top priority," and "the 737 MAX is safe and safety is a core value for us at Boeing." (*Id.* ¶¶ 327-328) And on November 27, 2018, Boeing provided "assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." (*Id.* ¶ 335) These and other statements in this category are not actionable for three reasons.

[6] The court in *Aircraft Sec. Litig.* recognized Muilenburg's statement was "technically correct," but held nevertheless that Muilenburg's "failure to disclose that Boeing pulled the wool over FAA AEG's eyes ma[de] the statement materially false and misleading." 2022 WL 3595058, at *22. Respectfully, the court erred in doing so. The colloquy between the analyst and Muilenburg makes clear that both were referencing the design of MCAS, and the certification of that design as airworthy, not the separate subject of pilot training. (Compl. ¶¶ 252-253.)

**Not False Or Misleading**: Plaintiffs allege that statements that the 737 MAX was safe were false because of alleged deficiencies in MCAS's development, certification, and operation. But Plaintiffs' allegations mischaracterize Boeing's statements. None of the challenged statements misrepresented MCAS's operation or even addressed the circumstances of its development and certification. To the contrary, they reflected the Defendants' (and the FAA's) belief at the time that the airplane was safe notwithstanding the possibility of an erroneous MCAS activation, particularly after Boeing's bulletin to operators and the FAA's airworthiness directive reminded pilots of the existing procedures for addressing the resulting runaway stabilizer flight condition.

Moreover, that it was possible for MCAS to activate erroneously was well known to the public when the safety statements were made. *See supra* at 4-6. As this context makes clear, none of these statements denied the possibility of erroneous MCAS activation; rather, they reflected Boeing's belief that the airplane was safe notwithstanding that possibility. Thus, in his November 13, 2018 interview, Muilenburg followed his statement that "the 737 MAX is safe" by acknowledging "there were some indications of an inaccurate angle of attack signal that was being sent to the [Lion Air] airplane and of course our airplane has the ability to handle that with procedures in place [a]nd we've already issued a couple of additional bulletins to our operators and pilots [ ] that point them back to existing flight procedures to handle this kind of situation." (Compl. ¶ 328) Boeing's November 27, 2018 press release, which provided "assurance that the 737 MAX is as safe as any airplane that has ever flown the skies" (*id.* ¶ 335), likewise recognized that the Lion Air flight had experienced "automatic nose down trim" and called out the "runaway stabilizer non-normal checklist" as the procedure "prescribed by the 737 MAX Flight Crew Operations Manual, and reaffirmed in [the bulletin and FAA directive], as the appropriate procedure to address unintended horizontal stabilizer movement, regardless of source." (Ex. 7)

Given this context, no investor could have understood Defendants to be opining that MCAS could not erroneously activate as it had on the Lion Air flight. Instead, those statements reflected Defendants' continued belief in the plane's safety at the time, after Boeing and the FAA had issued the bulletin and airworthiness directive providing additional guidance to pilots.

**Vague Assertions of Safety Are Not Actionable**: The law is clear that vague assurances of safety by product manufacturers are not actionable because reasonable investors do not consider them important in making investment decisions. In fact, the *Aircraft Sec. Litig* court dismissed claims based on the same statements pled here, explaining that these "vague affirmations of safety" were "immaterial puffery" as a matter of law. *Aircraft Sec. Litig.*, 2022 WL 3595058, at *9. Similarly, in *City of Monroe*, Bridgestone had made many public statements about its ATX tires after a series of accidents, stating it had "no reason to believe there is anything wrong with [the tires]," it had "full confidence" in the tires, and "rigorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality." 399 F.3d at 671. After a recall, shareholders claimed the statements were fraudulent because Bridgestone possessed directly contrary information when the statements were made. *Id.* The Sixth Circuit held the statements nonactionable, and "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to find them important to the total mix of information available." *Id.*

Defendants' statements about the safety of the 737 MAX are not actionable for the same reason. Like Bridgestone's statements that "rigorous testing" helped "ensure reliable quality" and that it had "full confidence" in its tires, Boeing's statements that "the 737 MAX is as safe as any airplane that has ever flown the skies" and "Boeing continues to have full confidence in the safety of the 737 MAX" (Compl. ¶¶ 335, 346, 351) were "loosely optimistic statements" that did not

include any objective measure investors could use to assess the assertion's accuracy. They are not actionable. *City of Monroe*, 399 F.3d at 671.

**Statements Of Opinion**: Courts also consistently treat product safety statements like those Plaintiffs challenge here as statements of opinion—even when the products are involved in accidents or recalled. For that reason as well, the *Aircraft Sec. Litig* court dismissed claims based upon these same statements as "nonactionable" statements of opinion. *Aircraft Sec. Litig.*, 2022 WL 3595058, at *9, and the Court should do the same here.

Treating vague affirmations of product safety as nonactionable statements of opinion is well-grounded in precedent. For example, in *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004), the Ford Explorer was involved in numerous accidents while equipped with a particular type of tire. Investors alleged that Ford misrepresented the safety of the SUV when stating that the "Ford Explorer is an extremely safe and thoroughly engineered vehicle." *Id.* at 571. Despite a subsequent recall, the Sixth Circuit held those allegations insufficient because the statement was an opinion and the plaintiffs offered "no basis" to conclude the defendants "did not believe the opinions expressed." *Id.* Similarly, *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530 (M.D.N.C. 2018), concerned a pharmaceutical that had been subject to Phase 3 clinical trials. *Id.* at 556. The defendants made statements based on the test results, touting the "safety" of the drug and their belief that it was "incredibly safe." *Id.* Even in this circumstance, where the product had been subject to objective testing, the court held the statements to be opinions "because 'reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions.'" *Id.*; *see also Gillis v. QRX Pharma*, 197 F. Supp. 3d 557, 597 (S.D.N.Y. 2016) (similar); *In re Yum! Brands Sec. Litig.*, 73 F. Supp. 3d 846, 862-64 (W.D. Ky. 2014) (same).

Here, Plaintiffs do not plead with particularity facts showing that Muilenburg or anyone at Boeing who prepared or approved any safety-related statement did not in fact hold the belief stated, or that the statements did not fairly align with information in Muilenburg's possession at the time. Nor do Plaintiffs identify any "particular (and material) facts going to the basis for" each opinion "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. They thus do not state a claim.[7]

### C. Plaintiffs Do Not Plead With Particularity That Defendants' Statements About Information Provided To Pilots Were False Or Misleading.

Plaintiffs allege that Defendants' statements about information provided to 737 MAX pilots were false and misleading. Specifically, they challenge statements regarding (1) information in the 737 MAX flight manuals, and (2) the 737 MAX's flight deck display.

**Flight Manuals**: On November 6, 2018, shortly after the first accident, Boeing issued the bulletin "direct[ing] flight crews to existing procedures to address th[e] condition" experienced in the Lion Air accident. (Compl. ¶¶ 323, 324) On November 13, 2018, Boeing's CEO responded to an interview question by explaining that information for pilots about what steps to take in a situation similar to the Lion Air accident flight is "part of the training manual. It's an existing procedure." (*Id.* ¶ 330) He made a similar statement the following week. (*Id.* ¶¶ 333-334) And Boeing press releases included similar statements later that month and in March 2019. (*Id.* ¶¶ 336, 343)

Plaintiffs do not allege facts undermining the truth of these statements directing pilots or otherwise referring to existing procedures. Nor could they. The portions of the November 6, 2018

[7] Finally, a number of the safety statements challenged by Plaintiffs were issued *after* the second accident and *after* regulators had grounded the 737 MAX fleet. (Compl. ¶¶ 348 (March 17, 2019), 349 (March 18, 2019), 351 (March 22, 2019), and 354 (April 5, 2019)) These general statements regarding the safety of the MAX *after* the grounding could not have been misleading to investors and thus cannot be actionable.

bulletin that Plaintiffs quote direct pilots to an existing procedure, the "Runaway Stabilizer NNC," in the flight manual. (Compl. ¶ 171) The day after Boeing issued the bulletin, the FAA issued the airworthiness directive referring pilots to that very same procedure. *Supra* at 5-6. Plaintiffs do not and cannot credibly allege that Boeing and the FAA highlighted a procedure that did not exist. Nor can they credibly allege that the procedure was not an existing procedure to address the flight conditions that occurred on the Lion Air flight, based on Defendants' understanding at the time. Instead, Plaintiffs claim that it was "materially misleading for Defendants to direct flight crews to existing procedures when those procedures were woefully insufficient to address MCAS." (Compl. ¶ 337) But Plaintiffs fail to allege any facts at all to support that allegation. Moreover, many of these challenged statements (*Id.* ¶¶ 343, 351, 366, 367, 373) were made *after* Boeing announced it was developing an MCAS software update to address the potential for an erroneous activation due to erroneous AOA data. (*Id.* ¶ 230) That context is irreconcilable with any claim that Defendants' statements regarding "existing procedures" were misleading.

**Flight Deck Display**: Plaintiffs also allege Boeing made misrepresentations about the "AOA Disagree Alert"—a cockpit indicator on the flight deck display that alerts when the plane's two AOA sensors provide conflicting data about the angle of attack. On April 28, 2019, Southwest Airlines indicated it had not known until after the Lion Air accident that the AOA Disagree Alert was not operative on most 737 MAXs. (Compl. ¶ 257) In response, Boeing issued statements indicating its belief that the alert was not needed to fly the 737 MAX safely. (*Id.* ¶¶ 366, 367, 373) Plaintiffs allege it was "materially misleading for Defendants to represent that the AOA Disagree Alert was not a safety feature and its malfunction did not adversely impact the safety or operation of the 737 MAX when they had previously said the opposite." (*Id.* ¶ 368) Again, Plaintiffs mischaracterize what was actually said. Boeing had not "previously said the opposite." Plaintiffs

do not and cannot allege that Boeing had said earlier that the AOA Disagree Alert was needed to fly the 737 MAX safely. Instead, as Plaintiffs allege, Boeing's certification documents described the AOA Disagree Alert as a "standard, non-optional feature"—not as a "safety feature." (Compl. ¶ 118) Boeing's subsequent statements that the AOA Disagree Alert feature was not needed to safely operate the airplane were thus fully consistent with its earlier statements.[8]

Boeing's statements that the AOA Disagree Alert was not needed to safely fly the 737 MAX were also clear statements of opinion, reflecting Boeing's engineering judgments. Plaintiffs' allegations do not satisfy *Omnicare*'s requirements to plead that someone who prepared or approved the statements did not actually believe the opinion or that the opinion did not "fairly align" with the information in their possession. *Supra* at 9. Notably, the FAA Administrator at the time had the same opinion as Boeing. (Ex. 8 at 11) That others may disagree with Boeing's (and the FAA's) opinion does not render the opinion false or misleading.

Nor do Plaintiffs plead facts demonstrating these alleged misstatements were material to investors. By April 29, 2019, when the first statement was made, the MAX had been grounded for six weeks, meaning that it would not fly again until changes (including updated software addressing the AOA Disagree Alert function) were made. Whether Boeing considered the alert necessary to safely operate the plane was thus immaterial to any reasonable investor's purchase decision at the time of the challenged statements. *See TSC Indus. v. Northway*, 426 U.S. 438, 449

---

[8] The *Aircraft Sec. Litig*. court found statements regarding the AOA Disagree alert to be false because a "feature that may have prevented the two plane crashes, even if not classified under regulatory definitions as a safety feature, is obviously important for the airplane's safety and would be understood by investors as such," but dismissed the claim on scienter grounds. 2022 WL 3595058, at *20. Respectfully, the Court erred in finding the statement to be false. Boeing never commented one way or the other on whether the presence of the AOA Disagree alert on the accident flights might have prevented the crashes. Rather, Boeing said only that pilots could safely operate the airplane without the alert. Plaintiffs do not allege that *this* statement was false. In other words, they do not and cannot allege that pilots could *not* safely fly the 737 MAX without the AOA Disagree alert, or that Boeing did not believe as much.

(1976) (a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important"). Plaintiffs do not and cannot plausibly plead the contrary.

### D. Plaintiffs Do Not Plead With Particularity That Statements Regarding The 737 MAX's Return To Service Were False Or Misleading.

Plaintiffs also allege Defendants made false or misleading statements regarding progress toward the 737 MAX's return to service and projections of when that might occur. For instance, Muilenburg stated on April 11, 2019 that, since the Lion Air crash, "our top engineers and technical experts have been working tirelessly in collaboration with the [FAA] and our customers to finalize and implement a software update that will ensure accidents like these never happen again." (Compl. ¶ 356) On April 24, 2019, Boeing stated in an SEC Form 10-Q that Boeing was "making steady progress on the path to final certification for a software update for the 737 MAX." (*Id.* ¶ 359; *see also id.* ¶ 360) Regarding the estimated timing of the return to service, on June 26, 2019, Muilenburg said he was "still looking at" the end of summer 2019. (*Id.* ¶ 375) On September 11, 2019, Muilenburg updated that estimate, stating that Boeing was "targeting early fourth quarter for a return to service of the 737 MAX." (*Id.* ¶¶ 384, 385; *see also id.* ¶¶ 380–382) Two months later, on November 11, 2019, Muilenburg stated: "it is possible that the resumption of MAX deliveries to airline customers could begin in December." (*Id.* ¶ 387)

Neither Muilenburg's general statements of progress in the regulatory process nor the estimates of when the MAX would return to service are actionable misstatements.

**Statements Of Progress**: Plaintiffs do not allege facts demonstrating that the statements about "progress" were false. (Compl. ¶¶ 348-49, 354, 356, 358, 359, 360, 362, 364, 369-72, 377, 379) Those statements indicated Boeing was still actively working on obtaining certification of the updates for the 737 MAX. Plaintiffs allege it was "materially misleading for Defendants to state that Boeing was making steady progress towards re-certification and knew how to fix MCAS

when the process was far from over." (*Id.* ¶ 363) But there is no contradiction inherent in making steady progress, even on a process that is "far from over." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *23 (holding with respect to the same statements that "[t]he plaintiffs allege that many of these statements touting ongoing 'progress' are actionable, but they do not allege that there was no progress. However halting and insufficient that progress may have been, the investors have not plead that vague assertions of 'progress' are false statements").

The Eleventh Circuit's decision in *Carvelli v. Ocwen Financial Corp.*, 934 F.3d 1307 (11th Cir. 2019), is also on point. In *Carvelli*, a mortgage finance company entered into a consent order with regulators that required improvements to internal testing to be verified by an outside monitor. *Id.* at 1314. Later, the company said it "felt 'good about the progress' it had made towards its 'national mortgage settlement compliance.'" *Id.* at 1321. The court held the statement immaterial because the defendant "never said it was in compliance with regulations but rather made vague statements about its efforts towards compliance." *Id.* at 1322. Thus, the court concluded, the statement "can't be classified as [a] material misrepresentation[] because no reasonable investor would have considered [it] in making investment decisions." *Id.*; *see Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws."). The same is true here.

**Return to Service Estimates**: Boeing's estimates of when the 737 MAX might return to service are not actionable because they are forward-looking statements and statements of opinion.

As an initial matter, the estimates fall plainly within the statutory safe harbor for forward-looking statements. They reflect "plans and objectives of management for future operations" and estimates of "future economic performance." 15 U.S.C. § 78u-5(i)(l)(B), (C). For that reason, the *Aircraft Sec. Litig* court concluded "that the June 26, 2019 statement that Boeing is "targeting ...

summer 2019" for the MAX's return to service is best understood as a "statement of the plans and objectives of management for future operation" falling within the safe harbor. 2022 WL 3595058, at *24.[9] So too here.

These statements were also accompanied by meaningful cautionary language explaining why any actual return to service date could differ from the estimate. Boeing's first quarter 2019 SEC Form 10-Q, filed on April 24, 2019, cautioned that the actual return to service could vary from Boeing's estimates based on the "conditions surrounding return to service of the 737 MAX fleet"—that is, conditions the FAA and other regulators set for certifying the updates to the plane. (Ex. 5 at 30) As part of this return to service process, the FAA asked Boeing to address a specific flight condition; Boeing promptly revealed that request in its June 26, 2019 SEC Form 8-K and cautioned that it "will not offer the 737 MAX for certification by the FAA until we have satisfied all requirements for certification of the MAX and its safe return to service." (Ex. 9 at 2) Boeing reiterated this statement in other disclosures, including a July 18, 2019 news release, a presentation accompanying its July 24, 2019 earnings call, and a written warning accompanying a September 11, 2019 investor conference presentation. (Ex. 10 at 3; Ex. 11 at 12; Ex. 12 at 2) In each, Boeing warned that it did not control the conditions regulators might set for the 737 MAX's return to service. Moreover, the challenged statements themselves used language that made clear that they were estimates subject to change. (*E.g.,* Compl. ¶¶ 375 ("looking at" end of summer), 384 ("targeting" early fourth quarter); 387 ("possible" deliveries could resume))[10]

---

[9] The *Aircraft Sec. Litig.* court nevertheless found that these statements were actionable, but that finding was based on that court's misreading of the allegations related to a conversation between the Boeing CEO and the Acting Administrator of the FAA, as addressed below.

[10] Boeing's estimates were made in the wake of these cautionary statements and must be treated as subject to them. *See, e.g., Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2021 WL 5083756, at *6 (N.D. Ill. Nov. 2, 2021), *on reconsideration in part*, 2022 WL 614925 (N.D. Ill. Mar. 2, 2022) (relying on cautionary language that described the "important" risk factors); *St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc,* 2011 WL 814932, at *9-10 (N.D. Ill. Feb. 28, 2011) (relying on cautionary statements in granting motion to dismiss in securities case);

To overcome these disclosures, Plaintiffs allege only that, sometime between June 17 and 23, 2019, the Acting Administrator of the FAA asked Muilenburg to "slow down [] talk of progress ... [to] giv[e] the FAA space to exercise scrutiny." (Compl. ¶ 264) Although the court in *Aircraft Sec. Litig.*, 2022 WL 3595058, at *23, found that this interaction caused the statements at issue to be actionable, respectfully, the court erred in doing so. The Acting Administrator asked only that Muilenburg "slow down" talk of progress and nothing about his request contradicts Muilenburg's statement, on June 26, 2019, that Boeing was "looking at" the end of summer—three months later. Muilenburg did not represent that the FAA had approved that estimate; in fact, he qualified it by saying "I'm not going to give you a specific timeline." (Ex. 13 at 6) Nor do Plaintiffs allege the Acting Administrator provided information contradicting Muilenburg's statement of the general timeframe Boeing was "looking at," let alone information that undermined Muilenburg's *opinion* about the aircraft's expected return to service. If anything, Plaintiffs do the opposite; they plead that Boeing's announcement *the same day* of a "potential risk" Boeing needed to mitigate "before the FAA would recertify the 737 MAX" was a *corrective* disclosure. (Compl. ¶ 490) Plaintiffs cannot have it both ways. None of Plaintiffs' allegations makes Muilenburg's estimates actionable.

### E. Plaintiffs Do Not Plead With Particularity That Any Statements About Boeing's Financial And Operational Performance Were False Or Misleading.

Plaintiffs attack statements regarding Boeing's financial and operational performance, made in the period between the first and second accidents. This category includes statements of historical fact, such as a January 30, 2019 statement that "the 737 program added 13 new customers during the year, and the MAX family surpassed 5,000 net orders in December," and lists of pending

---

*Desai v. Gen. Growth Props.*, 654 F. Supp. 2d 836, 844 (N.D. Ill. 2009) (cautionary statements in SEC filings were "absorbed into the market" in case brought under the fraud-on-the-market theory).

orders and planned production increases. (*Id.* ¶¶ 389-98) Plaintiffs claim it "was materially misleading for Defendants to disclose a production rate and backlog for the 737 MAX when its sales and production could no longer be reasonably relied on in light of the safety problems that rendered the airplane fundamentally unsafe." (*Id.* ¶ 395) None of these statements is actionable.

First, "[a]ccurate statements of historical fact, such as past financial results, are not actionable." *Anderson v. Abbott Labs.*, 140 F. Supp. 2d 894, 908 (N.D. Ill. 2001); *Ford*, 381 F.3d at 570 (same). While Plaintiffs fault Boeing for not providing additional disclosures qualifying its results, "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *Alizadeh v. Tellabs*, 2015 WL 557249, *11 (N.D. Ill. Feb. 9, 2015). The Court should dismiss all claims based on accurate statements of financial performance, just as the *Aircraft Sec. Litig* court did. *See Aircraft Sec. Litig.*, 2022 WL 3595058, at *12.

Second, the remaining statements in this category are forward-looking estimates of production and sales figures independently protected by both prongs of the PSLRA safe harbor. The statements were all accompanied by meaningful cautionary language. On January 30, 2019, concurrently with the first of the statements (Compl. ¶ 389), Boeing enumerated 22 risks related to its estimates, including "aircraft being subject to stringent performance and reliability standards" and "potential adverse developments in new or pending litigation and/or government investigations." (Ex. 14 at 13) The same enumeration of risks accompanied subsequent estimates. (Ex. 15 at 2; Ex. 16 at 5-14) This cautionary language was meaningful and warned of the types of risks that actually materialized. The court in the *Aircraft Sec. Litig.* action correctly rejected claims based on these statements for this reason. 2022 WL 3595058, at *12.

Third, the statements supporting the forward-looking estimates are opinions immaterial as a matter of law; Plaintiffs have not satisfied *Omnicare* for these statements. (Compl. ¶ 389 ("Our

customers continue to recognize the superior value proposition of our more fuel-efficient airplanes as reflected in the strong intake of new orders we saw last year."); ¶ 392 ("But in terms of the MAX, the demand signals in the marketplace continue to be very strong.")); *supra* at 9.

### F. Plaintiffs Do Not Plead With Particularity That Defendants' Certifications As To Compliance With SEC Filing Requirements Were False.

Plaintiffs also assert Defendants made false certifications in SEC filings regarding Boeing's internal disclosure controls and procedures. (Compl. ¶¶ 401-406). But each "statement" on its face expresses the speaker's *belief* that Boeing complied with the relevant requirements. (*Id.* ¶ 403 ("Based on my knowledge . . .")) Plaintiffs do not and cannot allege the speaker did not hold that belief. Further, Plaintiffs have not made any allegations at all regarding the adequacy of Boeing's disclosure controls and procedures. Accordingly, these claims are baseless.

## II. Plaintiffs Do Not Plead Facts Giving Rise To A "Strong Inference" Of Scienter.

The complaint also should be dismissed because Plaintiffs fail to adequately plead scienter. Scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l*, 495 F.3d 753, 756 (7th Cir. 2007). To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u- 4(b)(2)(A). The required "strong inference" must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309; *Makor*, 513 F.3d at 705. And a plaintiff must satisfy that standard with respect to each defendant and each alleged misstatement. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). Plaintiffs do not satisfy these requirements.

### A. Plaintiffs Do Not Plead Facts Giving Rise To A Cogent Inference Of Scienter.

Plaintiffs' allegations fail at the first step of the scienter analysis: they do not give rise to a cogent inference that any Defendant acted with deceptive intent for any alleged misstatement.

#### 1. Plaintiffs Do Not Adequately Plead That Boeing Acted With Scienter.

Most of Plaintiffs' scienter allegations are not tied to an individual and, as such, fail as a matter of law. Plaintiffs allege throughout the complaint that Defendants "knew" things by grouping Boeing and the individual Defendants together, without distinction. (Compl. ¶¶ 410–16, 419-20, 427–31) But "[i]ntent to deceive is not a corporate attribute." *Makor*, 513 F.3d at 707. "To establish corporate liability for a violation of Rule 10b-5 requires look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." *Id*. "Since the Plaintiffs have sued Muilenburg and Smith, they must plead what those individuals knew or should have known—not what others at the company knew about the truth or falsity of the statement at issue." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *9.

Nor can Plaintiffs solve this problem by referring to historical events related to the 737 MAX. The "admissions" about such matters in the DPA (Compl. ¶¶ 411, 430), for example, are not tied to Muilenburg's or Smith's knowledge and thus cannot demonstrate scienter here. Plaintiffs' vague allegations regarding Boeing's "no admit, no deny" settlement with the SEC (*id.* ¶ 422) are insufficient for the same reason, and also because the settled charges there, for alleged violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, do not even require a showing of scienter. *S.E.C. v. Kelly*, 545 F. Supp. 2d 808, 813 (N.D. Ill. 2008) ("Scienter is not required in order to establish violations of sections 17(a)(2) and 17(a)(3) of the Securities Act.").

To the extent Plaintiffs do reference Muilenburg or Smith specifically, they have not alleged with particularity facts supporting a strong inference that either made any statement alleged with scienter. As such, Plaintiffs necessarily have not pled Boeing's scienter, either.

### 2. Plaintiffs Do Not Adequately Plead That The Individual Defendants Acted With Scienter.

Plaintiffs do not adequately plead that either individual defendant knew any statement he made was false or misleading. Plaintiffs fail to make *any* meaningful allegations about Smith's state of mind,[11] and Plaintiffs' allegations about Muilenburg's knowledge are almost as thin.

**Edward Pierson's Concerns**: Plaintiffs allege that Edward Pierson, who worked at one of Boeing's manufacturing facilities, raised concerns about production quality with Muilenburg and the Board of Directors. (Compl. ¶ 419) These allegations do not support an inference of deceptive intent for at least two reasons. First, Plaintiffs do not allege Pierson's concerns about production issues had anything to do with MCAS (which is not alleged to have been connected with any production issues) or any of the alleged misstatements (none of which address production issues). Second, Pierson's letter does not support scienter because, as the Seventh Circuit has held, knowledge of *accusations* does not constitute knowledge of *misconduct*. *See Pugh*, 521 F.3d at 695 (alleging that lawsuits filed against defendants gave them knowledge of fraud "completely misses the boat" because litigation confers knowledge "of accusations of fraud, not fraud itself"). Plaintiffs do not allege what, if anything, Muilenburg learned about the accuracy of any of Pierson's accusations, or how any such knowledge could support scienter for alleged misstatements unrelated to production issues.

[11] In *Aircraft Sec. Litig.*, 2022 WL 3595058, at *1, the court dismissed Smith as a defendant because plaintiffs had not "advanced any plausible allegations that defendant Smith knowingly or recklessly misled investors." The same goes here.

**2016 Technical Pilot Instant Message Conversation**: Plaintiffs allege that in early 2019 before the second crash, Muilenburg learned of a 2016 instant message involving a Boeing technical pilot, Mark Forkner, regarding what Forkner thought was an MCAS malfunction in a flight simulator he was testing. (Compl. ¶ 411) Plaintiffs allege generally that Muilenburg's awareness of this message supports an inference that his statements regarding the 737 MAX were made with scienter—although notably, they do not identify which statements. Nor could they. As an initial matter, Plaintiffs allege only that Muilenburg *learned of* the instant message before the second accident. They do not allege that he actually received a copy of it, or what he was told about it in early 2019. Moreover, it is undisputed that Forkner's text message describes his experience in a *simulator* not the airplane, and nothing in the message indicates that Forkner expressed concerns about the safety of the airplane itself. (*Id.*) Finally, as the DPA makes clear, Forkner's interactions with the FAA did *not* relate to the design of the airplane or the FAA's certification of that design. Rather, Forkner's "[t]eam was *separate and distinct* from . . . [the] group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards," and "others in the Company *disclosed* MCAS's expanded operational scope to" that group. (Ex. 6 ¶ 4h (emphasis added))

Against this background, Plaintiffs fail to allege any credible basis to believe that Muilenburg did not believe statements he made about the 737 MAX's design, safety, and certification in 2019. Among other things, Plaintiffs do not plead what Mr. Forkner's comments meant, what caused the 2016 simulator issue, what actions Boeing took in response, or why Muilenburg should have viewed the message as casting doubt on the 737 MAX's safety or certification when the message involved a simulator, and Muilenburg learned of it *after* intensive

regulatory engagement by the FAA following the Lion Air accident.[12] Plaintiffs' allegations regarding the 2016 message simply do not support any inference, much less a "compelling" inference, that Muilenburg knew statements he made about the 737 MAX were false.

**Muilenburg's Interactions With The FAA**: Plaintiffs allege that FAA Acting Administrator Elwell's alleged June 2019 request "to slow down talk of [Boeing's] progress" should have alerted Muilenburg that his estimates of the timing of the 737 MAX's return to service were too optimistic. (Compl. ¶ 421) To start, this allegation relates only to statements about progress toward the 737 MAX's return to service, and thus cannot support scienter for any of the alleged misstatements on other subjects. *Phillips v. Scientific-Atlantic, Inc.*, 374 F.3d 1015, 1017-18 (11th Cir. 2004) (a plaintiff must plead scienter for "each alleged violation of the statute"). But even with respect to return-to-service statements, Plaintiffs' allegations cannot support a strong inference of scienter because nothing Mr. Elwell allegedly said contradicted Boeing's estimates at the time. *See supra* at 24.

### 3. Plaintiffs' Circumstantial Allegations Do Not Support A Cogent Inference Of Scienter.

Plaintiffs also fail to craft a circumstantial case to infer scienter.

**737 MAX "Fixes"**: Plaintiffs make a series of allegations that Boeing was working on updates to the 737 MAX, which supposedly shows Defendants knew the plane was "fundamentally unsafe." (Compl. ¶¶ 416–18) But enhancements to MCAS cannot form the basis for an inference of scienter as a matter of law. As the Seventh Circuit has held, subsequent remedial measures cannot be used to plead scienter because "drawing an inference from such facts does not comport with Federal Rule of Evidence 407." *Pugh*, 521 F.3d at 695; *Higginbotham*, 495 F.3d at 760.

---

[12] For these same reasons, the *Aircraft Sec. Litig.* court's findings on this point are erroneous and should not be followed by this Court. 2022 WL 3595058, at *15.

Judge Tharp reached the same conclusion, holding that "drawing an inference from Boeing's effort to make corrections to MCAS would run afoul Federal Rule of Evidence 407, which provides that evidence of subsequent remedial measures is not admissible to show a defendant's liability." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *11.

Plaintiffs' suggestion also does not follow as a matter of logic: that Boeing was improving the 737 MAX does not support an inference that Defendants believed the plane was unsafe. As reflected in their public statements at the time, Boeing—and the FAA—believed the 737 MAX was safe despite the potential for erroneous activation of MCAS because there is an existing procedure pilots are trained to follow in the event of an unintended activation of the horizontal stabilizer. Both Boeing and the FAA reiterated this procedure to pilots in the wake of the Lion Air accident, and in light of this guidance, the FAA allowed the MAX to continue flying while Boeing developed a software update. Thus, there is no basis to infer from Boeing's development of an MCAS update that Defendants believed the plane was unsafe without that update, much less that Boeing intended to deceive investors about whether there was an issue at all.

Nor does Plaintiffs' allegation that Boeing's November 13, 2018 letter to the FAA "secretly requested permission … to update the 737 MAX's flight manual to include information about MCAS" support a strong inference of scienter. (Compl. ¶ 416) Any suggestion that Boeing was attempting to hide MCAS from the public in November 2018 is belied by Plaintiffs' own allegations. Plaintiffs allege that by November 6, Boeing had published a bulletin describing the risk that an inaccurate AOA sensor data could cause the automated pitch trim system to activate erroneously and highlighting the proper procedure to address such an erroneous activation. *Supra* at 4. Plaintiffs further allege that Boeing had publicly disclosed the existence of MCAS by November 13. (*Id.* ¶¶ 174–175) That Boeing sought to add to the flight manual what it had already

made public does not suggest deceptive intent—in fact, it is inconsistent with any inference that Defendants intentionally sought to mislead investors about MCAS.

Further, Plaintiffs have not sufficiently alleged Muilenburg or Smith had knowledge of Boeing's historical and post-Lion Air reviews of MCAS. Plaintiffs attempt to rely on a hazard analysis and findings from a Boeing Safety Review Board. (Comp. ¶¶ 416, 418). Just as in *Aircraft Sec. Litig.*, however, "there are no particularized allegations regarding what Muilenburg knew about the hazard analysis. Absent such particularized allegations, there is not an adequate basis to conclude that Muilenburg intended to deceive investors by concealing problems with the analysis." 2022 WL 3595058, at *10; *see id.* ("Boeing's (and Muilenburg's) conclusion that the pilots (who had not followed their assumptions) needed little more than a reminder to follow the runaway stabilizer non-normal checklist may have been unreasonable in hindsight, but that does not suffice to state a securities fraud claim").

**Core Operations**: Plaintiffs allege that "the 737 was an integral part of Boeing's business" and cite this as evidence of scienter because that created "motive and an opportunity to commit fraud." (Compl. ¶¶ 426-29) This appears to be a "core operations" allegation—that executives should be presumed to know facts critical to their company. But just because executives stay abreast of their company's key operations does not mean they know every fact about them. There is no basis to infer Boeing's CEO or CFO knew every detail of the software design or certification on a particular airplane, let alone of a single subsystem on one of the most complex products in the world. *See Societe Generale v. Caterpillar*, 2018 WL 4616356, *8 (N.D. Ill. Sept. 26, 2018) (rejecting "core operations" theory); *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *25 (N.D. Ill. Mar. 30, 2022) (same). For that reason, the *Aircraft Sec. Litig.* court rejected this very argument. *See* 2022 WL 3595058, at *11.

**Financial Exposure From Simulator Training**: Plaintiffs allege that Defendants were "concerned about emphasizing MCAS to the FAA" because "higher level of differences training" would have required simulator training, which "would have been prohibitively expensive and time-consuming for airlines, and, by extension, Boeing." (Compl. ¶ 412) As an initial matter, the only misstatement Plaintiffs allege that concerns differences training between the MAX and other 737 models is that Muilenburg lied in a December 7, 2018 interview by supposedly saying the MAX was designed to behave like its predecessors. *Supra* at 11-12. But, by that time, according to Plaintiffs, Boeing had already met with the FAA to help it "understand MCAS." (Compl. ¶ 167) Because the FAA determines what training is required, and those discussions had taken place before the alleged misstatement, Plaintiffs' allegations cannot substantiate any motive to conceal differences between 737 models. Moreover, Plaintiffs themselves allege that by December 7, the details of MCAS had already been widely disseminated. *Supra* at 4-6. As a result, Plaintiffs' own allegations contradict any alleged motive to conceal differences between 737 models.

**Muilenburg's Termination**: Finally, Plaintiffs allege that Defendants' scienter is "evidenced by the resignation of Defendant Muilenburg" following the accidents. (Compl. ¶ 424) Nothing about his departure supports an inference of scienter. The obvious and natural inference "in the wake of the Lion Air and Ethiopian Airlines crashes" (*id.*) is straightforward: Two planes had tragically crashed, and the 737 MAX fleet had been grounded, with dire financial consequences for Boeing. Plaintiffs allege no facts suggesting the departures occurred because anyone had engaged in fraud. *See Zucco Partners v. Digimarc*, 552 F.3d 981, 1002 (9th Cir. 2009) (no inference of scienter where the complaint merely alleged the CFO's resignation in close proximity to alleged fraud); *In re Ceridian Sec. Litig.*, 542 F.3d 240, 249 (8th Cir. 2008) (similar).

* * * *

In sum, because Plaintiffs do not plead with particularity facts giving rise to a "cogent" inference that any Defendant acted with deceptive intent with respect to any alleged misstatement, they fail to satisfy the first part of the scienter analysis, and their complaint should be dismissed.

### B. The Most Compelling Inference From Plaintiffs' Allegations Is That Defendants Did Not Act With Scienter.

Plaintiffs' allegations also fail to establish scienter because they do not satisfy the second part of the analysis: that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. In applying that part of the test, the Court "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693.

Plaintiffs ask the Court to infer that Boeing and two of its most senior executives knowingly kept a plane they believed was unsafe in the air after the first accident, knowingly kept information from pilots that could have prevented a second accident, and knowingly lied about the potential timing of the 737 MAX's return to service. This makes no sense, and is inconsistent with the facts as pled. Boeing's success depends on its reputation for building safe products. Plaintiffs' theory "does not resonate in common experience" and cannot establish scienter because it "depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the] problem was revealed." *Nguyen v. Endologix*, 962 F.3d. 405, 412 (9th Cir. 2020); *see also DiLeo*, 906 F.2d at 629 (similar).

Plaintiffs' failure is particularly stark because the opposing innocent inference here is so compelling. As Plaintiffs allege, Boeing's Safety Review Board convened immediately after the first accident in an effort to understand what might have caused it, and identified a possible scenario involving MCAS activation. (Compl. ¶ 164) Boeing officials also met with the FAA to help them "understand MCAS." (*Id.* ¶ 167) Within a week, Boeing issued a bulletin to operators,

reinforcing the flight procedure for pilots to follow should a circumstance similar to the Lion Air flight arise, followed the next day by the FAA's own airworthiness directive reinforcing that guidance. *Supra* at 4-5. And in the following weeks, Boeing engaged in extensive additional dialogue with the FAA and other regulatory authorities in an effort to understand the causes of both accidents and to evaluate possible additional safety measures. (Compl. ¶¶ 266, 269) These allegations show that Boeing moved swiftly after the accidents to understand the potential causes and share information with the piloting community, in close coordination with regulators.

Thus, the most compelling inference is that Defendants (1) believed Boeing had manufactured a safe airplane; (2) believed that pilots had the information and training to safely address an erroneous activation of MCAS, particularly after Boeing issued its November 6 bulletin and the FAA endorsed it; and (3) in the wake of the grounding, believed Boeing was making progress toward the plane's return to service and expected to complete the process on the timetables disclosed. Whatever the merits of Plaintiffs' allegations regarding the design of the 737 MAX and the actions of other Boeing employees, those allegations do not support a conclusion that Defendants in this case intentionally issued deceptive statements.

**III. Plaintiffs Do Not Plead Loss Causation.**

The case should also be dismissed for a third independent reason: Plaintiffs do not adequately plead loss causation. "To plead loss causation, the plaintiff must allege that it was the very facts about which the defendant lied which caused its injuries." *Tricontinental v. PwC*, 475 F.3d 824, 842 (7th Cir. 2007); *see also Bastian v. Petren*, 892 F.2d 680, 685 (7th Cir. 1990) (affirming dismissal where allegations failed to plausibly allege "that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains"). A plaintiff can satisfy this element by pleading facts demonstrating that when the truth regarding an alleged misstatement emerged—referred to as a corrective disclosure—the price of the company's shares

declined *as a result*. *Dura Pharm.*, 544 U.S. at 346-47. Here, Plaintiffs allege ten instances in which a "corrective disclosure" supposedly caused them injury. But Plaintiffs do not and cannot connect any of their losses to the correction of any alleged misstatement. The *Aircraft Sec. Litig* court reached the same conclusion, noting that "[m]ost of the statements" it had dismissed for failure to plead material falsity would "alternatively fail on loss causation grounds," particularly given plaintiffs' failure "to connect specific statements to corrective disclosures." *Id.* at *29 n.13.

**October 29, 2018**: Plaintiffs first allege Boeing's stock price declined the day after the first accident occurred. (Compl. ¶ 453) But Plaintiffs have not plausibly alleged this decline would not have occurred but for certain *statements* by Boeing. Plaintiffs also do not connect this "disclosure" to any specific alleged misstatements, thus failing to plead any causal connection. Simply put, the first accident was not a disclosure at all, let alone one "correcting" a prior alleged misstatement. It was a tragic event that understandably caused Boeing's stock price to decline.

**March 10, 2019**: Plaintiffs next allege Boeing's stock price declined after the second accident. (Compl. ¶ 455) Once again, Plaintiffs offer only the vague allegation that the accident revealed a "previously concealed risk." Plaintiffs do not plead any "causal connection" to any alleged misstatement. And as Judge Tharp concluded, the accident did "not reveal the falsity of any prior statement, since Boeing never represented that a second crash could not occur or that MCAS would never malfunction again." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *29 n.13. And, again, it is unsurprising that Boeing's stock price declined following an accident.

**March 17, 2019**: Plaintiffs allege Boeing's stock price declined in response to an investigative report in *The Seattle Times*. (Compl. ¶ 467) According to Plaintiffs, this report revealed that "[t]he 737 MAX was fundamentally unsafe and had been certified based on incorrect facts about MCAS." (*Id.* ¶¶ 464, 473) But Plaintiffs have not connected this alleged disclosure to

any specific statements by Boeing regarding the certification process prior to March 17, 2019—nor could they. As the *Aircraft Sec. Litig.* court concluded, Plaintiffs thus do not plead that the report corrected any earlier misstatements. 2022 WL 3595058, at *29.

**March 21, 2019**: Plaintiffs cite a news article stating that the two planes that crashed "lacked two notable safety features in their cockpits [because] Boeing charged extra for them" and that the features would have provided the pilots information regarding data from the AOA sensors. (Compl. ¶ 474) Plaintiffs also quote a non-Boeing engineer's characterization of the alerts as "vital for safety." (*Id.*) But none of the alleged misstatements made before that disclosure concerned whether the 737 MAX had these cockpit features. *See Aircraft Sec. Litig.*, 2022 WL 3595058, at *21 (rejecting corrective disclosure allegation because "[t]he first alleged misstatement regarding the AoA issue … came weeks later, on April 29."). Nor is the opinion of an engineer unaffiliated with Boeing about whether the features were vital for safety a corrective disclosure; none of the alleged misstatements concerned that individual's views on the subject, and he was obviously not speaking for Boeing. Plaintiffs thus do not plead facts plausibly connecting the information to any alleged misstatement.

**April 5, 2019**: Plaintiffs allege that Boeing provided an update regarding its efforts to "mak[e] progress on the 737 MAX software update" and stated it was making adjustments to the 737 production system to prioritize software certification for the 737 MAX. (Compl. ¶¶ 478, 479) Plaintiffs claim that "[t]he news that MCAS still had not been fixed and that Boeing was adjusting its production schedule to prioritize the recertification and return to service of the 737 MAX partially revealed to the market that Defendants' prior representations were false and materially misleading." (*Id.* ¶ 481) But Plaintiffs do not allege Defendants had previously misrepresented the status of the software update. And the first allegedly fraudulent estimate of the MAX's return

to service did not occur until June 26, 2019—months later. (*Id.* ¶ 375) Plaintiffs thus do not and cannot plead that any alleged misstatement was corrected on this day. The *Aircraft Sec. Litig.* court found this statement did not correct a prior misstatement as well. 2022 WL 3595058, at *29.

**June 26, 2019**: Plaintiffs allege Boeing's stock price declined in response to a statement regarding a "potential risk" it needed to mitigate "before the FAA would recertify the 737 MAX." (Compl. ¶ 490) Again, Plaintiffs plead no connection between this news and any alleged misstatement about this "potential risk" or any representation about the software functionality referenced in the statement. Thus, there is no alleged misstatement that could have been corrected by this disclosure, as Judge Tharp also found. *Aircraft Sec. Litig.* 2022 WL 3595058, at *29.

**July 24, 2019**: Plaintiffs allege Boeing's stock price declined when Defendants disclosed on an earnings call that Boeing might suspend 737 MAX production if the grounding continued. (Compl. ¶ 492) Plaintiffs allege that the "news that Boeing might halt the production of the 737 MAX altogether partially revealed to the market that Defendants' prior representations were false or materially misleading." (*Id.* ¶ 493) But Plaintiffs do not allege any misstatements before this disclosure about whether Boeing would continue producing the 737 MAX during its grounding. Moreover, this was not a new disclosure: in its April 24, 2019 SEC Form 10-Q, Boeing cautioned that delays in returning the 737 MAX to service "could result in additional disruption to the 737 production system, including further reductions in the production rate and/or a temporary cease of production" (Ex. 5 at 50) "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time." *Katyle v. Penn Nat'l Gaming*, 637 F.3d 462, 473 (4th Cir. 2011); *see In re Omnicom Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (same). Thus, Judge Tharp found this statement did not correct a prior misstatement. *Aircraft Sec. Litig.* 2022 WL 3595058, at *29.

**October 18 and October 20, 2019**: On October 18, 2019, the 2016 instant messages sent by Boeing technical pilot Forkner were publicly released. (Compl. ¶ 495) A similar article was released on October 20. (*Id.* ¶ 496) Plaintiffs allege that over the next two trading days Boeing's stock price declined as a result. (*Id.* ¶ 497) Plaintiffs, however, fail to connect the Forkner messages to any prior statements, let alone explain how the Forkner messages "corrected" them. Nor could they, since the Forkner messages disclosed nothing new to the public about MCAS, information provided to pilots, or the FAA's certification of the aircraft under federal airworthiness standards, and Plaintiffs do not allege otherwise.[13]

**December 16, 2019**: On December 16, 2019, Boeing announced it would temporarily suspend production of the 737 MAX. (Compl. ¶ 498) Plaintiffs do not allege that this corrected any alleged misstatement. As discussed above, Boeing previously announced it would consider suspending production if the grounding continued longer than expected, and made announcements regarding delays in June and July. *Supra* at 40. Moreover, all but one of the challenged statements estimated the 737 MAX's return to service in late summer or "early" in the fourth quarter 2019. (Compl. ¶¶ 377, 380, 381, 382, 384, 385) By mid-December 2019, then, all of those estimates had already been corrected by the simple passage of time. Against this background, Plaintiffs cannot plausibly allege that Boeing's December 16 announcement was a corrective disclosure.[14]

---

[13] Judge Tharp concluded that the October 18, 2019 public revelation of the Forkner messages was a corrective disclosure because FAA Administrator Dickson expressed anger that they had not been disclosed sooner, and because analysts commented that the disclosure "likely hit a nerve" with the FAA and "may shatter the fragile trust between Boeing and the FAA." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *29 (internal quotation marks omitted). These observations may explain why Boeing's stock price dropped when the messages were made public—damaging its relationship with the FAA would plainly not be a good thing for Boeing—but they do not explain how that disclosure corrected any particular prior alleged misstatement, as required by *Dura Pharm.*, 544 U.S. at 346-47. Respectfully, Judge Tharp's reasoning supports dismissal: disrupting the "trust between Boeing and the FAA" on a forward-looking basis does not show the falsity of any *prior* statements about regulatory compliance or the FAA's oversight.

[14] Judge Tharp deemed Boeing's December 16 announcement to be an adequately alleged corrective disclosure based on the plaintiffs' argument in that case that the announcement "made it clear that the [FAA] would not act on Boeing's timeline." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *29. Respectfully, even as characterized, that disclosure did not correct any alleged misstatement. As Plaintiffs allege, Boeing had previously cautioned that it might suspend

**February 21, 2021**: On February 21, 2021, the FAA announced penalties against Boeing relating to a 2015 settlement agreement wholly unrelated to the issues in this suit. (Comp. ¶ 500) Indeed, Plaintiffs do not even attempt to argue that the FAA's announcement corrected any prior alleged misstatement. The FAA's announcement is therefore not a corrective disclosure.

* * *

To be clear, Defendants' argument is not that the decline in Boeing's stock price is unrelated to problems with the 737 MAX, but that there are obvious explanations for why the stock price would have declined that have nothing to do with the alleged misstatements. As Plaintiffs' own complaint and the facts subject to judicial notice demonstrate, Boeing's stock price was plainly impacted by the occurrence of two tragic airplane crashes and a series of unanticipated delays in the 737 MAX's return to service. *See In re Maximus Sec. Litig.*, 2018 WL 4076359, at *17 (E.D. Va. Aug. 27, 2018) (finding that securities fraud complaint failed to plead loss causation when "[t]he 21.9% stock drop associated with the November 2015 earnings call is adequately explained by the poor performance of the HAAS contract disclosed in the call, rather than the perceived disclosure of some previous fraud") To adequately plead loss causation, Plaintiffs must allege the disclosure of information that can be plausibly construed as revealing previously misrepresented facts. Because they do not, their allegations are insufficient to state a claim.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.

---

production if the grounding continued, (Compl. ¶ 492) and had repeatedly made clear that the FAA—not Boeing—controlled the timing of recertification, *see supra* at 23.

Dated: February 8, 2023

Respectfully submitted,

*/s/ John F. Hartmann*

John F. Hartmann, P.C.
Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000

Craig S. Primis, P.C. (*pro hac vice*)
Katherine Canning (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Defendants*