UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COLLEGE RETIREMENT EQUITIES FUND,
et al.,

                Plaintiffs,

        v.

THE BOEING COMPANY, DENNIS A.
MUILENBURG, and GREGORY D. SMITH,

                Defendants.

No. 22 CV 3845

Judge Manish S. Shah

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, a group of equity funds, bring securities fraud claims against The Boeing Company, its former chief executive officer Dennis Muilenburg, and its former chief financial officer Gregory Smith. Plaintiffs allege that Boeing, Muilenburg, and Smith made 89 false and misleading statements about the October 2018 and March 2019 crashes of two 737 MAX airplanes, the subsequent Federal Aviation Administration grounding, and the recertification and return to service of the 737 MAX fleet.

Defendants move to dismiss the complaint, arguing that plaintiffs failed to plead the essential elements of a securities fraud claim—that defendants intentionally made false or misleading statements that caused plaintiffs' losses—under the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act.

This case is similar to a putative class action brought against the same three defendants in this district, *In re The Boeing Company Aircraft Securities Litigation*, 19-cv-02394 ("*Aircraft Sec. Litig.*"). Judge Tharp in that case granted in part and denied in part the defendants' motion to dismiss. *Aircraft Sec. Litig.*, 19-cv-02394, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022). Although plaintiffs have attempted to address the insufficiencies in the allegations which led Judge Tharp to dismiss some of the claims, the outcome here remains nearly the same.

## I. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019); *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018).

When a plaintiff alleges fraud, heightened pleading requirements apply. The plaintiff "must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and must "provide 'precision and some measure of substantiation' to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)). This requires describing the "who,

what, when, where, and how" of the fraud. *Id.* (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

Section 10(b) of the Securities and Exchange Act of 1934 proscribes (1) the use or employment of any deceptive device; (2) in connection with the purchase or sale of any security; and (3) in contravention of Securities and Exchange Commission rules and regulations. 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this statute and forbids the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made … not misleading" in connection with sales of securities. 17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b), a plaintiff must allege that the defendant made a statement that was (1) false or misleading; (2) material; (3) made with scienter (knowledge of the statement's falsity); (4) connected to the purchase or sale of a security, on which investors relied; (5) and which caused economic loss. *Matrix Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). Investors' reliance on an allegedly false statement is presumed in an "impersonal, well-developed market for securities." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

In securities fraud actions, "[m]ere silence about even material information is not fraudulent absent a duty to speak," but, "if one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) (citations omitted). An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable

investor as having altered the total mix of information made available." *Basic*, 485 U.S. at 231–32 (quotation omitted).

Ordinarily, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), but securities fraud complaints under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To establish the "required state of mind," "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693–94 (7th Cir. 2008) (citing *Makor Issue & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). A "strong inference" that the defendant acted with scienter requires a showing that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

For statements attributed to individual defendants, such as former CEO Muilenburg and former CFO Smith, plaintiffs must show that those individuals either knew their statement was false or were reckless in disregarding a substantial risk that it was false. *Makor*, 513 F.3d at 704–705 (citation omitted) (describing recklessness as "indifference to the danger that a statement is false"). Boeing can be held liable on a *respondeat superior* theory based on fraudulent statements made by its officers in the course of their employment when those officers are identified, and their fraudulent statements are pled with particularity. *See id.* at 708 (citation omitted). A corporation is also liable for statements by employees who have apparent

authority to make them. *Id.* (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982)).

For statements attributed to a corporation generally, such as Boeing, there is no "judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations." *Pugh*, 521 F.3d at 693–94 (citing *Makor*, 513 F.3d at 710). Corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles. *Makor*, 513 F.3d at 710. Corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided that specific factual allegations link the individual to the statement. *Makor*, 513 F.3d at 708 (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

Although corporate scienter cannot be proven by "the collective knowledge of all the corporation's officers and employees," "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor*, 513 F.3d at 708, 710. However, the standard is high because "[i]ntent to deceive is not a corporate attribute." *Id.* at 707, 710. For example, "[s]uppose General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero. There would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.* at 710. "The critical question … is how likely it is that the allegedly false

5

statements … were the result of merely careless mistakes at the management level based on false information fed it from below, rather than on an intent to deceive or a reckless indifference to whether the statements were misleading." *Id.* at 709.

## II. Development of the 737 MAX, FAA Certification, and Boeing's Statements before the Lion Air crash

Boeing launched the 737 MAX program in August 2011 in response to competition from Airbus's A320neo. [17] ¶¶ 71–78.[1] The threat from Airbus prompted

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

The facts are taken from the amended complaint, [17], and from multiple exhibits attached to defendants' motion to dismiss. In ruling on a 12(b)(6) motion to dismiss, a court usually may only review the complaint. *Rosenblum v. Travelbybus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002). A court may also consider documents attached to the defendant's motion to dismiss if they are referred to in the plaintiff's complaint and central to the plaintiff's claim. *Rosenblum*, 299 F.3d at 661 (quotation omitted); *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). Additionally, courts may take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment. *Anderson v. Simon,* 217 F.3d 472, 474–75 (7th Cir. 2000).

Defendants attach seventeen documents to their motion that they argue should be considered. [24] at 12 ns.1–2. Thirteen of these documents are referred to in the complaint and are central to plaintiffs' claim: [24-2], [24-4], [24-5], [24-6], [24-7], [24-8], [24-11], [24-13], [24-14], [24-15], [24-16], [24-17], [35-2]. *See* [17] ¶¶ 164, 170–76, 181, 187, 191, 195, 206–08, 211–14, 219, 276, 304–08, 316–17, 323–25, 335–36, 341, 375, 377, 384, 389, 394, 402, 411, 416–17, 430. I consider them here.

Three documents are matters of public record: the FAA Emergency Airworthiness Directive, [24-3], the U.S. House of Representatives Summary of Subject Matter, [24-9], and Boeing's Form 8-K, [24-10]. Their authenticity has not been challenged, *see* [34], their existence is "not subject to reasonable dispute," and their "accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). I take judicial notice of the existence of these documents, but I decline to take judicial notice of the truth of the facts within the documents since plaintiffs reasonably dispute their content. [34] at 19 n. 2; *see Tobey v. Chibucos,* 890 F.3d 634, 648 (7th Cir. 2018).

The remaining document, Boeing's July 24, 2019 Second-Quarter 2019 Performance Review Presentation, [24-12], is not referenced in the complaint and is not a public document. I do not consider it on this motion. Even if it were appropriate to take notice of the Presentation, [24-12], or the truth of the facts in the exhibits [24-3], [24-9], and [24-10], it would not change the outcome of this opinion.

Boeing to scrap plans to develop an entirely new airplane in favor of remodeling the existing 737. [17] ¶ 76. By upgrading the existing model, Boeing would save significant time, resources, and money because pilots with experience on the existing model would not require expensive simulator training. [17] ¶¶ 76, 83–85.

The upgrade was not simple. To make the 737 MAX more fuel efficient, Boeing added larger engines to the airplane. [17] ¶ 91. These larger engines had to be mounted further forward and higher up on the 737 MAX's wings and the airplane's nose gear had to be extended. *Id.* These changes altered the 737 MAX's aerodynamics during certain flight maneuvers, in particular during high angles of attack, causing the plane to pitch up abnormally during flight. [17] ¶¶ 92–93. Rather than implement structural changes to the 737 MAX to address these concerns, Boeing added a new software component, the Maneuvering Characteristics Augmentation System ("MCAS"). [17] ¶ 95. MCAS was an automated system designed to push the plane's nose downward during high angles of attack. [17] ¶ 96. Boeing designed MCAS to only activate in very limited circumstances: when the airplane was both traveling above a certain speed threshold and in danger of stalling (at a high angle of attack). [17] ¶ 108. MCAS's activation in prior designs relied on two angle of attack sensors, but MCAS in the 737 MAX drew data from only one of them, creating a situation in which a single malfunctioning sensor could erroneously trigger MCAS to pitch the plane's nose down when no correction was needed. [17] ¶¶ 96, 109.

As early as November 2012, Boeing engineers expressed concerns about MCAS and pilots' ability to recognize and counter faulty activations quickly enough. [17]

¶¶ 104–105. Before use by any United States-based airline, the Federal Aviation Administration had to evaluate and approve the 737 MAX for commercial use. [17] ¶ 81. As part of the FAA certification process, Boeing was required to perform a "Functional Hazard Assessment"—a "systematic comprehensive examination of an airplane and system functions to identify potential minor, major, hazardous, and catastrophic failure conditions that may arise as a result of a malfunction or a failure to function." [17] ¶ 126. During a simulator training as part of the assessment, one test pilot, with the assistance of "teamwork," was able to recognize MCAS activation and respond to it in approximately four seconds. [17] ¶ 104. Another test pilot took more than ten seconds to respond and deemed the condition "catastrophic." *Id.* Boeing recorded the test pilot's reaction time in its internal MCAS "Coordination Sheets" without further inquiry. [17] ¶ 105. Between 2015 and 2018, Boeing issued at least six separate MCAS Coordination Sheets referencing the "catastrophic consequences" of a greater than ten-second pilot reaction time to faulty activations. [17] ¶ 106.

In 2014, a Boeing engineer recommended that Boeing install a "synthetic airspeed" system on the 737 MAX to detect false angle of attack signals. [17] ¶ 116. The engineer's proposal was rejected three times, including by the 737 MAX program director. *Id.*

Instead of programming MCAS to rely on data from both angle of attack sensors or adding a synthetic airspeed system, Boeing relied on the 737 MAX's "AOA Disagree Alert" to safeguard against faulty readings from the angle of attack sensors. [17] ¶ 117. The AOA Disagree Alert was a standard, non-optional feature on the 737

MAX. [17] ¶ 118. Boeing also offered customers the option to purchase an additional "AOA Indicator," a dial in the flight display showing the airplane's raw angle of attack data that aided flight crews to avoid a stall. [17] ¶ 119. Due to a miscommunication between Boeing and the supplier who coded the AOA Disagree Alert, the software required that the AOA Indicator display before displaying an AOA Disagree Alert. [17] ¶ 120. This meant that the AOA Disagree Alert, although installed on every 737 MAX, only functioned on airplanes that were also equipped with the optional AOA Indicator. *Id.* Before the Lion Air crash, only 20% of MAX airplanes had the optional AOA Indicator installed. [17] ¶ 119.

FAA approval of the 737 MAX involved two decisions by two groups. [17] ¶ 81. One group decided whether the airplane met United States federal airworthiness standards. *Id.* The second group, the FAA Aircraft Evaluation Group, decided what minimum level of training would be required for a pilot to fly the airplane by comparing the new version of the airplane to an older version. [17] ¶¶ 81–82. The Evaluation Group could assign one of five different levels of training, ranging from Level A, the least intensive, though Level E, the most intensive. [17] ¶ 83. Level D training required a full-flight simulator, which was more expensive and burdensome for airlines, while Level B differences training could be completed virtually on a computer or tablet. *Id.* Upon making its determination, the Evaluation Group published its recommendation for the appropriate training level in the Flight Standardization Board Report. [24-7] at 31. Considering that a more intensive training level would have been prohibitively expensive and time-consuming for

airlines and, by extension, Boeing, obtaining Level B differences training or lower was one of the 737 MAX's "design objectives." [17] ¶¶ 84–85.

In June 2015, Mark Forkner, Boeing's 737 Chief Technical Pilot, attended a 737 MAX briefing during which Boeing employees told the Aircraft Evaluation Group that MCAS was designed to operate only during high-speed wind-up turns, and only at speeds of Mach 0.7–0.8. [17] ¶ 130. After the briefing, Forkner and Patrick Gustavsson, a 737 MAX Technical Pilot, discussed MCAS with an Evaluation Group employee and made the same representations about its limited scope. *Id.* However, upon beginning test flights of the 737 MAX in January 2016, Boeing discovered that the airplane did not handle well when nearing stalls at lower speeds. [17] ¶ 131. In response, Boeing overhauled MCAS to allow it to activate at lower speeds and to expand how far MCAS could lower the plane's nose. *Id.* Boeing did not disclose these changes to the Evaluation Group. [17] ¶ 132.

In March 2016, Forkner e-mailed the Evaluation Group and asked for its approval to remove all references to MCAS from the 737 MAX's Flight Crew Operations Manual because MCAS was "completely transparent to the flight crew and only operates WAY outside of the normal operating envelope." [17] ¶ 133 (emphasis in original). The Evaluation Group approved Forkner's request, unaware of the MCAS changes. *Id.*

In November 2016, Forkner conducted a simulator flight of the 737 MAX and experienced MCAS activation at a lower speed than he anticipated. [17] ¶ 141. He subsequently texted with Gustavsson:

> Forkner: Oh shocker alert! / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] things [sic] is happening
>
> Gustavsson: Oh great, that means we have to update the speed trim description in vol 2
>
> Forkner: so I basically lied to the regulators (unknowingly)
>
> Gustavsson: it wasn't a lie, no one told us that was the case

*Id.* Despite acknowledging that he had unwittingly provided false information to the Evaluation Group, Forkner did not correct the record. [17] ¶ 142.

Rather, Forkner continued to suppress any mention of MCAS in the Flight Standardization Board Report, sending the Evaluation Group at least two emails proposing it delete references to MCAS because "it's way outside the normal operating envelope." [17] ¶¶ 142–43. The final version of the Report lacked information about MCAS, and "[i]n turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly false, inaccurate, and incomplete as a result." [17] ¶ 308.

In emails to his colleagues, Forkner boasted about his success in "jedi-mind tricking regulators into accepting the training that I got accepted by FAA." [17] ¶ 135. He also bragged about performing the same "jedi mind trick" on one of Boeing's customers by persuading the foreign airline that any additional training was not necessary. [17] ¶ 137.

11

A.     **Statements before the Lion Air Crash (8–10)**[2]

In early 2018, Boeing announced that the FAA certified the 737 MAX for commercial flight: "The FAA certification affirms that the airplane's handling, systems and overall performance all comply with required aviation regulations." [17] ¶¶ 148, 320; [34-1], statement 8. Plaintiffs argue that it was materially misleading for Boeing "to tout the certification of the 737 MAX when, in fact, they had defrauded the FAA into certifying the 737 MAX based on incorrect information." [17] ¶ 322. I agree. Boeing had a duty to disclose all material information regarding the certification. *See Stransky*, 51 F.3d at 1331 (citation omitted); *Basic*, 485 U.S. at 231–32 (quotation omitted).

Although this statement does omit material details surrounding the FAA certification of the 737 MAX, in particular Forkner's deceit, plaintiffs have not established scienter. Plaintiffs do not identify and plead that those involved in making the statement were aware of that material information. *See Makor*, 513 F.3d at 710. Plaintiffs also fail to allege facts that support a strong inference of corporate scienter. While plaintiffs have shown that Forkner deceived the FAA in the certification process, they do not allege any details that show corporate officials were sufficiently knowledgeable in early 2018 about Forkner's deception to know that

---

[2] Plaintiffs have attached an appendix to their opposition to defendant's motion to dismiss listing 89 statements and categorizing them into nine groups: Internal Disclosure Controls and Procedures, Regulatory Compliance, Certification of the 737 MAX, Design of the 737 MAX, MCAS, Safety of the 737 MAX, the 737 MAX's Production Rate and Backlog, Recertification and Return to Service of the 737 MAX, and AOA Disagree Alert. [34-1]. Because plaintiffs' appendix tracks their amended complaint, I refer to the statements as numbered and categorized in the appendix.

Boeing's announcement of the FAA certification was materially misleading. *See id.*
Indeed, plaintiffs' allegations and the Deferred Prosecution Agreement support that
corporate officials were not aware of Forkner's conduct until much later and that the
fraud was "neither pervasive across the organization, nor undertaken by a large
number of employees, nor facilitated by senior management." [17] ¶ 212; [24-7] at 7.
It is much more likely that, at the time of the announcement, Boeing's statement
affirming the MAX's compliance with required aviation regulations was "the result of
merely careless mistakes at the management level based on false information fed it
from below, rather than an intent to deceive or a reckless indifference to whether the
statements were misleading." *See Makor*, 513 F.3d at 709.

During the same announcement, Keith Leverkuhn, Vice President and
General Manager of the 737 MAX program, added, "Our teams built superior
capabilities into the MAX 9 and proved them all the way through flight test." [17]
¶¶ 148, 320; [34-1], statement 9. Boeing also stated the 737 MAX was "designed to
offer customers exceptional performance" and "incorporate[d] … features to deliver
the highest efficiency, reliability and passenger comfort in the single-aisle market."
*Id.* A month later, Boeing announced that the 737 MAX successfully completed its
first flight. [17] ¶¶ 149, 321. Leverkuhn stated, "Everything we saw during today's
flight shows that the MAX 7 is performing exactly as designed." [17] ¶¶ 149, 321; [34-
1], statement 10. Boeing again represented that the "737 MAX family incorporates
the latest CFM International Leap-1B engines, Advanced Technology winglets,

13

Boeing Sky Interior, large flight deck displays and other features to deliver the highest efficiency, reliability and passenger comfort in the single-aisle market." *Id.*

Plaintiffs allege that it was materially misleading for Boeing and Leverkuhn "to represent that the 737 MAX was safe, reliable, and a superior aircraft when the precise opposite was true." [17] ¶ 322. Yet, Leverkuhn and Boeing's statements regarding the capabilities, design, and performance of the 737 MAX were not false. [34-1], statement 9, 10. Further, these statements are vague and aspirational, constituting nonactionable puffery. *See City of Taylor Police and Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (citation omitted). Boeing's assertions of the 737 MAX's superiority are "rosy affirmation[s] heard from corporate managers and numbingly familiar to the marketplace." *See City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–670 (6th Cir. 2005) (quotation omitted). These statements are "so lacking in specificity … that no reasonable investor could find them important to the total mix of information available," and are not actionable. *See id*.

Ultimately, even if these statements were materially false or misleading, plaintiffs have again failed to plead scienter as to Leverkuhn and any others involved in making the statements. Plaintiffs make no allegations that Leverkuhn knew his statements were false or recklessly disregarded a substantial risk they were false. Plaintiffs also fail to allege corporate scienter as to the group-published statements. Plaintiffs allege that there were indications that the plane was not safe. [17] ¶¶ 104–105, 116, 119, 141. But plaintiffs' allegations do not support a strong inference that

14

any corporate official involved in making the Boeing-attributed statements would have necessarily known that the plane had safety issues at this time. Plaintiffs' allegations show corporate officials were informed of the safety concerns much later. [17] ¶¶ 182, 206–08, 212.

## III. Boeing's Response to the Lion Air Crash

On October 29, 2018, twelve minutes after takeoff from Jakarta, Indonesia, Lion Air flight 610 crashed, killing all 189 people onboard. [17] ¶¶ 157–60. Boeing immediately convened a group of experts who "quickly identified that [] MCAS activation could have been a scenario" that led to the crash. [17] ¶ 163. As more information became available, Boeing's Safety Review Board determined that the issue with MCAS created a disastrous situation where pilots were required to perform multiple complex procedures in a very short time span to prevent the airplane from nosediving. [17] ¶ 165. This "high crew workload" issue, "coupled with the limited amount of time that the crew would have … before the airplane became unrecoverable, posed an 'airplane safety issue' that required remediation." *Id.* The airplane safety issue was "compounded by the presence of other distracting visual, auditory, and tactile alerts and warnings associated with a damaged or malfunctioning A[O]A sensor on the 737 MAX." *Id.*

After the Lion Air crash, defendants set out to reassure the public and investors that the 737 MAX was safe and that Boeing was taking steps to prevent

any future accidents.[3] Plaintiffs divide this series of statements, [34-1], statements 17–32, into three categories: the Safety of the 737 MAX, the Design of the 737 MAX, and MCAS (including information Boeing provided to pilots about MCAS).

### A. Statements about the Safety of the 737 MAX (19–20, 23, 25, 27, 29, 31)

In the aftermath of the Lion Air crash, CEO Muilenburg and Boeing, through press releases, made statements reassuring the public of the airplane's safety. [34-1], statements 19–20, 23, 25, 27, 29, 31. These statements comprised vague affirmations of safety and Boeing's core values. [17] ¶¶ 327–29, 333–35, 338.

Plaintiffs allege that Muilenburg and Boeing defrauded investors when making these statements because they omitted facts that cut the other way, including, but not limited to, that MCAS had a single point of failure, Boeing misled regulators, Boeing knew that many MAX airplanes were missing an AOA Disagree Alert, and Boeing increased the power of MCAS without fully informing stakeholders. [17] ¶¶ 331, 336, 340. In turn, defendants argue that these safety-related statements are nonactionable because the statements were either not false, were immaterial as a matter of law because they were insufficiently specific to affect a reasonable investor's assessment of the value of Boeing, or were simply opinions. [24] at 22–26.

---

[3] Plaintiffs draw some of their allegations from the detailed fact findings in the SEC Cease-and-Desist Orders. [17] ¶¶ 316–18; [35-2]. Defendants argue that the plaintiffs cannot use these allegations from the "no admit, no deny" settlement to demonstrate scienter "because the settled charges [in the Orders] … do not even require a showing of scienter." [24] at 35. Plaintiffs do not argue that the Orders themselves establish scienter, but that the underlying facts within the Orders do. [34] at 31. Plaintiffs may use the facts in these Orders to make their scienter arguments. *See, e.g., In re Under Armour Sec. Litig.*, 540 F.Supp.3d 513, 522 (D. Md. 2021) (permitting plaintiffs to rely on a Cease-and-Desist Order to show scienter even though defendant consented to a non-scienter-based violation).

I agree with defendants' argument that the statements were insufficiently specific. Regardless of the falsity of these statements, a reasonable investor could not find them material. Like the statements about safety before the crash, these statements are the kind of loosely optimistic statements that are unimportant to total mix of information for investors. *See City of Monroe*, 399 F.3d at 669–670. When Muilenburg and Boeing made these statements, there had been a plane crash. Because that information was public knowledge, only unreasonable investors would find Muilenburg and Boeing's simple affirmations of safety and general references to Boeing's core values meaningful to the total mix of information. *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) ("General statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery' meaning they are too general to cause a reasonable investor to rely upon them."). Accordingly, Muilenburg's and Boeing's statements about the safety of the 737 MAX after the Lion Air crash are not actionable. [34-1], statements 19–20, 23, 25, 27, 29, 31.

## B. Statement about the Design of the 737 MAX (32)

Muilenburg, in a December 2018 interview, stated that "[p]art of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way. So even though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot." [17] ¶ 339; [34-1], statement 32. Plaintiffs allege that it was materially misleading for Muilenburg to represent that the 737 MAX behaved in the same way as Boeing's prior commercial airplanes. [17] ¶ 340.

But Muilenburg's statement does not address the plane's actual handling behavior. Instead, Muilenburg spoke of Boeing's intentions in designing the plane, which plaintiffs' allegations support as true. Plaintiffs allege that Boeing went to great lengths to design the plane in a way that would allow pilots to transition to the 737 MAX seamlessly. *See, e.g.,* [17] ¶¶ 85 ("obtaining Level B differences training or lower was one of the 737 MAX's 'design objectives' and imperative to its financial success."), 89 ("in its contract with Southwest, Boeing agreed to pay $1 million per airplane if Southwest's pilots were unable to operate the 737 NG and 737 MAX 'interchangeably' 'due to any reason.'"). True statements that are not materially misleading are not actionable. 17 C.F.R. § 240.10b-5. Therefore, statement 32 is not actionable.

### C. Statements about MCAS and Information Provided to Pilots (17– 18, 20–22, 24, 26, 28, 30)

On November 6, 2018, Boeing issued a press release in response to the Lion Air crash, disclosing that it had released an "Operations Manual Bulletin (OMB) directing operators to existing flight crew procedures to address circumstances where there is an erroneous input from an AOA sensor." [17] ¶¶ 170–71; [34-1], statement 17, 18. In several subsequent public statements regarding the Lion Air crash, Muilenburg and Boeing pointed to this procedure and bulletin to assuage public concern about the plane's safety. [34-1], statements 20–22, 24, 26, 28, 30.

Plaintiffs argue that, by directing flight crews to existing procedures, Boeing "created the false impression that there was nothing wrong with the 737 MAX and that the Lion Air crash was caused by pilot error." [17] ¶ 179. Plaintiffs allege that,

in most cases, a pilot applying the existing procedure would not be able to recover the 737 MAX from a nosedive caused by an MCAS malfunction. [17] ¶ 326, 331. Taking the allegations in the amended complaint as true, the information provided to pilots was dangerously incomplete and misleading. Muilenburg further erred by repeatedly invoking the bulletin and existing procedures as proof that pilots could fly the plane safely. [34-1], statements 21 ("our airplane has the ability to handle that with procedures in place and we've already issued a couple of additional bulletins"), 22 ("if there is an inaccurate angle of attack sensor feeding information to the airplane there is a procedure to handle that"), 24 ("the bulletin we put out again last weekend … pointed to that existing flight procedure"), 26 (denying reports that the procedure pilots need to handle erroneous MCAS activation was not in the pilot manual).

These statements are not actionable, however, because plaintiffs have not adequately pled Muilenburg and Boeing's scienter as detailed below.

### D. Insufficient Allegations of Scienter as to Post-Lion Air Crash Statements

Plaintiffs argue that Muilenburg and other Boeing employees knew that statements made after the Lion Air Crash regarding MCAS and information provided to pilots were false, but none of the complaint's allegations (individually or collectively) show that those making the statements (as opposed to others) knew the statements were false or omitted material facts.

#### 1. Boeing's Internal Investigation after the Lion Air Crash

Plaintiffs allege that on November 15, 2018, "Muilenburg and other Boeing senior executives were informed that the Safety Review Board had concluded that

19

the high crew workload issue associated with unintended MCAS activation posed an 'airplane safety issue' that required remediation and that Boeing engineers were working on redesigning MCAS's software to address the issue." [17] ¶ 182.[4] Plaintiffs argue that this shows Muilenburg knew that the airplane was not safe and that the existing procedures were inadequate for pilots to save the aircraft from a MCAS malfunction. [34] at 29–30.

But Muilenburg's one statement after November 15, 2018, on the sufficiency of "existing procedures" was not necessarily inconsistent with the Safety Review Board's conclusions. [34-1], statements 26. Plaintiffs also allege that despite the Board's safety concerns, Boeing decided that the planes could continue to operate. [17] ¶ 181; [35-2] ¶ 37. Boeing and Muilenburg's conclusion that pilots needed little more than a reminder to follow the existing procedures may have been unreasonable in hindsight, but that does not suffice to state the scienter required for a securities fraud claim.

Defendants argue that "[t]he much more plausible inference is that, like Boeing's safety engineers and the FAA, Muilenburg believed the airplane remained safe to fly." [35] at 15. I agree. At worst, the Safety Review Board's conclusions, as allegedly communicated to Muilenburg, support a strong inference of negligence on

---

[4] Plaintiffs also allege that "in an implicit admission that pilots had **not** been adequately trained and existing flight procedures were **not** sufficient to address MCAS—Defendants secretly requested permission from the FAA to update the 737 MAX's flight manual" and suggested pilots receive a higher level of simulator training. [17] ¶ 416 (emphasis in original). Defendants argue that enhancements to MCAS or pilot training materials cannot form the basis for an inference of scienter as a matter of law. [24] at 38–39. I agree, "drawing an inference from such facts does not comport with Federal Rule of Evidence 407, which provides that subsequent remedial measures may not be used as evidence of liability." *See Pugh*, 521 F.3d at 695 (citing *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 760 (7th Cir. 2007)).

Muilenburg's part, which is not adequate for pleading a private securities fraud claim. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201 (1976) (holding that § 10(b) "was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone.")

### 2. *Boeing's Functional Hazard Analysis*

Plaintiffs also allege that defendants had scienter because they knew that Boeing failed to conduct a thorough functional hazard analysis of MCAS, in violation of its own standards and regulatory requirements, and then presented the MAX for certification to the FAA based on that inadequate analysis. [17] ¶ 414. But plaintiffs do not allege that Muilenburg or other executive officials were informed Boeing failed to conduct a thorough hazard analysis of MCAS. *See* [17] ¶¶ 104–107, 126–130, 414. While plaintiffs allege that Muilenburg was briefed on December 17, 2018, regarding the MCAS Certification Compliance Review team's findings, this occurred after the statements above and it is not clear whether Muilenburg was informed of the hazard analysis itself. [17] ¶¶ 206–208. Absent particularized allegations that Muilenburg knew about the hazard analysis, there is not an adequate basis to conclude that he intended to deceive investors by concealing problems with the analysis.

### 3. *Importance of the 737 MAX to Boeing's Business*

Plaintiffs additionally argue that "given the importance of the 737 MAX and the magnitude and consequences of their fraud, [Muilenburg was] aware of—or recklessly disregarded—the issues with the airplane and how it was certified." [34] at 36. Plaintiffs have alleged, in detail, that the 737 MAX and aspects of its development, including the goal to avoid required simulator training, were critically

important to Boeing's business and its attempt to compete with Airbus. [17] ¶¶ 71–78, 84–85, 89, 426–428.

Plaintiffs' allegations about the 737 MAX's importance are only relevant if there is a strong inference that its importance meant development details would necessarily have reached Muilenburg when he made false statements. *See Makor*, 513 F.3d at 710. While plaintiffs have alleged that the MAX was an important product for Boeing, they have not alleged that Boeing's senior management would necessarily be aware of specific and detailed issues that arose during the MAX's development and after the Lion Air crash. Indeed, plaintiffs allege Muilenburg was informed of some of these issues, including the MCAS Certification Compliance Review findings, Pierson's concerns, and the Forkner messages, only after December 17, 2018. [17] ¶¶ 206–208, 210, 212.

It is much more likely that Muilenburg made careless mistakes based on "false information fed from below" than it is that he had scienter for the period following the Lion Air crash. *See Makor*, 513 F.3d at 709. Plaintiffs' allegations suggest that certain important decisions were delegated below the corporate management level, and those employees defrauded the FAA while concealing their conduct from management. *See* [24-7] at 7 (Forkner and Gustavsson's misconduct was "neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management."). Even considering the importance of the 737 MAX, Plaintiffs fail to put forth a plausible allegation that at the time Muilenburg

responded to the Lion Air crash, he knew what Boeing's engineers and technical pilots knew.

### 4. Deferred Prosecution Agreement

Plaintiffs argue that the Deferred Prosecution Agreement, [24-7], establishes Boeing's scienter based on the company's own admissions. [34] at 31–32 (citations omitted). Boeing admitted in the DPA that it "knowingly, and with intent to defraud, conspired to defraud the FAA [Aircraft Evaluation Group] … in order to bring about a financial gain to Boeing." [17] ¶ 308. Boeing further admitted that it "intentionally withheld and concealed from the FAA its knowledge of MCAS's expanded operational scope" and that the 737 MAX's Flight Standardization Board Report and flight manual were "materially false, inaccurate, and incomplete as a result." *Id.*

Yet, "intent to deceive is not a corporate attribute." *Makor*, 513 F.3d at 707. While "[i]t is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud," the statement must be "so dramatic an announcement" that corporate officials would have had to approve it and necessarily had knowledge of its falsity or a material omission. *Id.* at 710 (offering a hyperbolic example of General Motors sales figures).

Boeing's materially false statements made after the Lion Air crash about MCAS and pilots' ability to counter false activations are not so dramatic to support a strong inference of corporate scienter. As noted above, Muilenburg, as well as other corporate officials, would not have been sufficiently knowledgeable regarding MCAS's engineering deficiencies and the insufficiencies of the pilot training materials to know that the statements were false after the Lion Air crash.

The DPA admissions do not change this analysis. The DPA says that Forkner and Gustavsson's misconduct was "neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." [24-7] at 7. Muilenburg was informed of some of these issues, including the MCAS Certification Compliance Review findings, Pierson's concerns, and the Forkner messages, only after December 17, 2018. [17] ¶¶ 206–208, 210, 212. So, while plaintiffs may attempt to use the facts and admissions in the DPA to support their allegations of Muilenburg's scienter, the DPA admissions do not establish Boeing's corporate scienter.

### 5. Plaintiffs' Allegations Collectively

Even taking all the facts alleged collectively, plaintiffs' allegations fail to give rise to a strong inference of scienter as to Muilenburg or Boeing. While the inference that Muilenburg knew, or should have known, about the MAX's problems is a reasonable one, under the PLSRA, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.

Defendants argue that in the weeks after the Lion Air crash, Boeing believed it had manufactured a safe airplane and believed that pilots had the information and training to safely address an erroneous MCAS activation, particularly after Boeing issued its November 6 bulletin and the FAA endorsed it. [24] at 43. As plaintiffs allege, Boeing's Safety Review Board convened immediately after the Lion Air accident to understand what might have caused it and identified a possible scenario involving MCAS activation. [17] ¶ 164. Boeing officials also met with the FAA to help

them "understand MCAS." [17] ¶ 167. In the following weeks, Boeing engaged in additional dialogue with the FAA and other regulatory authorities. [17] ¶¶ 180, 183. Defendants argue that these allegations show that Boeing quickly took steps to identify the potential causes of the crash and to share information with pilots and regulators. [24] at 43. The inference of scienter is not more compelling than the inference of mistake. *See Makor*, 513 F.3d at 709. Boeing's actions immediately after the Lion Air crash raise an inference of negligence with respect to its misleading statements to the market about MCAS and pilot training, which does not give rise to a § 10(b) claim. *See Ernst & Ernst*, 425 U.S. at 201 (holding that § 10(b) "was addressed to practices that involve some element of scienter and cannot be read to impose liability for negligent conduct alone.").

## IV. Statements about the 737 MAX's Production Rate and Backlog (33–37, 39, 43, 64)

In between the Lion Air and Ethiopian Airlines crashes, Boeing, Muilenburg, and Smith made several statements about the 737 MAX's production rate and market success. [34-1], statements 33–37, 39, 43, 64. Plaintiffs allege that these statements were calculated to defraud investors. [17] ¶¶ 395, 397, 399. These statements were either not false or inaccurate predictions protected by the PSLRA safe harbor.

To begin, many of the allegedly misleading statements simply report Boeing's past performance. [34-1], statements 33 ("our backlog of more than 4,700 aircraft and a production skyline that is sold out into early next decade. The 737 program added 13 new customers during the year, and the MAX family surpassed 5,000 net orders in December."), 37 (Boeing's earning presentation stated Boeing had a "robust

backlog of $412B" and that the "737 MAX family surpassed 5,000 net orders."), 39 ("We're in an oversold position."), 64 (Boeing's "737 program has a backlog of more than 4,400 aircraft and a production skyline that is sold out into early next decade."). Reports of past performance are rarely actionable. *See Anderson v. Abbott Labs.*, 140 F.Supp.2d 894, 909 (N.D. Ill. 2001) ("Accurate statements of historical fact, such as past financial results, are not actionable."); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) ("Because plaintiffs have not alleged the historical inaccuracy of [defendant's] financial and earnings' statements, such statements are not misrepresentations.").

Plaintiffs do not allege that these statements were inaccurate. Instead, they contend that defendants materially misled investors because they "disclose[d] a production rate and backlog for the 737 MAX when its sales and production could no longer be reasonably relied on in light of the safety problems that rendered the airplane fundamentally unsafe." [17] ¶¶ 395, 397, 399. Plaintiffs argue that defendants "created the false impression that there would be no interruption in the production or delivery of the 737 MAX." [34] at 27. But "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *Alizadeh v. Tellabs*, 13-c-537, 2015 WL 557249, at *11 (N.D. Ill. Feb. 9, 2015) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997)). Even if these statements could be construed as implications of future performance, then, like the statements addressed below, they are protected by the PSLRA safe harbor for forward-looking statements.

In a January 2019 earnings call, Muilenburg, Smith, and Boeing announced that Boeing would increase the 737 MAX production rate from 52 to 57 per month. [17] ¶¶ 389–93; [34-1], statements 33–37. Smith and Boeing also later reaffirmed Boeing's plan to increase production in February 2019. [17] ¶¶ 394, 396; [34-1], statements 39, 43.

These are forward-looking statements subject to the PSLRA safe harbor. 15 U.S.C. § 78u-5(c). The safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if either (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," § 78u-5(c)(1)(A)(i); or (2) "the plaintiff fails to prove" that the officer who made or approved the statement had "actual knowledge ... that the statement was false or misleading," § 78u-5(c)(1)(B). Plaintiffs must raise a strong inference that Muilenburg, Smith, and Boeing knew their stated plan to increase MAX production was materially misleading.

Plaintiffs' allegations do not raise this strong inference. Plaintiffs argue that Muilenburg was aware of the Safety Review Board conclusion that it would take 27 months to redesign and reinstall MCAS, and therefore, he knew that the increased production plan was materially misleading. [34] at 28 n. 12. However, knowledge that it would take over two years to redesign and reinstall MCAS does not demonstrate that Muilenburg knew that an increase in production was unattainable. Plaintiffs also allege that the same Safety Review Board "concluded that pilots could continue

to fly the 737 MAX during the 27 months," suggesting that the redesign and reinstall would not affect the production and sale of the MAX. [17] ¶ 181.

Plaintiffs' allegations of Smith's scienter are even weaker. In their opposition to defendant's motion to dismiss, plaintiffs repeatedly argue that they establish Smith's scienter by alleging that Smith was informed about the Safety Review Board's concerns. [34] at 29–30 (citing [17] ¶¶ 165, 181–82), 35 n. 17 (citing [17] ¶ 182), 36 (citing [17] ¶ 182), 38 (citing [17] ¶¶ 165, 182), 39 (citing [17] ¶ 181). But plaintiffs do not allege Smith's knowledge of this information—they allege that Muilenburg and "other senior executives" were informed of the Safety Review Board concerns. [17] ¶ 182. While it is not an unreasonable inference that Boeing's CFO would be keep abreast of important developments after a catastrophic accident, group pleading is not permitted under the PSLRA. *Makor*, 513 F.3d at 710. Plaintiffs' ambiguous allegations that "senior executives" were informed of the Safety Review Board findings do not suffice as particularized allegations about Smith.

Plaintiffs also allege that defendants knew or recklessly disregarded that their disclosed production rate and backlog for the 737 MAX could no longer be reasonably relied on considering the warnings of Edward Pierson, a Boeing plant supervisor at Boeing's Renton, Washington facility. [17] ¶ 420. Since June 2018, Pierson had contacted multiple senior officials at Boeing with his concerns regarding safety and quality control problems in the 737 MAX production. [17] ¶¶ 150–53. In one of his efforts to raise these concerns, Pierson sent a letter directly to Muilenburg on December 19, 2018, which resulted in a meeting with Boeing counsel. [17] ¶¶ 209–

10. After Boeing announced a production ramp up on February 7, 2019, Pierson sent an extensive follow-up email to Boeing counsel. [17] ¶ 221. On February 19, 2019, Pierson escalated his concerns to Boeing's entire Board of Directors, but never received a response. [17] ¶ 223. Two days after the Ethiopian Airlines crash, Pierson again wrote to the entire Board of Directors, including Muilenburg, and again did not receive a response. *Id.* Plaintiffs make no specific allegations that suggest Smith was aware of Pierson's concerns.

While Pierson's concerns were directly related to the safety of the 737 MAX and the production rates that defendants had promised, plaintiffs have not alleged how Pierson's warnings about production problems would necessarily lead to the conclusion that a production increase to 57 airplanes a month was not feasible. *See Pugh*, 521 F.3d at 695 (holding that litigation accusing defendants of fraud indicated only knowledge of "accusations of fraud, not fraud itself.").

Further, certain statements from the January 30, 2019 earnings call are vague and aspirational. For example, Muilenburg attested that the 737 MAX "is creating value in the market for our customers." [17] ¶ 392; [34-1], statement 36. Such opinions are rarely actionable. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (holding a statement of opinion is not actionable if the opinion expressed "fairly aligns with the information in the issuer's possession at the time."); *see also City of Taylor*, 8 F.4th at 595 (holding statements of "vague optimism" constitute nonactionable puffery).

29

The plaintiffs have not pled with particularity the specific knowledge that Muilenburg and Smith possessed which would contradict their assessment in statements 33–36, 39. *See Omnicare*, 575 U.S at 189.

As for statement 43, plaintiffs have failed to support a strong inference that the statement was "made by or with the approval of an executive officer" and that officer had "actual knowledge … that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B). It is a reasonable inference that the statement would have been approved by an executive officer. But plaintiffs make no allegations to show that any officers had knowledge that Boeing's plan to increase production was unattainable.

## V.     Boeing's Response to the Ethiopian Airlines Crash

On March 10, 2019, Ethiopian Airlines flight 302 crashed six minutes after takeoff, killing all 157 people aboard. [17] ¶¶ 224–25. International regulators and airlines rapidly ordered the grounding of the 737 MAX. [17] ¶¶ 226–27. The FAA shortly followed, grounding the 737 MAX indefinitely. [17] ¶ 232.

Plaintiffs categorize Boeing's and Muilenburg's statements following the crash into four categories: MCAS (including information provided to pilots), Safety of the 737 MAX, AOA Disagree Alert, and Certification of the 737 MAX. [34-1], statements 38, 44–49, 51, 53–55, 57, 59, 66–67, 69–71, 74, 76.

### A.     Statements about MCAS and Pilot Training Materials (45–47, 54)

Boeing released multiple statements shortly after the Ethiopian Airlines crash that addressed MCAS functionality and pilot training materials. [34-1], statements 45–47. Boeing's March 11, 2019 press release addressed technical questions about

MCAS: "A pitch augmentation control law (MCAS) was implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack. It was put through flight testing as part of the certification process prior to the airplane entering service. MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope." [17] ¶ 343; [34-1], statement 45.

Plaintiffs allege that this statement was materially misleading because Boeing falsely stated that MCAS does not control the airplane during normal flight when it could operate during nearly the entire speed range for the 737 MAX, including at lower altitudes in and around takeoff and landing. [17] ¶ 345. Defendants argue that another statement in the press release expressly acknowledged the potential for erroneous activation of MCAS at times other than those for which it was designed: "the operations manual 'already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor.'" [24] at 20 (quoting [17] ¶ 343). This statement is not a clarification. It does not explain the conditions (be it normal or abnormal flight conditions) under which erroneous AOA sensor data could trigger MCAS. The key information—that MCAS could be activated erroneously during a normal commercial flight—was not disclosed.

The press release also again directed pilots to the Flight Crew Operations Manual and November 6, 2018 bulletin, stating: "Boeing's 737 MAX Flight Crew Operations Manual (FCOM) already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor.

Case: 1:22-cv-03845 Document #: 36 Filed: 09/18/23 Page 32 of 59 PageID #:1191

The pilot will always be able to override the flight control law using electric trim or manual trim. In addition, it can be controlled through the use of the existing procedure as reinforced in the Operations Manual Bulletin (OMB) issued on Nov. 6, 2018." [17] ¶ 343; [34-1], statement 46. Boeing issued another press release the next day, stating in part "based on the information currently available, we do not have any basis to issue new guidance to operators." [17] ¶ 344; [34-1], statement 47.

Plaintiffs allege that these statements were materially misleading because Boeing directed flight crews to existing procedures when those procedures were woefully insufficient to address MCAS malfunctions. [17] ¶ 345. Plaintiffs also allege that the flight manual and bulletin referenced in these statements were deficient because of Forkner's effort to mislead the FAA Aircraft Evaluation Group to exclude all mentions of MCAS. *Id.* Defendants argue that these statements were made to pilots, not the investing public, and cannot form the basis of a securities fraud claim. [35] at 8. Yet, Boeing reassured investors of the 737 MAX's design and safety by way of stating that pilots knew how to fly the plane, when in reality the flight manual was "materially false, inaccurate, and incomplete." [17] ¶ 308. Once Boeing chose to rely on the information in the flight manual as a way to reassure investors, it had a duty to tell the whole truth. *See* 17 C.F.R. § 240.10b-5(2) ("It shall be unlawful for any person … to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."); *Stransky*, 51 F.3d at 1331 (citation omitted). Therefore, statements 45–47 were materially misleading.

32

Boeing also made a statement on March 22, 2019, saying that its "[a]irplanes are delivered with a baseline configuration, which includes a standard set of flight deck displays and alerts, crew procedures and training materials that meet industry safety norms and most customer requirements." [17] ¶ 351; [34-1], statement 54. Plaintiffs allege this statement is materially misleading because the training materials provided to pilots were deficient as a result of Forkner's misrepresentations to the Aircraft Evaluation Group. [17] ¶ 352. For the same reasons as the statements described above, this too was misleading.

Plaintiffs have also adequately alleged scienter as to these statements. While plaintiffs do not link these statements to Muilenburg, Smith, or any other Boeing employee and establish their scienter, their allegations still support a strong inference for corporate scienter. *See Makor*, 513 F.3d at 710. It is exceedingly unlikely here that the corporate officials involved in making these statements did not at least recklessly disregard the risk that the statements were false or materially misleading. These statements focus on the system responsible for two deadly airplane crashes of Boeing's newest airplane and pilots' ability to safety fly it. And the statements were released right after the second crash. It is implausible that Muilenburg or another high-level executive was not involved in the authorization of such statements. *Cf.* [17] ¶¶ 183, 189–90 (alleging that Muilenburg, Boeing senior engineers, and Boeing attorneys were extensively involved in statements issued immediately after the Lion Air crash), 229 (alleging Muilenburg's involvement in drafting an email to Boeing employees after the Ethiopian Airlines crash).

It is also implausible that the corporate officials involved in making the statement were not aware of the issues with MCAS and pilots' ability to safely fly the 737 MAX at this time. Plaintiffs allege that Boeing counsel, Muilenburg and other executives were already aware of the Forkner messages and were actively concealing them from the FAA. [17] ¶ 212. Muilenburg and Boeing's senior engineering and compliance personnel were also aware of the MCAS Certification Compliance Review that questioned the rational for the decision to remove MCAS from pilots' differences training and the 737 MAX's flight manual. [17] ¶¶ 206–08. At this point in the chronology, the strong inference is that some high-level corporate official knew (or was recklessly indifferent to) the relevant details about the functionality of the system responsible for two deadly crashes and pilots' ability to safely fly the MAX, one of Boeing's biggest assets.

Defendants fail to present a plausible nonfraudulent story that is more cogent and compelling. Defendants argue that plaintiffs' "allegations show that Boeing moved swiftly after the accidents to understand the potential causes and share information with the piloting community." [24] at 43. Defendants propose that the "most compelling inference is that Defendants … believed that pilots had the information and training to safely address an erroneous activation of MCAS." *Id.* But plaintiffs' allegations establish that knowledge of the inadequacy of pilot training materials was widespread at the senior management level. So, it is exceedingly unlikely that the corporate officials involved in making these statements were merely

repeating lies fed to them by other executives or lower-level employees. *See Makor*, 513 F.3d at 710–11. Statements 45–47, and 54 are actionable.

### B.    Statements about the Safety of the 737 MAX (44, 47–49, 51, 57, 59, 67)

During this period, Muilenburg and Boeing also made statements reassuring the public of the airplane's safety. [34-1], statements 44, 47–49, 51, 57, 67. These vague affirmations of safety and Boeing's core values, like the ones made after the Lion Air crash discussed above, are immaterial puffery and opinion, nonactionable as a matter of law. *See City of Monroe*, 399 F.3d at 669–670.

The reasoning above applies even more so after the second accident, when the total mix of information available to investors had grown to include two crashes and the indefinite grounding of the 737 MAX. Many of Boeing's and Muilenburg's statements after the second crash contain vague reassurances of safety while acknowledging facts that directly imply that the airplane was not, in fact, safe. For example, in its statement about the FAA grounding, Boeing repeated its common refrain that "[s]afety is a core value at Boeing" but also acknowledged the "suspension of operations of the entire global fleet of 371 737 MAX aircraft" and the need for "safety enhancements" to ensure that "this does not happen again." [17] ¶ 346; [34-1], statement 48. Boeing's "core value" statements would not have been relevant to the total mix of information in a statement that also announced the indefinite grounding of the 737 MAX because of safety problems. *Cf. Omnicare*, 575 U.S. at 190 ("an investor reads each statement within such a document, whether of fact or of

opinion, in light of its surrounding text, including hedges, disclaimers, and apparently conflicting information.").

Plaintiffs also allege that Boeing's statement regarding the FAA grounding was materially misleading because Boeing affirmed its support of the grounding when Muilenburg had personally asked the President of the United States not to ground the planes. [17] ¶¶ 346–47. But plaintiffs do not allege how disclosure of Boeing's opposition to the grounding order "would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231–32 (quotation omitted). The total mix of information available to investors at the time already included two plane crashes and the grounding order.

One statement in the safety category does provide more detail than the others. In April 2019, Muilenburg stated that the software update to MCAS "will make the 737 MAX even safer by preventing erroneous angle of attack sensor readings from triggering the Maneuvering Characteristics Augmentation System, or MCAS, something that initial investigation reports indicate occurred in both MAX accidents, as one link in a longer chain of events. We know we can break this chain link. It's our responsibility to eliminate this risk." [17] ¶ 356; [34-1], statement 59. Plaintiffs allege that this statement is materially misleading because Muilenburg told the market that the 737 MAX was safe when it was not. [17] ¶ 357. Although the statement implied that the MAX was safe (when it said the MAX could be made even safer), the surrounding text acknowledged that the risk from MCAS continued and had not been eliminated. [17] ¶ 356; [34-1], statement 59. Considering the total mix of information

described above and the statement's focus on the need for a software update to improve safety, a reasonable investor would not have relied on Muilenburg's implied affirmation of safety in this statement. *See City of Monroe*, 399 F.3d at 669–670.

## C.    Statements about the AOA Disagree Alert (55, 70–71, 76)

In April 2019, Southwest issued a statement which revealed that, before the Lion Air Crash, Boeing had falsely told it that the AOA Disagree Alert was operable on all MAX aircraft regardless of whether Southwest had purchased the optional AOA Indicator. [17] ¶ 257. In response, Boeing acknowledged that the AOA Disagree Alert "was not activated as intended," but still maintained that pilots had "all flight data and information needed to safely operate the aircraft." [17] ¶ 366; [34-1], statement 70. Boeing emphasized, "[t]his information is readily accessible to pilots, and it always has been." *Id.* Boeing later issued additional statements downplaying the importance of the AOA Indicator and the AOA Disagree Alert, stating they "provide supplemental information only, and have never been considered safety features on commercial jet transport airplanes." [17] ¶¶ 367, 373; [34-1], statements 71, 76 ("the absence of [an AOA Disagree] alert didn't adversely affect airplane safety or operation."). Boeing had also previously issued a similar statement regarding the 737 MAX's baseline configuration and the AOA Disagree Alert. [17] ¶ 353; [34-1], statement 55 (Boeing had "developed an MCAS software update to provide additional layers of protection if the AOA sensors provided erroneous data.").

Plaintiffs allege that it was materially misleading for Boeing to represent that pilots had all the information they needed to safely operate the 737 MAX when there was no reference to MCAS in the airplane's Flight Crew Operations Manual and the

AOA Disagree Alert was inoperable on 80% of 737 MAX airplanes. [17] ¶¶ 368, 374. Plaintiffs also allege that it was materially misleading for Boeing to represent that the AOA Disagree Alert was not a safety feature, and its malfunction did not adversely impact the safety or operation of the 737 MAX when Boeing had previously said the opposite. *Id.* Defendants counter that Boeing's statements were not false, or were immaterial, and alternatively, they were nonactionable expressions of opinion. [24] at 27–29; [35] at 9.

Defendants' argument is misplaced. Even if Boeing's statements were technically correct, insofar as the AOA Disagree Alert was not classified under regulatory definitions as a "safety feature," Boeing downplaying the importance of the AOA Indicator and the AOA Disagree Alert as important to the safety of the 737 MAX made the statements materially misleading. *See* [17] ¶ 240 ("an aeronautical and economic analyst … explained, the [AOA] features are 'critical, and cost almost nothing for the airlines to install.' 'Boeing charges for them because it can. But they're vital for safety.'").

Ultimately, the statements, even if materially false, are not actionable for two reasons. First, plaintiffs have failed to allege the scienter of anyone involved in making the statements. Plaintiffs argue that they have adequately pled scienter as to the AOA Disagree Alert statements by way of alleging that Boeing's Vice President Michael Sinnett was aware that a functioning AOA Disagree Alert would have prevented the Lion Air crash. [34] at 23 n. 6; [17] ¶ 124. Yet, even if Sinnett knew that Boeing's statements regarding the AOA Disagree Alert were false, plaintiffs

have not shown Sinnett was involved in making these statements. While Sinnett's knowledge may be imputable to Boeing as a corporate defendant is considered to have acquired the collective knowledge of its employees, "specific intent cannot be aggregated similarly." *See Southland*, 365 F.3d at 367 (quotation omitted); *Makor*, 513 F.3d at 708 (holding scienter is established by "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement … rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment.").

Second, even if plaintiffs were able to establish scienter for these statements, plaintiffs do not adequately allege how any of these statements caused a loss to investors. Loss causation is discussed in more detail below, but plaintiffs making securities fraud claims must plausibly allege that "the defendant's fraud caused an economic loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). Plaintiffs allege that Boeing's stock fell on March 21, 2019, after *The New York Times* reported on the AOA Disagree Alert issues. [17] ¶¶ 240–41, 475. The first alleged misstatement regarding the Alert, issued March 22, 2019, was in direct response to the article. [17] ¶¶ 242, 351; [34-1], statement 55. The information about Boeing's misrepresentations to its customers was available to investors before Boeing issued its denials and defended its actions with respect to the Alert.

### D.    Statements about Certification of the 737 MAX and Boeing's Relationship with the FAA (38, 53, 66, 69, 74)

Plaintiffs allege that Muilenburg, Smith, and Boeing repeatedly misled investors regarding the original FAA certification process of the 737 MAX and Boeing's relationship with the FAA.

To start, in March 2019, Boeing issued a press release, stating in part: "All Boeing airplanes are certified and delivered to the highest levels of safety consistent with industry standards." [17] ¶¶ 242, 351; [34-1], statement 53. Plaintiffs allege that it was materially misleading to tout the certification of the 737 MAX when, in fact, Boeing had withheld information from the FAA. [17] ¶ 352. I agree.

Plaintiffs do not allege which individuals were involved in making this statement, but instead argue that Forkner's fraud and his scienter is established by the DPA and is imputable to Boeing. [34] at 31 n. 15. Plaintiffs allege that the Forkner messages, consisting of Forkner's texts with Gustavsson and emails with the Aircraft Evaluation Group, show that (1) Forkner recognized MCAS had greater control over the aircraft than he previously understood and that it was active at low speeds as well as high; (2) this meant Forkner would need to notify the Evaluation Group so they could update their assessment of MCAS; and (3) Forkner nonetheless continued working to secure a Level B training designation by concealing the change from the Evaluation Group. [17] ¶¶ 130–138, 141–145.

Plaintiffs' legal support for their argument that Forkner's scienter is imputable to Boeing is weak. [34] at 31 n. 15 (citing *United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992) (holding that knowledge of an employee is imputable to

their employer, not that an employee's scienter is imputable)). There may be a path through which corporate scienter could be established based on the state of mind of a lower-level employee, intending to help their company, who knowingly furnished false information that became the basis of a fraudulent public announcement. *Makor*, 513 F.3d at 708. But plaintiffs do not elaborate on their argument and have not pled how Forkner was involved in any misstatements or omissions to investors with particularity. Nor do plaintiffs plead that Forkner communicated false and misleading statements to Boeing with the intent that Boeing communicate those statements to the market. Therefore, Forkner's scienter cannot be imputed to Boeing.

Plaintiffs' allegations do support a strong inference of corporate scienter as to this statement. There is a strong inference that corporate officials were involved in making the statement, which was released in response to a damning *New York Times* article revealing the inadequacies of the AOA Disagree Alert. [17] ¶¶ 240–42, 351. And like with the statements regarding MCAS and pilot training materials discussed above, plaintiffs' allegations support a strong inference that corporate officials were aware of and actively concealed Forkner's fraud in the certification process. [17] ¶ 212. While there is a conceivable inference that the corporate officials involved in making the statement were fed false information from below, it is less compelling than the inference that corporate officials at least recklessly disregarded their knowledge of fraud in the certification process when making this statement.

Subsequently in an April 25, 2019 conference call with investors, a bank analyst asked Muilenburg, "[H]ow did this happen, right? … Is there any way you

can give us a feeling for how did this slip through engineering organization? How did it slip through the FAA." [17] ¶ 361; [35-2] ¶ 67. Muilenburg responded:

> Yeah, Ron, there is no technical slip or gap here, right? Again, as I mentioned, we know that both accidents were a series of events, and that is very common to all accidents that we've seen in history. And what we know is that in this case, there was an erroneous angle-of-attack information that came into the airplane from multiple causes. We know that at some point during the flight, that activated the MCAS control laws, and we know that ultimately there were actions or actions not taken that contributed to the final outcome … But I can tell you with confidence that we understand our airplane, we understand how the design was accomplished, how the certification was accomplished, and remain fully confident in the product that we've put in the field. But we also know there are areas that we can improve, and that is the source of the software update here. But there was no surprise or gap or unknown here or something that somehow slipped through a certification process. Quite the opposite. We know exactly how the airplane was designed. We know exactly how it was certified. We have taken the time to understand that.

[17] ¶ 361; [34-1], statement 66. A few days later, Muilenburg reiterated Boeing's compliance with the certification process: "We have gone back and confirmed again … that we followed exactly the steps in our design and certification processes that consistently produce safe airplanes. It was designed per our standards. It was certified per our standards." [17] ¶ 364; [34-1], statement 69. One month later, Muilenburg also said: "[Boeing's] relationship with the FAA has centered on the delegated authority approval and how that process works. And I will tell you that I have a great deal of confidence in that process and how it works. It's a high integrity process and I think it's proven. It's demonstrated results. It's a way for the FAA to exercise its independent role, its regulatory role as it should, but also tap into the deep technical expertise in our company." [17] ¶ 371; [34-1], statement 74.

Plaintiffs allege that these statements were materially misleading because Muilenburg stated that nothing out of the ordinary happened in the 737 MAX certification process when Boeing had defrauded the FAA into certifying the MAX based on incorrect information. [17] ¶¶ 363, 365. Plaintiffs also allege that it was materially misleading for Muilenburg to state he had confidence in the certification process and to characterize the process as "proven" and of "high integrity" when Boeing had defrauded the FAA into certifying the MAX based on false information. [17] ¶ 374.

Defendants argue that the statements are not false because Boeing did not mislead the FAA personnel responsible for determining whether the design of the 737 MAX complied with federal airworthiness standards. [24] at 21–22. Defendant's argument relies on a definition of the certification process that excludes the Aircraft Evaluation Group, the arm of the FAA that determines pilot training requirements and publishes the Flight Standardization Board Report. Yet, the DPA and SEC Cease-and-Desist Orders make clear that the Evaluation Group pilot training determination is part of the FAA certification. [24-7] at 30–31 (referring to the training determination and report "as part of [the FAA] evaluation and approval process."); [35-2] ¶ 23 ("In connection with the overall evaluation, approval and certification process …, the FAA-AEG is responsible for determining the required level of differences training.").

Even if Boeing did make more substantial disclosures about MCAS to FAA airworthiness certification officials as defendants argue, Muilenburg's "failure to

disclose that Boeing pulled the wool over [the Evaluation Group's] eyes makes the statement[s] materially false and misleading." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *22; *see McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d. Cir. 1990) ("literally accurate" statements "can become through their context and manner of presentation, devices which mislead investors.").

Defendants also argue that plaintiffs mischaracterize Muilenburg's statements and that he did not say that "nothing out of the ordinary happened in connection with the certification of the 737 MAX" but that Muilenburg stated that Boeing understood the risks of erroneous MCAS activation and believed it could be managed by pilots. [24] at 21–22. Yet, the analyst specifically asked Muilenburg how issues with MCAS slipped past the FAA. [17] ¶ 361; [35-2] at 12. Muilenburg answered that nothing had slipped through the certification, omitting material information. [17] ¶ 361; [34-1], statement 66.

Disclosure of Forkner's "jedi mind tricking" the Aircraft Evaluation Group would have altered the total mix of information available to investors by raising significant questions about Boeing's compliance and relationship with regulatory authorities. Boeing's relationship with regulators was material information to investors, as demonstrated by several public comments after the Forkner messages were disclosed to the public. [17] ¶ 282.

Plaintiffs have also established Muilenburg's scienter regarding the FAA certification process due to his knowledge of the Forkner messages. Plaintiffs allege that Muilenburg and other senior Boeing executives became aware of the Forkner

44

messages in January 2019 and that Muilenburg immediately understood the messages to be "concerning." [17] ¶ 212. Nevertheless, defendants did not provide the messages to the FAA until October 2019. [17] ¶¶ 212, 279.

Defendants argue that plaintiffs allege that Muilenburg only learned of the messages, not that he actually received a copy of them. [24] at 37. Defendants further argue "Forkner's text message describes his experience in a simulator not the airplane, and nothing in the messages indicates that Forkner expressed concerns about the safety of the airplane itself." *Id.* (emphasis omitted).

While these two issues may present factual disputes about the extent of Muilenburg's knowledge and about whether a simulator flight accurately captures actual flight characteristics, these matters are not appropriate for resolution on this motion where plaintiffs' allegations are taken as true, and I draw all reasonable inferences in their favor. *See Doe*, 933 F.3d at 854; *Sloan*, 901 F.3d at 893.

At this stage, plaintiffs' allegation that Muilenburg knew about the Forkner messages suffices to allege that Muilenburg knew: (1) MCAS was active throughout the airplane's speed range; (2) Boeing's technical pilots knew this and thought this posed a risk to the Aircraft Evaluation Group's Level B training; and (3) Forkner, knowing that the Evaluation Group was misinformed about MCAS's operation, doubled down and kept it in the dark so that MCAS would not be mentioned in the Flight Standardization Board Report nor in the pilot training materials. Thus, plaintiffs have established Muilenburg's scienter when he falsely affirmed the

integrity of a regulatory approval process that he knew had been compromised. Statements 53, 66, 69, and 74 are actionable.

In contrast, statement 38, made by Smith, regarding the certification process is not actionable. At a February 2019 conference, Smith stated, "Look, certification is a big part of any development program. But I'd like to think we get well ahead of that and obviously working our way through 737 and all the derivatives of the 737 MAX … I wouldn't tell you that we see anything that's been outside the norm of what we've normally been through in our certification of our other aircraft." [17] ¶ 341; [34-1], statement 38.

Plaintiffs allege that it was materially misleading for Smith to characterize the certification of the MAX as normal when Boeing had defrauded the FAA into certifying the MAX based on incorrect information. [17] ¶ 342. But plaintiffs have failed to establish Smith's scienter as to this statement. While plaintiffs argue that Smith was informed about the Forkner text messages, plaintiffs' complaint does not reflect this. [34] at 21 n. 4 (citing [17] ¶¶ 182, 206, 212), 33 (citing [17] ¶ 212). Plaintiffs allege that Muilenburg and "other senior executives" were informed of the Forkner text messages. [17] ¶ 212. While it is not an unreasonable inference that Smith, as Boeing's CFO, would be informed of the messages, "plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh*, 521 F.3d at 693–94. Plaintiffs' allegations that "senior executives" were informed of the Forkner messages do not support a strong inference that Smith was also aware of the messages. Therefore, statement 38 is not actionable.

46

## VI.    Statements about the 737 MAX's Return to Service (50, 52, 56, 58, 62–63, 65, 68, 72–73, 75, 77–78, 81–86, 89)

After the grounding of the 737 MAX in March 2019, Boeing, Muilenburg, and Smith periodically updated the public on Boeing's progress on the MAX's recertification and return to service timeline. These statements can be divided into two categories: (1) general statements regarding progress on the recertification process; and (2) detailed estimates on the timing of the 737 MAX's return to service.

Many of Muilenburg's, Smith's, and Boeing's statements regarding recertification of the 737 MAX consisted of general reassurances that Boeing was actively working on the recertification process and updates to the MAX. [34-1], statements 50, 52, 56, 58, 62–63, 65, 68, 72–73, 75. Plaintiffs do not allege facts demonstrating that these statements were false. [17] ¶¶ 348–49, 356, 358–60, 362, 369–70, 372. Instead, plaintiffs argue that it was "materially misleading for Defendants to state that Boeing was making steady progress towards re-certification and knew how to fix MCAS when the process was far from over." [17] ¶¶ 363, 357, 374. But even slow and inadequate progress would not render these statements false. *Aircraft Sec. Litig.*, 2022 WL 3595058, at *23. Therefore, statements 50, 52, 56, 58, 62–63, 65, 68, 72–73, and 75 are not actionable.

Between June 2019 and November 2019, Muilenburg, Smith, and Boeing also made multiple statements estimating that the 737 MAX would be recertified and return to service during the 2019 fourth quarter. [17] ¶¶ 375, 377, 379–82, 384–85, 387; [34-1], statements 77–78, 81–86, 89.

47

Defendants argue that these are forward-looking statements that fall under PSLRA safe harbor. [24] at 30; 15 U.S.C. § 78u-5(c). I agree. These statements are best understood as "statement[s] of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," § 78u-5(i)(1)(B), and therefore qualify as forward-looking statements.

Defendants argue that Muilenburg's, Smith's, and Boeing's statements were accompanied by meaningful cautionary language that made clear that the return to service estimate was subject to risks. [24] at 31; [35] at 12. But "[c]autionary statements are not meaningful if they warn of potential risk that has already materialized." *Aircraft Sec. Litig.*, 2022 WL 3595058, at *25 (citing *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009); *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102 (D.C. Cir. 2015) ("cautionary language cannot be 'meaningful' if it is 'misleading in light of historical fact[s] ... that were established at the time the statement was made.")).

Although Muilenburg's, Smith's, and Boeing's predictions of the 737 MAX's return were accompanied by language that regulators would not move as quickly as forecasted, this risk had already materialized. Plaintiffs allege that in mid-June 2019, Muilenburg met in secret, to avoid public scrutiny, with FAA Acting Administrator Daniel Elwell at the Paris Air Show. [17] ¶ 264. At this meeting, Elwell "asked Muilenburg that Boeing slow down its talk of progress, giving the FAA space to exercise scrutiny" and "FAA officials had grown impatient with Boeing's optimism

about putting the MAX back in service." *Id.* Muilenburg allegedly agreed, saying "we're not going to push." *Id.*

"Companies cannot claim the protection of cautionary language by listing broad areas of risk and then avoid liability for statements 'implying that no such risks on the horizon even if a precipice were in sight.'" *Aircraft Sec. Litig.*, 2022 WL 3595058, at *25 (quoting *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 733 (7th Cir. 2004)). Here, plaintiffs have already established that Muilenburg and Boeing knew the cautionary language was misleading considering Elwell's warnings.

Thus, to state a claim based on these statements, plaintiffs must plead facts that give rise to a strong inference that Muilenburg, Smith, and Boeing knew the return to service estimates were false or misleading. *See Makor*, 513 F.3d at 704–05 ("'[A]ctual knowledge' of falsity, not merely indifference to the danger the statement is false, is required for liability for 'forward looking' statements." (citations omitted)).

Despite Elwell's request that Boeing slow down its talk of progress, Muilenburg announced a few days after their meeting that Boeing was "still … looking at" the "end of summer" 2019 as the "timeframe" for the MAX's return to operation. [17] ¶ 375; [34-1], statement 77. Plaintiffs allege that, considering Muilenburg's meeting with Elwell, this statement was materially false and misleading, and Muilenburg knew this timeframe was false. [17] ¶ 376.

I agree with plaintiffs. Plaintiffs' allegations support the inference that Muilenburg knew he was presenting a misleading timeline. Muilenburg omitted that the FAA had asked him to slow down its talk of progress. The FAA's view of the return

to service timeline directly contradicted Muilenburg's estimate. *See, e.g., In re Amgen Inc. Sec. Litig.*, 544 F.Supp.2d 1009, 1028–29 (C.D. Cal. 2008) (finding company's statement that "we think the market has plenty of room to grow" actionable in light of undisclosed FDA warnings that products would require further testing); *Selbst v. McDonald's Corp.*, No. 04 C 2422, 2005 WL 2319936, at *20 (N.D. Ill. Sept. 21, 2005) (concluding unrealistic projections were actionable when defendants "had access to reports which would lead a reasonable person to believe that the predictions being made in public statements are not accurate and/or missing relevant information.").

Indeed, continued announcements that the 737 MAX could be recertified by the end of 2019 eventually pushed the FAA to "demand[] a meeting with [] Muilenburg to address Defendants' false claims that the 737 MAX would be re-certified and returned to service by the end of the year." [17] ¶ 293. As reported by *The New York Times* on December 12, 2019, FAA Administrator Dixon met with Muilenburg, "reprimanded [him] for putting pressure on the agency to move faster in approving the return of the company's 737 MAX jet[, and] … chastised [him] for suggesting the plane would be recertified [in 2019]." *Id*. Dickson also "told his colleagues that he had not agreed to [Defendant Muilenburg's] timeline and felt as though he was being manipulated." [17] ¶ 292. The FAA went as far as to e-mail Congressional staff explaining the falsity of Boeing's repeated representations to its customers and investors about the 737 MAX's return to service timeline. [17] ¶ 294.

While plaintiffs' allegations support a strong inference that Muilenburg knew his estimates were false, courts must still consider "plausible, nonculpable

explanations for the defendant's conduct." *Tellabs*, 551 U.S. at 323–324. Defendants argue that Muilenburg "in the wake of the grounding, believed Boeing was making progress toward the plane's return to service and expected to complete the process on the timetables disclosed." [24] at 43. Further, defendants assert that it "makes no sense" for Boeing and its most senior executives to have "knowingly lied about the potential timing of the 737 MAX's return to service." [24] at 42.

I disagree. Plaintiffs' inference that Muilenburg acted with scienter is cogent and compelling as to his statements estimating the 737 MAX's return to service. According to defendants, "[p]laintiffs' theory 'does not resonate in common experience' and cannot establish scienter because it 'depends on the supposition that defendants would rather keep the stock price high for a time and then face the inevitable fallout once [the] problem was revealed.'" *Id.* (quoting *Nguyen v. Endologix*, 962 F.3d 405, 412 (9th Cir. 2020)). Yet, "Muilenburg's alleged actions are consistent with him taking a gamble that he could cover up damning information until the MAX was back in operation. Such gambles need not be perfectly rational to support a 10b-5 claim, since the securities laws 'forbid foolish frauds along with clever ones.'" *Aircraft Sec. Litig.*, 2022 WL 3595058, at *27 (quoting *Asher*, 377 F.3d at 728); *see also Makor*, 513 F.3d at 710 ("The fact that a gamble—concealing bad news in the hope it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." (citation omitted)).

In determining whether a defendant acted with scienter, it is relevant to ask whether they acted with "motive and opportunity to commit fraud." *ASTI Comms.,*

*Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Plaintiffs have alleged both in a cogent and compelling manner. Muilenburg wanted to conceal the Forkner messages (and other evidence of Boeing's insufficient safety protocols) and believed he could pressure the FAA into acting faster so the MAX's return to service would overshadow any news of Boeing's fraud.[5] Muilenburg also had the opportunity, with access to senior officials in the federal government, including the President and FAA officials. [17] ¶¶ 264, 346–47. Muilenburg's statements 77, 81, and 83–86 specifically estimating the 737 MAX's return to service are therefore actionable.

Plaintiffs do not allege facts to tie statements 78 and 89 to a specific individual and instead attribute them to Boeing generally. Plaintiffs' allegations must give rise to a strong inference that corporate officials would have both been necessarily involved in the authorization or making of a statement, and that any corporate officials involved in making the statement would have actually known that the statements' specific estimates on the 737 MAX's return to service were false or materially misleading.

Considering the importance of the 737 MAX's return to service to Boeing, there is a strong inference that corporate officials, including Muilenburg, would have been involved in authorizing statements estimating when it would return to service. It is

---

[5] Plaintiffs also allege that defendants' scienter is evidenced by Muilenburg's resignation, which was allegedly "the result of his repeated lies to regulators and investors." [17] ¶¶ 298, 424. Plaintiffs do not elaborate on how Muilenburg's resignation shows that he had scienter as to any specific materially false or misleading statement he made. But plaintiffs' allegations on why Muilenburg resigned, taken as true, do support a reasonable inference that Muilenburg had motive to cover up Boeing's fraud because he put stock price ahead of safety. [17] ¶¶ 298, 424.

exceedingly likely that Muilenburg himself would have been involved in the making of the Boeing-attributed statements—most of the false statements regarding the 737 MAX's return to service emanated directly from him. *See Makor*, 513 F.3d at 711. And plaintiffs' allegations make clear that Muilenburg was aware that the FAA disagreed with Boeing's return to service timeline, which is enough to support a strong inference that he knew Boeing's statements were false. Therefore, statements 78 and 89 estimating the return to service timeline are actionable.

But Smith's statement estimating the 737 MAX's return to service is not actionable because plaintiffs fail to make any allegations that support Smith knew the return to service timeline was false or misleading. [34-1], statement 82. While it is a reasonable assumption that Muilenburg would have informed Smith of the FAA's disagreement with Boeing's return to service timeline, plaintiffs must establish a strong inference that Smith actually knew his statement was false or misleading. Plaintiffs make no allegations that Smith knew what Muilenburg did at the time of his statement. Having not established a strong inference of Smith's knowledge that his statement was false, statement 82 is not actionable.

## VII. Statements about Boeing's Regulatory Compliance and Internal Disclosure Controls and Procedures (1–7, 11–16, 40–42, 60–61, 79–80, 87–88)

Plaintiffs allege that multiple statements of Boeing's regulatory compliance in its 2017–2019 Form 10-K statements were materially misleading because Boeing falsely represented that its internal disclosure controls and procedures were effective, and Muilenburg and Smith evaded those controls. [17] ¶¶ 405, 407; [34-1], statements 1–7, 11–16, 40–42, 60–61, 79–80, 87–88.

Defendants argue that each statement on its face expresses the speaker's belief that Boeing complied with the relevant requirements. [24] at 34. Plaintiffs argue that these statements are not expressions of opinion, but are Boeing's, Muilenburg's, and Smith's certifications of Boeing's regulatory compliance. [34] at 28. According to plaintiffs, even if they were opinions, they are actionable because Boeing, Muilenburg, and Smith knew by no later than January 2019 that Boeing had defrauded the FAA during the 737 MAX certification. *Id.* (citing [17] ¶¶ 212–13).

Regardless of whether these statements are opinion or false, they are immaterial. No reasonable investor would rely on these 2017–2019 Form 10-K statements as representations of satisfactory compliance. *See Singh*, 918 F.3d at 63 (holding only detailed descriptions of compliance efforts amount to actionable assurances of actual compliance). The challenged statements of compliance are generic. For example, statements 5 and 42 only stated that Boeing's commercial aircraft products are required to comply with FAA regulations generally. These statements did not say that Boeing's aircraft did indeed comply with regulations. While plaintiffs plead that it is materially misleading for defendants to state that they were required to comply with all applicable FAA regulations while failing to disclose that they were not actually in compliance with those regulations, these statements were simply boilerplate language that would not be relied upon by a reasonable investor.

## VIII. Loss Causation

To state a private claim for securities fraud, plaintiffs must allege a causal connection between defendants' fraudulent conduct and plaintiffs' alleged losses.

54

*Dura Pharm.*, 544 U.S. at 338. The notice pleading standard of Rule 8 governs allegations of loss causation. Fed. R. Civ. P. 8(a); *Dura Pharm.*, 544 U.S. at 346. Plaintiffs can satisfy this element by pleading facts that show when the truth regarding an alleged misstatement emerged—referred to as corrective disclosure— the price of the company's shares declined as a result. *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n. 5 (7th Cir. 2020); *Dura Pharm.*, 544 U.S. at 346–47. These corrective disclosures need not be a mirror image of previous misstatements. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (corrective disclosure "need not precisely mirror the earlier misrepresentation"); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("fact-for-fact" disclosure not required to establish loss causation).

Plaintiffs have adequately alleged that Muilenburg and Boeing deceived investors with respect to (1) the functionality of the MCAS system and the adequacy of information provided to pilots to address erroneous MCAS activation, [34-1], statements 45–47, 54; (2) Boeing's relationship with the FAA and the integrity of the FAA approval process, [34-1], statements 53, 66, 69, 74; and (3) the timeline for the MAX's recertification and return to service, [34-1], statements 77–78, 81, 83–86, 89. Therefore, Plaintiffs must allege that when information became available to the market that revealed (1) the inadequacy of information provided to pilots regarding MCAS and the inaccuracy of information on MCAS functionality; (2) Boeing's fraud in the FAA certification of the MAX; and (3) that the FAA took a view contrary to Boeing and Muilenburg's time estimates regarding recertification and return to

55

service, that information caused the stock price to fall, proximately causing plaintiffs' loss.

Plaintiffs allege that Boeing's stock prices fell in response to a series of ten partial but inadequate disclosures. [17] ¶ 440. Of these ten disclosures, plaintiffs fail to connect eight to the circumstances that earlier materially false statements concealed or misrepresented. Only two of these alleged corrective disclosures—the October 18, 2019 release of the Forkner messages to the public and the December 16, 2019 announcement of a production halt for the 737 MAX—can be said to have corrected earlier materially false statements.

First, plaintiffs allege that Boeing's stock dropped more than 10% in response to the October 18, 2019 *New York Times* article revealing the Forkner messages and the October 20, 2019 *Wall Street Journal* article reporting on internal pressure from Boeing managers regarding safety-related approvals. [17] ¶¶ 281–84, 495–97. Plaintiffs argue the release of the Forkner messages "partially revealed that Boeing had defrauded—or at least lied—to the FAA in connection with certification of the 737 MAX. The articles also cast doubt on Boeing's regulatory compliance and the effectiveness of its internal disclosure controls and procedures." [34] at 45; [17] ¶ 497.

Defendants argue that the publication of the Forkner messages was not a corrective disclosure because it "disclosed nothing new to the public about MCAS, information provided to pilots, or the FAA's certification of the aircraft under the federal airworthiness standards, and Plaintiffs do not allege otherwise." [24] at 47. Defendants also argue that the forward-looking nature of disrupting "trust between

Boeing and the FAA" suggests that the release of the messages did not show the falsity of any prior statements. [24] at 47 n. 13.

However, the forward-looking effect of the publication is not the corrective disclosure. The release of the Forkner messages corrected Boeing's prior statements that pilots had all the necessary information to adequately address an erroneous MCAS activation, that Boeing had no basis to issue new guidance, and that MCAS only functioned during non-normal flight. [34-1], statements 45–47, 54. The messages also corrected Boeing's and Muilenburg's past statements affirming the integrity of the initial FAA certification of the 737 MAX. [34-1], statements 53, 66, 69, 74. Therefore, plaintiffs have plausibly alleged that the release of the Forkner messages revealed the falsity of Boeing's and Muilenburg's prior statements on MCAS, the adequacy of information provided to pilots regarding MCAS and the integrity of the FAA's oversight.

Second, plaintiffs allege that Boeing's announcement of temporary suspension of production of the 737 MAX on December 16, 2019, partially revealed that the MAX was not in the final stages of recertification, the software update to MCAS was not complete, and the airplane would not return to service on the timeline that Boeing had disclosed to investors. [17] ¶¶ 498–99. Plaintiffs allege that Boeing's stock declined more than 3% in response to this news. [17] ¶ 499. Plaintiffs argue that this announcement revealed that "Boeing's regulator never agreed with its timeline and saw the timeline as part of a pressure campaign," and corrected Muilenburg's estimated timeline. [34] at 45 (quoting *Aircraft Sec. Litig.*, 2022 WL 3595058, at *30).

Defendants argue that the disclosure did not correct any alleged misstatement, and "all of those estimates had already been corrected by the simple passage of time." [24] at 47.

I agree with plaintiffs. While plaintiffs are not detailed in their allegations and may struggle to show that the stock price decline resulted from the revelation that the FAA never agreed with Boeing's return to service timeline, plaintiffs have provided defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm.*, 544 U.S. at 347; *Aircraft Sec. Litig.*, 2022 WL 3595058, at *30. Plaintiffs adequately allege loss causation for statements 77–78, 81, 83–86, and 89.

Plaintiffs also attempt to argue that they have shown causation through a "materialization of the risk" theory. [34] at 46. However, this is "not a legal doctrine or anything special as a matter of fact." *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010). "The phrase adds nothing to the analysis. Whether the numbers are black or red, the fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied." *Id.* at 684. As just discussed, plaintiffs have adequately alleged two corrective disclosures of Boeing's and Muilenburg's false and misleading statements, and the loss realized.

## IX. Conclusion

For the foregoing reasons, defendants' motion to dismiss, [23], is granted in part and denied in part. Plaintiffs may proceed on their 10(b)(5) claims against defendants Boeing and Muilenburg as to statements 45–47, 53–54, 66, 69, 74, 77–78, 81, 83–86, and 89. The claims based on other statements, and all claims against

Smith, are dismissed without prejudice.[6] Plaintiffs have leave to file an amended complaint by October 10, 2023. If no amended complaint is filed, Boeing and Muilenburg shall answer the complaint by October 17, 2023. The parties shall file a joint status report with a proposed case schedule on October 20, 2023.

ENTER:

Manish S. Shah
United States District Judge

Date: September 18, 2023

---

[6] *See NewSpin Sports, LLC v. Arrow Elecs., Inc.*, 910 F.3d 293, 310 (7th Cir. 2018) ("Ordinarily ... a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." (quoting *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015))).