# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| COLLEGE RETIREMENT EQUITIES FUND, et al., | |
| Plaintiffs, | Case No. 1:22-cv-03845 |
| v. | Hon. Manish S. Shah |
| THE BOEING COMPANY, et al., | |
| Defendants. | |

---

# DEFENDANTS' REPLY MEMORANDUM IN SUPPORT
## OF THEIR MOTION TO DISMISS

---

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654

Craig S. Primis, P.C. (*pro hac vice*)
Katherine Katz, P.C. (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004

Kenneth Monroe
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116

Reid Coleman (*pro hac vice pending*)
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, Texas 78701

*Counsel for Defendants*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

I.     The Statements This Court Previously Dismissed Are Not Actionable. ........................... 2

     A.     Nothing In The Opposition Alters This Court's Ruling That The "Safety" Statements Are Not Actionable. ................................................................. 2

     B.     Plaintiffs Do Not Identify New Factual Allegations That Plead Scienter For The "Existing Procedures" Statements. ............................................. 5

     C.     Plaintiffs' Opposition Fails To Rebut Defendants' Arguments That The Other Previously Rejected Statements Are Not Actionable. ................................. 8

II.     Plaintiffs' Allegations Related To The Alaska Airlines Accident Do Not State A Claim. .......................................................................................................... 9

     A.     Plaintiffs' Scattershot Pleading Is Improper. .............................................. 9

     B.     Plaintiffs Fail To Show That Any Statement Is Actionable As Fraud. ................... 9

          1.     General Statements About Safety and Quality Are Not Actionable. ........... 9

          2.     Statements Related to Boeing's Codes of Conduct and Other Policies Are Not Actionable. ................................................... 12

          3.     Statements About the 737 MAX Production Rate Are Not Actionable. .............................................................. 13

          4.     Risk Disclosures in Boeing's SEC Filings Are Not Actionable. .............. 14

     C.     Plaintiffs Fail To Identify Particularized Factual Allegations Supporting a Strong Inference of Scienter. .............................................................. 16

     D.     Plaintiffs Fail To Plead Loss Causation. ................................................... 19

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alger Capital Appreciation Fund v. The Boeing Co.*,
No. 2022-L-2342 (Ill. Cir. Ct. Apr. 30, 2024) ............................................................................1

*In re Bally Total Fitness Sec. Litig.*,
2007 WL 551574 (N.D. Ill. Feb. 20, 2007) ...............................................................................17

*In re Bofi Holding, Inc. Sec. Litig.*,
2016 WL 5390533 (S.D. Cal. Sept. 27, 2016)...........................................................................11

*Bondali v. Yum! Brands, Inc.*,
620 Fed. App'x 483 (6th Cir. 2015) ..........................................................................................15

*In re CenturyLink Sales Pracs. & Sec. Litig.*,
403 F. Supp. 3d 712 (D. Minn. 2019).......................................................................................13

*Chew v. Moneygram Int'l, Inc.*,
2024 WL 4346522 (N.D. Ill. Sept. 30, 2024) ...........................................................................12

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ....................................................................................................10

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ........................................................................................17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................................................4, 20

*In re Electrobras Sec. Litig.*,
245 F. Supp. 3d 450 (S.D.N.Y. 2017).......................................................................................13

*Hall v. Johnson & Johnson*,
2019 WL 7207491 (D.N.J. Dec. 27, 2019)..........................................................................10, 11

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) .............................................................................13

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014)..........................................................................................17

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................................................................................................18

*In re Massey Energy Co. Sec. Litig.*,
883 F. Supp. 2d 597 (S.D.W. Va. 2012) ...................................................................11

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .......................................................................11

*Okla. Firefighters Pension & Ret. Sys. v. Six Flag Ent. Corp.*,
58 F.4th 195 (5th Cir. 2023) ...................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015) ........................................................................................4, 11, 12

*In re Petrobras Sec. Litig.*,
116 F. Supp. 3d 368 (S.D.N.Y. 2015) .....................................................................13

*Ret. Sys. v. Energy Transfer LP*,
532 F. Supp. 3d 189 (E.D. Pa. 2021) .................................................................10, 13

*Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...........................................................10

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) ..........................................................18

*Rossy v. Merge Healthcare*,
169 F. Supp. 3d 774 (N.D. Ill. 2015) ......................................................................17

*Schaefer v. Universal Scaffolding & Equip., LLC*,
839 F.3d 599 (7th Cir. 2016) ....................................................................................8

*Seeks v. The Boeing Co.*,
752 F. Supp. 3d 992 (N.D. Ill. 2024) ................................................................1, 2, 3

*In re Signet Jewelers Ltd. Sec. Litig.*,
389 F. Supp. 3d 221 (S.D.N.Y. 2019) .....................................................................13

*St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ............................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..................................................................................................7

*In re The Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ...........................................................2

*In re The Boeing Co. Sec. Litig.*,
2025 WL 2428481 (E.D. Va. Mar. 7, 2025) ...........................................................20

ii

*United States v. Articles of Drugs Consisting of 203 Paper Bags*,
818 F.2d 569 (7th Cir. 1987) ...................................................................................................1

## **INTRODUCTION**

Plaintiffs' opposition does not explain how the allegations in their complaint are sufficient to plead securities fraud under Rule 9(b) and the PSLRA for the over 300 statements they now try to inject into this case. They are not.

*First*, Plaintiffs attempt to bring back into the case 73 statements related to the 737 MAX accidents in 2018 and 2019 *that this Court already dismissed*. Plaintiffs barely engage with the Court's prior decision. Instead, they argue the Court should sustain the statements because *different courts* in *different cases* declined to dismiss *some* of the statements. But those decisions are not binding on this Court. *See United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569, 572 (7th Cir. 1987) (A single district-court decision, "especially one that cannot be appealed," "has little precedential effect" and is not binding "on other district judges in the same district."). Moreover, the primary case Plaintiffs cite, *Seeks v. The Boeing Co.*, 752 F. Supp. 3d 992 (N.D. Ill. 2024) (*Seeks II*), does not support Plaintiffs' position since more than 60 of the statements that Plaintiffs seek to inject into the case were either *dismissed* or not at issue in that case. And the state-court decision Plaintiffs mention in passing, *Alger Capital Appreciation Fund v. The Boeing Co.*, No. 2022 L 2342 (Ill. Cir. Ct. Apr. 30, 2024)—which involved different claims, different pleading standards, and different governing precedent—is not relevant to this motion at all. Because Plaintiffs do not provide a reasoned basis for the Court to disturb its prior ruling, it should decline to do so.

*Second*, Plaintiffs come no closer to salvaging securities-fraud claims based on their 252 new alleged misstatements related to the supposed manufacturing problems that contributed to the 2024 Alaska Airlines accident. Although Plaintiffs spend half their opposition rehashing allegations from their 400-page complaint, their brief, just like their complaint, fails to piece together the allegations in any meaningful way. Plaintiffs never clearly articulate which statements

are misleading and why.  Nor do they identify factual allegations supporting scienter and loss causation for each statement.  Plaintiffs' scattershot pleading is insufficient under the PSLRA. Plaintiffs try to get around their pleading failures by pointing to a decision in the Eastern District of Virgina declining to dismiss similar claims.  But the bench decision in that case is neither binding on this Court nor persuasive.  The sum total of the court's analysis is a few lines in the transcript that simply recite the elements of a § 10(b) claim and state a conclusion.  Even a cursory examination of Plaintiffs' hundreds of alleged misleading statements (basically every statement referencing safety or quality in the three years before the accident) and 17 alleged corrective disclosures (essentially every piece of bad news following the accident) reveals numerous incurable deficiencies across all elements of their claims.

## ARGUMENT

**I.     The Statements This Court Previously Dismissed Are Not Actionable.**

**A.     Nothing In The Opposition Alters This Court's Ruling That The "Safety" Statements Are Not Actionable.**

This Court correctly held that the fifteen safety statements (*e.g.*, safety is a "core value" at Boeing) from late 2018 and early 2019 are immaterial because they are "the kind of loosely optimistic statements that are unimportant to the total mix of information for investors."  9/18/23 Order 17.  Judge Tharp likewise rejected these statements as immaterial.  *In re The Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9, *19 (N.D. Ill. Aug. 23, 2022) (*Seeks I*).  In arguing otherwise, Plaintiffs rely almost exclusively on *Seeks II*, which declined to dismiss *some* of the statements at issue here.  Opp'n 19.  Contrary to Plaintiffs' suggestion, the *Seeks II* court *dismissed* many safety statements—including at least six challenged in this case—because, like this Court, it concluded that they were "too vague to be considered material to a reasonable investor."  752

F. Supp. 3d at 1017.[1]  These included the statements that "[w]e are confident in the safety of the 737 MAX" and that safety is a "core value" at Boeing.  *Id*.  The court offered no rationale for why it viewed those statements as immaterial and other safety statements (*e.g.*, the 737 MAX is "safe") as material.  As this Court and Judge Tharp held, a reasonable investor would not view *any* of the safety statements as having significantly altered the total mix of information in the marketplace.

Plaintiffs argue (in a footnote) that this Court dismissed the safety statements "without the benefit of" certain new allegations.  Opp'n 19 n.3.  But those allegations do not move the needle on materiality.  Allegations that an analyst report in November 2018 noted Boeing's "commitment to airline safety," SAC ¶ 187, and another said "we would never doubt the company's commitment to safety," SAC ¶ 195, do not show that Defendants' vague affirmations of safety affected investor decision-making.  Unlike in the cases Plaintiffs cite, Opp'n at 20, Plaintiffs here do not allege that any analyst specifically referred to the challenged statements or incorporated them into quantitative evaluations of the company.  Similarly, internal discussion about the need to reassure the public about the 737 MAX's safety, SAC ¶ 176, does not transform public affirmations of safety and general references to Boeing's core values into measurable statements of objective fact that investors would find material.

The safety statements also are nonactionable opinions.  Plaintiffs do not dispute that the statements are opinions, or contend that the individuals who prepared or approved them did not actually believe the expressed opinions.  They argue only that the opinions did not "fairly align" with what those individuals allegedly knew at the time because the SRB had concluded that the high crew workload associated with an erroneous MCAS activation posed a "safety issue."

---

[1]  The statements dismissed in *Seeks II* included part of Statements 20 and 47 and all of Statements 27, 48, 51, and 57.  Four other safety statements alleged here (Statements 19, 49, 59, and 67) were not at issue in *Seeks II*.

Opp'n 21–22. But what matters is whether the *totality* of information in the speakers' possession "fairly align[ed]" with their opinion that the MAX was safe. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015). And accounting for the *other* information available to Defendants—(i) the pilots on the Lion Air flight prior to the accident flight successfully used existing procedures to override erroneous MCAS activation and landed the plane safely, (ii) Boeing and the FAA both determined that the appropriate action after the accident was to remind pilots how to "properly respond" to erroneous MCAS activation using existing procedures, and (iii) the FAA concluded that the MAX could continue to operate—renders Plaintiffs' claims based on opinion statements nonactionable under *Omnicare*.

Finally, Plaintiffs have not identified any allegation linking the safety statements to an alleged corrective disclosure that revealed those statements were false. They protest that corrective disclosures need not be a "mirror image of previous misstatements," Opp'n 27, but that does not exempt them from needing to plead a "causal connection between the material representation and the loss," *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). Plaintiffs' lead argument—that the March 10, 2019 Ethiopian Airlines accident revealed there was something "fundamentally unsafe" about the 737 MAX—does no such thing. Opp'n 38. Plaintiffs do not refute Defendants' argument that the March 10 accident itself did not reveal *anything* about the 737 MAX's safety because the cause of the accident (and any connection to MCAS) was not known until several days later. The only incremental information on March 10 was the fact of a second accident.[2]

---

[2] The other alleged corrective disclosures that Plaintiffs reference in passing also fail. Opp'n 38–39. They vaguely assert that articles released in March 2019 disclosed that there were "flaws" in the safety analysis presented to the FAA and that the 737 MAX aircraft involved in the accidents lacked a feature that alerts crews when the angle-of-attack sensors provide conflicting data. *Id*. But a vague statement that the 737 MAX is "safe" cannot plausibly be corrected by the information Boeing submitted to the FAA or the aircraft's standard cockpit features. The October 18, 2019 *New York Times* article publishing the Forkner messages is likewise inadequate. Again, Plaintiffs do not even attempt to explain how the information disclosed on that day—*i.e.*, that Forkner unknowingly provided inaccurate information to the FAA group responsible for determining the level of pilot

4

### B. Plaintiffs Do Not Identify New Factual Allegations That Plead Scienter For The "Existing Procedures" Statements.

The eight "existing procedures" statements (all from November 2018) are either pulled from or refer back to Boeing's November 6, 2018 bulletin, which reminded pilots to use an existing memory procedure—the runaway stabilizer non-normal checklist—to respond to the conditions encountered on the Lion Air flight. This Court held that Plaintiffs fail to plead that Defendants acted with scienter, and nothing in the amended complaint changes that. Defs.' Mem. 16–20.

Plaintiffs again try to plead scienter by alleging that Muilenburg and others received updates on the SRB investigation. Opp'n 29–31. But the Court already rejected this argument, finding that Plaintiffs' own allegations show that the statements were "not necessarily inconsistent with the [SRB's] conclusions." 9/18/23 Order 20. Plaintiffs allege the SRB convened after the accident to consider potential causes. SAC ¶ 163. One possibility was inappropriate crew response to erroneous MCAS activation, and data recovered a week after the accident supported that hypothesis. *Id.* The SRB recommended issuing a bulletin advising flight crews how to "properly respond" using the runaway stabilizer procedure, which Boeing did on November 6. *Id*. ¶ 166. The next day, the FAA issued a directive pointing pilots to the same procedure. *Id.* ¶ 173. There was no basis for Muilenburg or others to second guess the conclusions of Boeing's technical experts and the FAA—that existing procedures provided the proper response to erroneous MCAS activation and that airlines could continue to operate the aircraft safely.

Plaintiffs pivot to the allegation that the SRB concluded that the procedure pilots would use to respond to similar conditions on other 737 variants (*i.e.*, retrimming the aircraft) would only reset, not deactivate, MCAS. Opp'n 29. But they concede that the November 6 bulletin told flight

---

training (as opposed to the FAA group responsible for certifying the airplane as airworthy)—can plausibly be said to have corrected the safety statements.

crews exactly that and explained that pilots needed to take additional steps, outlined in the runaway stabilizer procedure, to deactivate MCAS. SAC ¶ 492. The bulletin stated that although the "nose down stabilizer trim movement can be stopped and reversed with the use of the electric stabilizer trim," it "may restart 5 seconds after the electric stabilizer trim switches are released," and "[r]epetitive cycles of uncommanded nose down stabilizer continue to occur unless the stabilizer trim system is deactivated" using the cutout "switches in accordance with the existing procedures in the Runaway Stabilizer NNC." Ex. 1 to Defs.' Mem. 1. In short, Defendants were aware that the runaway stabilizer procedure needed to be completed to deactivate MCAS—not that the procedure did not work.

Plaintiffs also point to allegations that the FAA's airworthiness directive was an "interim action," and that Boeing, at the FAA's request, had started developing a software update to eliminate the potential for erroneous MCAS activation. Opp'n 30. But Plaintiffs do not explain why these allegations support scienter (they do not). Although the FAA labeled its airworthiness directive an "interim action," the agency still confirmed the guidance in Boeing's bulletin and directed pilots to the same runaway stabilizer procedure. SAC ¶ 173. And the fact that Boeing was working on updating *MCAS's design* says nothing at all about whether Defendants knew their statements about *existing procedures* were false. Although the software update would reduce the likelihood that pilots would face erroneous MCAS activation, that does not mean existing procedures were inadequate to address the issue. At any rate, Plaintiffs already tried this theory and failed. *See* 9/18/23 Order 20–21 (allegation that "Boeing engineers were working on redesigning MCAS's software" did not support scienter for existing procedures statements).

Plaintiffs turn next to the allegation that Boeing engineer Thomas Dodt informed Boeing's Chief Engineer John Hamilton that, with repeated erroneous activations, MCAS could command

6

the horizontal stabilizer "beyond the electric … limit" and that this could "overpower the pilots' ability to react" using electric trim. Opp'n 30. But nothing that Dodt told Hamilton would have given Boeing's technical experts—much less Muilenburg—reason to believe that pilots could not counter erroneous MCAS activation using the runaway stabilizer procedure. Boeing's bulletin and the FAA's directive told crews that repeated MCAS activations, *without proper pilot response*, could result in a mis-trim state that would make it difficult to control the aircraft. As a result, there is no inconsistency between what Dodt told Hamilton and the "existing procedures" statements.[3]

In sum, Plaintiffs have not carried their burden to plead a strong inference of scienter. A "strong" inference must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Plaintiffs ignore the competing inference that the speakers believed that pilots could use existing procedures to address erroneous MCAS activation.[4] Plaintiffs' inference—that Muilenburg and others endorsed the use of a procedure they *knew* would not work—is paper-thin by comparison. This is especially true given Plaintiffs' allegations about what the speakers knew: other pilots had successfully used the procedures to counteract erroneous MCAS activation, Boeing issued a bulletin (at the SRB's recommendation) pointing to those procedures, and the FAA endorsed the bulletin's guidance. *See* SAC ¶¶ 163–64, 166, 173. As before, "[t]he much more plausible

---

[3] Plaintiffs focus on a different and irrelevant question—whether they have alleged that the details about MCAS and the MAX's stabilizer travel limits were reported to Muilenburg. Opp'n 31. They argue that it is "reasonable" to infer that Muilenburg learned those details because Hamilton briefed him on the investigation's status. *Id*. But a generalized allegation about periodic updates is not enough to impute Hamilton's alleged knowledge—which was not inconsistent anyway—to Muilenburg. *See* 9/18/23 Order 28 ("While it is not an unreasonable inference that Boeing's CFO would be ke[pt] abreast of important developments after a catastrophic accident, group pleading is not permitted").

[4] Plaintiffs suggest that *Seeks II* "expressly" considered the question whether the inference of scienter was at least as compelling as any opposing inference of nonfraudulent intent. Opp'n 31. That position finds no support in the court's decision. The court's analysis focused exclusively on the plaintiffs' proposed inference of scienter without ever considering the opposing inference of nonfraudulent intent—contrary to *Tellabs'* instruction.

inference is that, like Boeing's safety engineers and the FAA, Muilenburg believed the airplane remained safe to fly." 9/18/23 Order 20.

###### C. Plaintiffs' Opposition Fails To Rebut Defendants' Arguments That The Other Previously Rejected Statements Are Not Actionable.

This Court properly rejected the other five categories of alleged misstatements related to the MAX—(i) design and certification, (ii) the AOA Disagree Alert, (iii) return to service, (iv) production rate and backlog, and (v) regulatory compliance and internal disclosure controls— and Plaintiffs did not meaningfully alter the relevant allegations. Rather than identify new supporting allegations, Plaintiffs claim that Defendants' arguments are forfeited because they are "perfunctory" and "unsupported by legal authority." Opp'n 27. But Defendants' arguments based on *this Court's* prior decision are not the type of underdeveloped arguments that lead to forfeiture. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) (argument forfeited where party "cite[d] no authority and simply assert[ed]" that the district court erred).

In truth, it is *Plaintiffs* who fail to provide any support for the five categories of statements they try to reallege—all of which were either rejected in *Seeks II* or were not at issue there. For the 29 statements in the first four categories, Plaintiffs do not even try to argue that they altered their allegations to cure the pleading deficiencies identified by this Court. This is reason enough to reject the claims. For the remaining category—regulatory compliance and internal disclosure control statements from Boeing's SEC filings—Plaintiffs contend that a single statement in a proposed (and rejected) plea agreement that Boeing had "inadequate anti-fraud controls and an inadequate anti-fraud compliance program" during the time the FAA was certifying the 737 MAX establishes that all 22 statements in this category were false. Opp'n 28. But Plaintiffs do not explain how that allegation undermines the statements at issue, which include Boeing's statements about FAA regulatory compliance requirements and routine financial certifications and disclosures

8

required by the Sarbanes-Oxley Act,[5] let alone establishes scienter for each statement. At any rate, this Court rejected those statements as *immaterial*, 9/18/23 Order 54, and nothing in the proposed plea agreement alters the materiality of those statements.

## II. Plaintiffs' Allegations Related To The Alaska Airlines Accident Do Not State A Claim.

### A. Plaintiffs' Scattershot Pleading Is Improper.

Plaintiffs' shotgun approach to pleading flouts the requirements of the PSLRA. The problem is not the complaint's length, the number of challenged statements, or the use of bold and italics to identify the supposedly false or misleading statements. Opp'n 17–18. The defect is that Plaintiffs bold and italicize large swaths of their 100-page collection of block quotes and do not explain what portion of the bolded and italicized language is false or misleading and why. Instead, Plaintiffs merely recite a laundry list of five or so copied-and-pasted, boilerplate reasons why the statements may be false or misleading—a pleading tactic that Plaintiffs nowhere defend and that courts routinely reject. Defs.' Mem. 24 (citing cases). With respect to scienter and loss causation, Plaintiffs state that "separate sections" of the amended complaint address these issues. Opp'n 18. But those sections—neither of which reference specific alleged misstatements—only highlight the problem. The Court need not take up the Sisyphean task of piecing together these new claims.

### B. Plaintiffs Fail To Show That Any Statement Is Actionable As Fraud.

#### 1. General Statements About Safety and Quality Are Not Actionable.

The vague statements extolling the importance of safety and quality at Boeing cannot form the basis of a securities-fraud claim because they are immaterial, nonactionable statements of

---

[5] *See, e.g.*, SAC ¶ 772 (Boeing's "commercial aircraft products are required to comply with FAA regulations"); SAC ¶ 767 ("Our Chief Executive Officer and Chief Financial Officer have evaluated our disclosure controls and procedures … and have concluded that these disclosure controls and procedures are effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934 is recorded, processed, summarized and reported").

opinion, and not adequately alleged to be false or misleading. Defs.' Mem. 25–29. Plaintiffs' contrary arguments lack merit.

*First*, the safety and quality statements are all immaterial as a matter of law. In arguing otherwise, Plaintiffs point to a bench ruling denying Boeing's motion to dismiss in the Virginia action. Opp'n 19. But Plaintiffs never grapple with *this Court's* prior decision, which correctly held that over a dozen substantively (often literally) identical statements about the importance of safety to Boeing's business were immaterial as a matter of law. 9/18/23 Order 17. And Plaintiffs do not even attempt to argue that there is any meaningful difference between the statements at issue here and those that were previously dismissed. There is none.

Although Plaintiffs try to bolster the Virginia court's ruling by string-citing other decisions that supposedly upheld similar statements, none of the decisions advance their cause. Many *dismissed* the statements that most closely resemble those challenged here. For instance, Plaintiffs cite *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651 (6th Cir. 2005), because it sustained Bridgestone's statement that "objective data clearly reinforces our belief that these are high-quality, safe tires." *Id.* at 671. But Plaintiffs cannot point to any safety statement here that similarly references measurable "objective data." Instead, the statements here are akin to Bridgestone's remarks that it had "no reason to believe there is anything wrong" with its tires and that it had "full confidence" in its tires, which the Sixth Circuit held were "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.*[6] Plaintiffs simply mischaracterize other

---

[6] *See also Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 532 F. Supp. 3d 189, 219 (E.D. Pa. 2021) (dismissing statement that engineers and others are "very focused on safe[ty]"); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *15 (D.N.J. Dec. 27, 2019) (rejecting as immaterial "general value-oriented statements regarding the Company's commitment to consumer safety"); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at *24–*25 (N.D. Ill. Feb. 13, 2013) (dismissing statements that company "aims to achieve a

decisions. For example, they highlight that *Hall v. Johnson & Johnson*, 2019 WL 7207491 (D.N.J. Dec. 27, 2019), sustained a statement containing the words "quality and safety, [is] our number-one priority," but omit that the court was focused on a different aspect of the statement when addressing materiality. *Id.* at *16; *see also Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 957, 968 (N.D. Cal. 2014) (similar). The remaining case, *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597 (S.D.W. Va. 2012), recognized that only statements whose "truth or falsity" can be determined are material. *Id.* at 618. And the plaintiffs there offered an objective yardstick by which to measure the statements' veracity. *Id.* at 617. Plaintiffs here do nothing of the sort.[7]

*Second*, the safety and quality statements are opinions, and Plaintiffs' allegations fail to satisfy the *Omnicare* standard. Defs.' Mem. 27. Plaintiffs' only response is that an opinion statement can be actionable if it "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." Opp'n 22 (quoting *Omnicare*, 575 U.S. at 189). True enough. But to satisfy their pleading burden, Plaintiffs "must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. Plaintiffs do not identify *any* such factual allegations here. While they gesture towards a 2024 FAA report identifying purported deficiencies in Boeing's safety and

---

culture of continuous improvement that will enhance its efficiency, effectiveness and competitiveness" and that it is "Redoubling Commitment to Quality").

[7] Plaintiffs also argue that repeating vague and banal statements can somehow transform them into material factual representations. That is not the law, and Plaintiffs' cases do not show otherwise. For instance, Plaintiffs invoke *In re Bofi Holding, Inc. Sec. Litig.*, 2016 WL 5390533 (S.D. Cal. Sept. 27, 2016), but that case involved statements about a bank's underwriting practices that the court concluded were "neither aspirational nor general." *Id.* at *9.

quality-control procedures, Opp'n 22 (citing SAC ¶¶ 406–10, 413, 415), the FAA's conclusions—long after Defendants made the statements—say nothing about the speakers' inquiry into or knowledge concerning the opinions at the time. *See Chew v. Moneygram Int'l, Inc.*, 2024 WL 4346522, at *12 (N.D. Ill. Sept. 30, 2024) (allegation that government later found that company failed to comply with DPA not enough to plead that opinion statements touting progress towards compliance were misleading). Plaintiffs' allegations thus fail to satisfy *Omnicare*.

*Finally*, Plaintiffs have not adequately alleged that any of the more than 110 safety and quality statements were false or misleading. Defs.' Mem. 28. Citing a 2024 FAA report and allegations by a handful of whistleblowers, Plaintiffs argue that the safety and quality statements were misleading because some of Boeing's safety and quality control initiatives had not yet taken hold in the Company's manufacturing facilities. Opp'n 23. But the allegations Plaintiffs highlight do not undermine Defendants' actual statements. For example the fact that some employees interviewed by the FAA were unfamiliar with Boeing's Safety Management System is not contrary to statements that Boeing was "advancing," "implementing," or had "commit[ted]" to such a program. And Plaintiffs nowhere refute the argument that the statements concerning traveled work were not misleading because they described Boeing's ongoing efforts to eliminate the practice rather than represented that it already had been eliminated. Defs.' Mem. 28.

## 2. Statements Related to Boeing's Codes of Conduct and Other Policies Are Not Actionable.

Plaintiffs argue that the statements about Boeing's policies of encouraging employees to report illegal or unethical behavior and prohibiting retaliation against those who do were misleading because the policies were not universally followed. Opp'n 23–24. The backbone of this argument—which Plaintiffs nowhere defend—is that these statements implicitly guaranteed that all employees adhere perfectly to Boeing's policies. But the challenged statements simply

12

repeat or describe Boeing's corporate ideals, without implying anything about compliance. The statements that "Boeing expects all employees … to report potential misconduct promptly so that it can be appropriately addressed," SAC ¶ 776, that employees are "required on an annual basis to sign the Boeing Code of Conduct to reaffirm their commitment to do their work in a compliant and ethical manner," *id*. ¶ 712, and the others in this category are the type of aspirational statements that do not create § 10(b) liability. Defs.' Mem. 29 (collecting cases).

The few cases Plaintiffs cite are not to the contrary. Some involved circumstances where the company made the code-of-conduct statements in response to growing concerns about specific wrongdoing. *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019) (statements responded to "a credible accusation" of "rampant sexual harassment"); *In re Electrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) (statements responded "to specific press reports" about money laundering); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (similar). Here, by contrast, there is no allegation that Boeing touted its codes of conduct for such a purpose. Plaintiffs' other cases involved code-of-conduct statements that spoke directly to compliance, which is not the case here. *See Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *4 (N.D. Ill. Sept. 1, 2020) (statements made "unqualified" representation regarding company's conduct); *In re CenturyLink Sales Pracs. & Sec. Litig.*, 403 F. Supp. 3d 712, 728 (D. Minn. 2019) (CEO publicly stated that code was "not aspirational").[8]

### 3. Statements About the 737 MAX Production Rate Are Not Actionable.

The statements concerning the 737 MAX program's production rate, which include reports of past performance and planned production increases, are not actionable because they were either

---

[8] The last case Plaintiffs cite entailed a unique situation where a court concluded that code-of-conduct statements were actionable because the plaintiffs alleged that the stated policies did not reflect the Company's true policy. *Energy Transfer LP*, 532 F. Supp. 3d at 221.

not false or are protected by both prongs of the PSLRA's safe harbor. Defs.' Mem. 30–32. This Court already rejected numerous substantively identical production-rate statements for these reasons, and it should do the same here. *See* 9/18/23 Order 25–30.

Plaintiffs do not dispute that Boeing's reports of past production rates were accurate, or that accurate statements of historical performance are not actionable. They instead claim that these statements were misleading because "such rates could only be achieved using traveled work." Opp'n 26. But none of these statements can plausibly be construed as making *any* representation about traveled work, much less a misleading one.

The PSLRA's safe harbor protects the statements about Boeing's planned production increases. This Court already held that such statements are forward-looking within the meaning of the PSLRA. 9/18/23 Order 27. Plaintiffs insist that the cautionary language accompanying the statements was not meaningful because it did not disclose the risks stemming from potential problems with Boeing's production lines. Opp'n 27. But the cautionary language disclosed that production rates depended on "the overall health of [Boeing's] production system." Ex. 8 to Defs.' Mem. 40; *see also* Ex. 9 to Defs.' Mem. 33. And because it squarely addressed the relevant risks, the cautionary language is "sufficiently specific to provide a safe harbor." *St. Lucie Cnty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *10 (N.D. Ill. Feb. 28, 2011). At any rate, the projections are protected by the safe harbor's second prong because Plaintiffs plead no facts showing that those involved in making the statements had "actual knowledge" they were misleading. Defs' Mem. 31–32. Plaintiffs do not argue otherwise.

### 4. Risk Disclosures in Boeing's SEC Filings Are Not Actionable.

Plaintiffs argue that the risk disclosures warning investors about challenges endemic to Boeing's manufacturing operations were misleading because those risks had already materialized. Opp'n 25. This argument rests on the mistaken premise that the disclosures made a representation

14

about the existing state of Boeing's operations. Risk disclosures are inherently forward-looking, probabilistic statements that convey information about events that could occur in the future and the impact those events might have were they to occur. Reasonable investors would recognize as much and thus understand that the statements were designed to warn them "of what harms *may* come to their investment" in the future, not to educate them "on what harms are currently affecting the company." *Bondali v. Yum! Brands, Inc.*, 620 Fed. App'x 483, 491 (6th Cir. 2015).[9]

Plaintiffs next contend that the statements that Boeing was "fully cooperating with U.S. government investigations related to the accidents and the 737 MAX" were misleading. Opp'n 25. In support, they point to their allegations that Boeing did not initially cooperate with the DOJ's criminal investigation, failed to promptly produce the Forkner messages to the FAA, and hampered testing conducted as part of the Senate's investigation into the accidents. *Id.* (citing SAC ¶¶ 216–17, 321). But these allegations were public knowledge before the earliest challenged risk disclosure in February 2021. As Plaintiffs acknowledge, the January 2021 DPA stated that the Company had not initially cooperated with DOJ's investigation, SAC ¶¶ 216, 328; Boeing's failure to produce the Forkner messages to the FAA was publicly reported in October 2019, *id.* ¶ 277; and Plaintiffs allege that the report that Boeing hindered the Senate's investigation was published in December 2020, *id.* ¶ 321. Plaintiffs thus fail to plead facts showing that the disclosures were false or misleading.

Finally, Plaintiffs argue that the disclosures concerning the DPA were false or misleading because Boeing did not fully satisfy its obligation to implement an improved compliance and ethics program. Opp'n 26. The challenged disclosures, however, merely describe the agreement and

---

[9] Plaintiffs' reliance on the Court's prior determination that certain cautionary language accompanying the return-to-service estimates was not "meaningful" is misplaced. Opp'n 25. Whether that cautionary language was meaningful has no relevance to whether the "operational challenges" disclosures were false or misleading.

15

identify corresponding risks; they do not make any representation about compliance. *See, e.g.*, SAC ¶¶ 781, 784–85. Plaintiffs point to Boeing's alleged admission in a proposed plea agreement in 2024 that the Company's "anti-fraud compliance program and internal controls have not been fully implemented or tested." *Id*. ¶ 486. But that does nothing to show that the challenged disclosures, which began less than a month after Boeing entered the DPA in January 2021, were false or misleading—much less that they were known to be so—*at the time they were made*.

### C. Plaintiffs Fail To Identify Particularized Factual Allegations Supporting a Strong Inference of Scienter.

Plaintiffs' opposition does not point to alleged facts showing that each Defendant acted with an intent to deceive investors at the time of the alleged misstatements. Although they try to stitch together the required "strong inference" of scienter with a patchwork of circumstantial theories, Opp'n 32–37, their theories, considered separately or together, lack the most critical element for pleading scienter: Particularized factual allegations linking Defendants to knowledge of *specific information* that contradicted their statements.

Plaintiffs' attempts to manufacture scienter by pointing to Defendants' general access to information and their statements that they were focused on safety after the 2018 and 2019 accidents fail. Opp'n 31–32. The PSLRA requires Plaintiffs to do more than assert that Defendants *must have known* damaging information by virtue of their positions and their receipt of unspecified "reports." Plaintiffs must identify with particularity what information Defendants supposedly learned and explain how it would have put them on notice that their later statements were false. Plaintiffs invoke a barrage of allegations about the organizational changes implemented after the MAX accidents—for example, that Muilenburg and Calhoun received all safety reports generated by a new safety unit and that there were weekly meetings to ensure that senior management reviewed "safety reports from all levels of the company." Opp'n 32. But for all the space Plaintiffs

16

dedicate to describing the "reporting structure" and the existence of "safety reports," not once do they allege what specific information Defendants supposedly learned that was inconsistent with their statements. Plaintiffs instead appear to assume that *everything* that touched on safety, quality control, and other topics must have been contained in some report that ultimately reached Boeing's CEO and CFO. Raw conjecture of this sort is not a substitute for particularized factual allegations.

None of the decisions Plaintiffs cite condone their "must have known" theory. Opp'n 33. The complaints in those cases identified the particular contradictory information that undermined the defendants' statements—exactly what Plaintiffs lack here. For example, *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009), involved statements concerning a real estate company's ability to refinance $1.5 billion in maturing debt during the Great Recession. The plaintiffs alleged specific, concrete reasons why defendants should have known their statements were misleading, including that the company had already contacted dozens of banks, life insurance companies, and pension funds and *none* was willing to refinance the debt. *Id.* at 850. Here, by contrast, Plaintiffs fail to identify any contradictory information Defendants learned through "safety reports" and their monitoring efforts.

Plaintiffs next point to the allegations made by several whistleblowers and former Boeing employees. Opp'n 34–35. Plaintiffs cite no allegation that any of these individuals contacted or otherwise interacted with any Defendant. The allegations thus reveal nothing about Defendants' knowledge at the time of any alleged misstatement. *See Rossy v. Merge Healthcare*, 169 F. Supp. 3d 774, 783–84 (N.D. Ill. 2015).[10] Unable to furnish any connection with the individuals

---

[10] *See also In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) (rejecting confidential witness allegations where "they do not establish what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements"); *In re Bally Total Fitness Sec. Litig.*, 2007 WL 551574, *8 (N.D. Ill. Feb. 20, 2007) (same where witness "does not allege that he ever spoke with [defendant] or had knowledge of" what information defendant reviewed).

17

responsible for the statements, Plaintiffs resort to arguing that Defendants must have known about the claimed safety and quality issues because they were "widespread and pervasive." Opp'n 34. But this sort of conjecture cannot satisfy the PSLRA. Plaintiffs must instead allege particularized facts showing that Defendants were themselves aware of the specific "widespread and pervasive" problems that supposedly rendered their statements false. In any event, Plaintiffs never explain how the issues—*e.g.*, employees removing parts from receiving areas before inspection, SAC ¶ 473—would establish a strong inference that Defendants were at least *severely reckless* in speaking about Boeing's commitment to safety and quality.[11]

The cases Plaintiffs claim support their argument actually defeat it. Plaintiffs' principal case *dismissed* the claims against one defendant on scienter grounds because—as is true here—no witness could allege any "direct interaction" with that individual, notwithstanding allegations that the misconduct was "widespread and pervasive." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, *9, *11 (N.D. Ill. Oct. 30, 2012). The plaintiffs in *Okla. Firefighters Pension & Ret. Sys. v. Six Flag Ent. Corp.*, 58 F.4th 195 (5th Cir. 2023), challenged an executive's statements about the status of several theme park developments. To plead scienter, they relied on the allegations of a former employee who was "responsible for overseeing the construction" of the parks. *Id.* at 205. The employee alleged that he "prepared" presentations containing details about the developments that contradicted the statements and that those details were "directly related" to the executive. *Id.* at 216. Those allegations were a far cry from what Plaintiffs allege here.

---

[11] Plaintiffs briefly contend that they established corporate scienter, highlighting vague allegations that "Boeing management" and "senior leadership" knew about various safety and quality issues. Opp'n 34–35 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710–11 (7th Cir. 2008)). *Makor* held that where the alleged misstatement was an announcement "so dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," then it is possible to infer "corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Makor*, 513 F.3d at 710. But Plaintiffs allege no such "dramatic" announcement here.

18

Plaintiffs barely defend their other scattershot theories. First, Plaintiffs repeat their allegation that Boeing's supposed failure to produce documents for the NTSB's Alaska Airlines investigation supports scienter. Opp'n 35–36. But Plaintiffs still do not explain what information they think those documents contained, why Boeing's CEO and CFO would have had anything to do with the document production, or why the alleged withholding of these unidentified documents in 2024 suggests that Defendants intentionally misled investors—starting in *January 2020*. The decisions Plaintiffs cite, all of which involved circumstances where the individual defendants personally participated in the efforts to conceal their fraud, are patently inapposite.

Second, Plaintiffs also cannot plead scienter based on their allegation that safety and quality control improvements were important to Boeing after the accidents. Opp'n 36–37. Courts routinely reject this "core operations" theory as a basis for pleading scienter, just as this Court did before. *See* 9/18/23 Order 21–23. And Plaintiffs nowhere explain why the general importance of safety and quality would mean that senior management would necessarily be aware of every detail related to those issues in Boeing's far-flung operations.

Third, while Plaintiffs insist that the investigations initiated by the SEC, DOJ, and FAA support scienter, they never explain why. Opp'n 37. Plaintiffs do not attempt to link any particular investigation to any particular statement, let alone explain how the investigations support an inference that Defendants intentionally misled investors.

Finally, Plaintiffs argue that the circumstances surrounding Muilenburg's resignation and Calhoun's retirement support scienter. Opp'n 36. But they point to no facts related to these departures that support an inference that Defendants intentionally made false statements.

**D.    Plaintiffs Fail To Plead Loss Causation.**

Plaintiffs' opposition does not explain how the 17 alleged corrective disclosures from 2024 (basically every piece of bad news in the five months after the Alaska Airlines accident) are related

19

to any of the 200 alleged misstatements, much less revealed those statements to be false. Plaintiffs argue that they need not connect "a particular stock price decline to the correction of one or more alleged misstatements" to plead loss causation. Opp'n 40. But that is exactly what the law requires—they must plead "a causal connection between the material misrepresentation and the loss," not simply that the misrepresentation "'touches upon' a later economic loss." *Dura*, 544 U.S. at 342–43. Plaintiffs assert that "[e]ach of the alleged corrective events" revealed that Defendants' statements about Boeing's commitment to safety, quality, and regulatory compliance were false. Opp'n 40. That conclusory assertion, which asks the Court to *assume* a connection exists, cannot sustain the claims. Finally, Plaintiffs are wrong that the Virginia court "twice rejected" these loss causation arguments. In fact, the court's class-certification decision rejected every alleged corrective disclosure after January 8, 2024 (*i.e.*, the first trading day after the accident) because they "reflected the consequences of, and reactions to, the Alaska Airlines incident *as opposed to the correction of prior misstatements*." *In re The Boeing Co. Sec. Litig.*, 2025 WL 2428481, at *3 (E.D. Va. Mar. 7, 2025) (emphasis added).

## CONCLUSION

The Court should grant Defendants' Motion to Dismiss.

Dated: November 5, 2025

Respectfully submitted,

_/s/ John F. Hartmann_

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862-2000

Craig S. Primis, P.C. (_pro hac vice_)
Katherine Katz, P.C. (_pro hac vice_)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

Kenneth Monroe
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
(617) 385-7500

Reid Coleman (_pro hac vice pending_)
KIRKLAND & ELLIS LLP
401 West 4th Street
Austin, Texas 78701
(512) 678-9050

_Counsel for Defendants_

21

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on November 5, 2025, a copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF system, which will send notice of such filing to all registered users.

*/s/ John F. Hartmann*
John F. Hartmann, P.C.