UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COLLEGE RETIREMENT EQUITIES FUND,
et al.,

           Plaintiffs,

           v.

THE BOEING COMPANY, et al.,

           Defendants.

No. 22 CV 3845

Judge Manish S. Shah

### MEMORANDUM OPINION AND ORDER

Plaintiffs, a group of equity funds, bring securities fraud claims against The Boeing Company, its former chief executive officers Dennis Muilenburg and David Calhoun, and its former chief financial officers Gregory Smith and Brian West. Plaintiffs allege that Boeing, Muilenburg, Smith, Calhoun, and West made 341 false and misleading statements about the October 2018 and March 2019 crashes of two 737 MAX airplanes, the subsequent Federal Aviation Administration grounding, the recertification and return to service of the 737 MAX fleet, and a January 2024 Alaska Airlines accident.

Defendants move to dismiss the complaint, arguing that plaintiffs failed to plead the essential elements of a securities fraud claim—that defendants intentionally made false or misleading statements that caused plaintiffs' losses— under the heightened pleading standard of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act. For the reasons discussed below (and in part reasons discussed in an earlier opinion in this litigation, *Coll. Ret. Equities Fund*

*v. Boeing Co.*, No. 22 CV 3845, 2023 WL 6065260, at \*1 (N.D. Ill. Sept. 18, 2023), much of which is repeated here), the motion is granted in large part and denied in part.

## I.     Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019); *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018).

When a plaintiff alleges fraud, heightened pleading requirements apply. The plaintiff "must state with particularity the circumstances constituting fraud or mistake," Fed. R. Civ. P. 9(b), and must "provide 'precision and some measure of substantiation' to each fraud allegation." *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)). This requires describing the "who, what, when, where, and how" of the fraud. *Id.* (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

Section 10(b) of the Securities and Exchange Act of 1934 proscribes (1) the use or employment of any deceptive device; (2) in connection with the purchase or sale of any security; and (3) in contravention of Securities and Exchange Commission rules

and regulations. 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this statute and forbids the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made … not misleading" in connection with sales of securities. 17 C.F.R. § 240.10b-5. In order to plead a violation of section 20(a) of the Securities and Exchange Act, a plaintiff must first adequately plead a violation of section 10(b) and Rule 10b-5. *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 936 (7th Cir. 2018).

To state a claim under Section 10(b), a plaintiff must allege that the defendant made a statement that was (1) false or misleading; (2) material; (3) made with scienter (knowledge of the statement's falsity); (4) connected to the purchase or sale of a security, on which investors relied; (5) and which caused economic loss. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011) (citation omitted). Investors' reliance on an allegedly false statement is presumed in an "impersonal, well-developed market for securities." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

In securities fraud actions, "[m]ere silence about even material information is not fraudulent absent a duty to speak," but, "if one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995) (citations omitted). An omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the total mix of information made available." *Basic*, 485 U.S. at 231–32 (quotation omitted).

3

Ordinarily, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), but securities fraud complaints under the PSLRA must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). To establish the "required state of mind," "the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693–94 (7th Cir. 2008) (citing *Makor Issue & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). A "strong inference" that the defendant acted with scienter requires a showing that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

For statements attributed to individual defendants, such as former CEOs Muilenburg and Calhoun and former CFOs Smith and West, plaintiffs must show that those individuals either knew their statement was false or were reckless in disregarding a substantial risk that it was false. *Makor*, 513 F.3d at 704–05 (citation omitted) (describing recklessness as "indifference to the danger that a statement is false"). Boeing can be held liable on a *respondeat superior* theory based on fraudulent statements made by its officers in the course of their employment when those officers are identified, and their fraudulent statements are pled with particularity. *See id.* at 708 (citation omitted). A corporation is also liable for statements by employees who have apparent authority to make them. *Id.* (citing *Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982)).

For statements attributed to a corporation generally, such as Boeing, there is no "judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations." *Pugh*, 521 F.3d at 693–94 (citing *Makor*, 513 F.3d at 710). Corporate officers may not be held responsible for unattributed corporate statements solely on the basis of their titles. *Makor*, 513 F.3d at 710. Corporate documents that have no stated author or statements within documents not attributed to any individual may be charged to one or more corporate officers provided that specific factual allegations link the individual to the statement. *Id.* at 708 (quoting *Southland Sec. Corp. v. Inspire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

Although corporate scienter cannot be proven by "the collective knowledge of all the corporation's officers and employees," "it is possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Id.* at 708, 710. However, the standard is high because "[i]ntent to deceive is not a corporate attribute." *Id.* at 707, 710.

## II.    Facts

Boeing launched the 737 MAX program in August 2011 in response to competition from Airbus's A320neo. [54] ¶¶ 71–78.[1] The threat from Airbus prompted Boeing to scrap plans to develop an entirely new airplane in favor of remodeling the existing 737. [54] ¶ 76. By upgrading the existing model, Boeing would save

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from plaintiff's second amended complaint, [54].

significant time, resources, and money because pilots with experience on the existing model would not require expensive simulator training. [54] ¶¶ 76, 83–85.

The upgrade was not simple. To make the 737 MAX more fuel efficient, Boeing added larger engines to the airplane. [54] ¶ 91. These larger engines had to be mounted further forward and higher up on the 737 MAX's wings and the airplane's nose gear had to be extended. [54] ¶ 91. These changes altered the 737 MAX's aerodynamics during certain flight maneuvers, in particular during high angles of attack, causing the plane to pitch up abnormally during flight. [54] ¶¶ 92–93. Rather than implement structural changes to the 737 MAX to address these concerns, Boeing added a new software component, the Maneuvering Characteristics Augmentation System ("MCAS"). [54] ¶¶ 90, 95. MCAS was an automated system designed to push the plane's nose downward during high angles of attack. [54] ¶ 96. Boeing designed MCAS to only activate in very limited circumstances: when the airplane was both traveling above a certain speed threshold and in danger of stalling (at a high angle of attack). [54] ¶ 108. MCAS's activation in prior designs relied on two angle of attack sensors, but MCAS in the 737 MAX drew data from only one of them, creating a situation in which a single malfunctioning sensor could erroneously trigger MCAS to pitch the plane's nose down when no correction was needed. [54] ¶¶ 97, 109.

As early as November 2012, Boeing engineers expressed concerns about MCAS and pilots' ability to recognize and counter faulty activations quickly enough. [54] ¶¶ 104–105. Before use by any United States-based airline, the Federal Aviation Administration had to evaluate and approve the 737 MAX for commercial use. [54]

6

¶ 81. As part of the FAA certification process, Boeing was required to perform a "Functional Hazard Assessment"—a "systematic comprehensive examination of an airplane and system functions to identify potential minor, major, hazardous, and catastrophic failure conditions that may arise as a result of a malfunction or a failure to function." [54] ¶ 126. During a simulator training as part of the assessment, one test pilot, with the assistance of "teamwork," was able to recognize MCAS activation and respond to it in approximately four seconds. [54] ¶ 104. Another test pilot took more than ten seconds to respond and deemed the condition "catastrophic." *Id.* Boeing recorded the test pilot's reaction time in its internal MCAS "Coordination Sheets" without further inquiry. [54] ¶ 105. Between 2015 and 2018, Boeing issued at least six separate MCAS Coordination Sheets referencing the "catastrophic consequences" of a greater than ten-second pilot reaction time to faulty activations. [54] ¶ 106.

In 2014, a Boeing engineer recommended that Boeing install a "synthetic airspeed" system on the 737 MAX to detect false angle of attack signals. [54] ¶ 116. The engineer's proposal was rejected three times, including by the 737 MAX program director. [54] ¶ 116.

Instead of programming MCAS to rely on data from both angle of attack sensors or adding a synthetic airspeed system, Boeing relied on the 737 MAX's "AOA Disagree Alert" to safeguard against faulty readings from the angle of attack sensors. [54] ¶ 117. The AOA Disagree Alert was a standard, non-optional feature on the 737 MAX. [54] ¶ 118. Boeing also offered customers the option to purchase an additional "AOA Indicator," a dial in the flight display showing the airplane's raw angle of attack

data that aided flight crews to avoid a stall. [54] ¶ 119. Due to a miscommunication between Boeing and the supplier who coded the AOA Disagree Alert, the software required that the AOA Indicator display before displaying an AOA Disagree Alert. [54] ¶ 120. This meant that the AOA Disagree Alert, although installed on every 737 MAX, only functioned on airplanes that were also equipped with the optional AOA Indicator. [54] ¶ 120. Before the Lion Air crash, only 20% of MAX airplanes had the optional AOA Indicator installed. [54] ¶ 119.

FAA approval of the 737 MAX involved two decisions by two groups. [54] ¶ 81. One group decided whether the airplane met United States federal airworthiness standards. [54] ¶ 81. The second group, the FAA Aircraft Evaluation Group, decided what minimum level of training would be required for a pilot to fly the airplane by comparing the new version of the airplane to an older version. [54] ¶¶ 81–82. The Evaluation Group could assign one of five different levels of training, ranging from Level A, the least intensive, though Level E, the most intensive. [54] ¶ 83. Level D training required a full-flight simulator, which was more expensive and burdensome for airlines, while Level B differences training could be completed virtually on a computer or tablet. [54] ¶ 83. Considering that a more intensive training level would have been prohibitively expensive and time-consuming for airlines and, by extension, Boeing, obtaining Level B differences training or lower was one of the 737 MAX's "design objectives." [54] ¶¶ 84–85.

In June 2015, Mark Forkner, Boeing's 737 Chief Technical Pilot, attended a 737 MAX briefing during which Boeing employees told the Aircraft Evaluation Group

8

that MCAS was designed to operate only during high-speed wind-up turns, and only at speeds of Mach 0.7–0.8. [54] ¶ 130. After the briefing, Forkner and Patrick Gustavsson, a 737 MAX Technical Pilot, discussed MCAS with an Evaluation Group employee and made the same representations about its limited scope. [54] ¶ 130. However, upon beginning test flights of the 737 MAX in January 2016, Boeing discovered that the airplane did not handle well when nearing stalls at lower speeds. [54] ¶ 131. In response, Boeing overhauled MCAS to allow it to activate at lower speeds and to expand how far MCAS could lower the plane's nose. [54] ¶ 131. Boeing did not disclose these changes to the Evaluation Group. [54] ¶ 132.

In March 2016, Forkner e-mailed the Evaluation Group and asked for its approval to remove all references to MCAS from the 737 MAX's Flight Crew Operations Manual because MCAS was "completely transparent to the flight crew and only operates WAY outside of the normal operating envelope." [54] ¶ 133 (emphasis in original). The Evaluation Group approved Forkner's request, unaware of the MCAS changes. [54] ¶ 133.

In November 2016, Forkner conducted a simulator flight of the 737 MAX and experienced MCAS activation at a lower speed than he anticipated. [54] ¶ 141. He subsequently texted with Gustavsson:

> Forkner: Oh shocker alert! / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] things [sic] is happening
>
> Gustavsson: Oh great, that means we have to update the speed trim description in vol 2
>
> Forkner: so I basically lied to the regulators (unknowingly)
>
> Gustavsson: it wasn't a lie, no one told us that was the case

[54] ¶ 141. Despite acknowledging that he had unwittingly provided false information to the Evaluation Group, Forkner did not correct the record. [54] ¶ 142.

Rather, Forkner continued to suppress any mention of MCAS in the Flight Standardization Board Report, sending the Evaluation Group at least two emails proposing it delete references to MCAS because "it's way outside the normal operating envelope." [54] ¶¶ 144–45. The final version of the Report lacked information about MCAS, and "[i]n turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly false, inaccurate, and incomplete as a result." [54] ¶¶ 146, 354.

In emails to his colleagues, Forkner boasted about his success in "jedi-mind tricking regulators into accepting the training that I got accepted by FAA." [54] ¶ 135. He also bragged about performing the same "jedi mind trick" on one of Boeing's customers by persuading the foreign airline that any additional training was not necessary. [54] ¶ 137.

On February 16, 2018, Boeing reported that the FAA had certified the 737 MAX 9 for commercial flight. [54] ¶ 149. On March 16, 2018, Boeing announced that the 737 MAX 7 had successfully completed its first flight. [54] ¶ 150. Just over six months later, on October 29, 2018, Lion Air flight 610 took off from Jakarta, Indonesia on its way to Pangkal Pinang, Indonesia. [54] ¶ 157. Two minutes into the flight, MCAS, relying on erroneous data from the single angle-of-attack sensor, took control of the airplane and forced the nose downwards. [54] ¶ 157. After ten minutes, and

more than 20 MCAS activations, the plane crashed into the Java Sea, killing all 189 people on board. [54] ¶¶ 158, 160.

Boeing immediately began an internal investigation, and "quickly identified" erroneous MCAS activation as a potential issue, and that erroneous MCAS was a "safety issue" to which pilots would not know how to respond. [54] ¶¶ 163, 165. Boeing's Safety Review Board determined that the same procedure pilots would follow in responding to a similar error in the original 737 plane would only reset, and not deactivate, MCAS in a 737 MAX plane. [54] ¶ 166. The Safety Review Board determined that requiring pilots to perform multiple complex procedures in a very short period of time to prevent a plane from nosediving was a "high crew workload" issue that posed an "airplane safety issue" requiring remediation. [54] ¶ 167. Boeing's senior executives, including defendant Muilenburg, were apprised of the internal investigation team's findings daily. [54] ¶¶ 168–69. Despite the Safety Review Board's findings, Boeing and Muilenburg still directed flight crews to existing procedures to address circumstances where there was erroneous input from an angle-of-attack sensor. [54] ¶¶ 177–79.

On March 10, 2019, Ethiopian Airlines flight 302 departed Addis Ababa, Ethiopia for Nairobi, Kenya. [54] ¶ 225. One minute into the flight, MCAS took over the airplane and forced its nose down. [54] ¶ 225. The pilots attempted to follow the procedures outlined by Boeing by disconnecting the airplane's electric trim motor to disable the MCAS. [54] ¶ 226. But once they did so, the pilots could no longer use the electric switch to trim the stabilizer back into neutral position. [54] ¶ 226. They could

11

not move the stabilizer by hand, so they were forced to reconnect the airplane's electric trim motor, which reactivated the MCAS. [54] ¶ 226. The plane crashed in a field less than a minute later, killing all 157 people on board. [54] ¶ 226.

After the Ethiopian Airlines crash, aviation regulators around the world grounded the 737 MAX fleet. [54] ¶ 227. On March 13, 2019, the FAA grounded the 737 MAX indefinitely. [54] ¶ 234. After a review process, the FAA rescinded its order grounding the 737 MAX on November 18, 2020. [54] ¶ 322.

In the wake of the crashes, defendants told the market that Boeing had a renewed commitment to safety and quality and was fixing its corporate culture to emphasize transparency. [54] ¶ 15. It also said it was ensuring that employees could raise concerns about safety and quality control without fear of retaliation. [54] ¶ 15.

On January 5, 2024, Alaska Airlines flight 1282 was forced to make an emergency landing minutes after take-off when a door plug flew off mid-flight. [54] ¶ 371. The FAA temporarily grounded 171 737 MAX 9 airplanes. It was later determined that Boeing workers had almost immediately spotted bad parts when the plane's fuselage arrived at the factory, but they didn't fix the parts right away and the 737 moved on to the next work station. [54] ¶¶ 402, 418. When crews completed the repair 19 days later, they failed to replace four critical bolts on a plug door they had opened to do the job, leading to the accident on January 5. [54] ¶¶ 402, 418.

Whistleblowers came forward after the Alaska Airlines accident to report that safety and quality control had not improved at Boeing after the Lion Air and Ethiopian Airlines crashes, and that unsafe manufacturing practices and dangerous

12

shortcuts were still being used to rush airplanes to market. [54] ¶ 16. When workers raised concerns about these practices, they were retaliated against. [54] ¶ 16.

### III.  Statements 1–89[2]

#### A.  Theories previously dismissed (Statements 1–45, 47–52, 55–65, 67–68, 70–73, 75–76, 79–80, 82, 87–88)

Plaintiffs allege the same 89 statements they previously alleged as false or misleading. For statements 1–16, 19, part of 20 (the portion of the statement saying that safety is a core value), 27, part of 29 (the portion of the statement saying that safety as core value), 32–44, part of 47 (the portion of the statement talking about safety as Boeing's number one priority and "full confidence in the safety of the 737 MAX), 48–52, 55–65, 67–68, 70–73, 75–76, 79–80, 82, and 87–88, plaintiffs have failed to add new allegations to cure the deficiencies from the first amended complaint. [54] ¶¶ 488–89, 493–94, 498–99, 502, 504–11, 513–17, 520–22, 525–27, 529, 532–33, 535–36, 538–39, 545, 767–70, 772; [88-1] statements 1–16, 19–20, 27, 29, 32–44, 47–52, 55–65, 67–68, 70–73, 75–76, 79–80, 82, 87–88. Theories or claims based on those statements are dismissed for the same reasons I previously dismissed them. *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *5–6 (statements 8–10), *7 (statements 19–20, 27, 29), *8 (statement 32), *11–12 (statements 33–37, 39, 43, 64), *15–16 (statements 44, part of 47, 48–49, 51, 57, 59, 67), *16–17 (statements 55, 70–

---

[2] Plaintiffs have attached an appendix to their opposition to defendant's motion to dismiss listing 341 statements and categorizing them into ten groups: Internal Disclosure Controls and Procedures, Regulatory Compliance, Design and Certification of the 737 MAX, Existing Procedures, Safety of the 737 MAX, Production Rate, Recertification and Return to Service, Safety and Quality Control, Codes of Conduct, and Potential Risks. [88-1]. Because plaintiffs' appendix tracks their amended complaint, I refer to the statements as numbered in the appendix.

71, 76), *20 (statement 38), *20–21 (statements 50, 52, 56, 58, 62–63, 65, 68, 72–73, 75), *23 (statement 82), *23 (statements 1–7, 11–16, 40–42, 60–61, 79–80, 87–88) (N.D. Ill. Sept. 18, 2023).

I also previously dismissed statements that "the 737 MAX is safe" (statement 20), "the 737 MAX is a very safe airplane" (statement 20), "[t]he airplane is safe" (statement 23), "the 737 MAX is a safe airplane," (statement 25), and "the 737 MAX is as safe as any airplane that has ever flown the skies" (statements 29, 31) as immaterial. *Id.* at *7. Plaintiffs have added allegations in support of the materiality of the statements. They say that analyst reports and articles credited defendants' statements and said that because Boeing explained that standard pilot procedures would counter any problems with MCAS, the 737 MAX was a safe plane. [54] ¶¶ 187, 195, 204. They allege that one former pilot, the CEO of an aviation consulting firm, said that based on Boeing's explanation, he would "fly on [a 737 MAX] tomorrow without hesitation." [54] ¶ 204.

I still find that the statements were insufficiently specific and immaterial. Investors knew that there had been a crash. These statements were the kind of loosely optimistic statements an executive would say in the wake of a tragic event involving their company's product. As I found before, only unreasonable investors would find Muilenburg and Boeing's simple affirmations of safety meaningful. *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *7.

I previously found that statements Boeing and its executives made telling pilots to apply existing procedures were materially misleading. *Id.* at *8 (statements

14

17–18, 20–22, 24, 26, 28, 30); [54] ¶¶ 491–92, 494–98, 500. I dismissed those statements because plaintiffs failed to allege facts to establish scienter. *Id.* at \*8–9.

In their second amended complaint, plaintiffs have added allegations to support scienter for these statements. Muilenburg allegedly helped to prepare the November 6 bulletin. [54] ¶ 179. Plaintiffs allege that by November 4, 2018, Boeing's Safety Review Board had already identified erroneous MCAS activation as a "safety issue" and concluded that pilots would not know how to respond to repeated MCAS activation. [54] ¶¶ 165, 811. These findings were distributed to Boeing's senior executives, including Muilenberg, who were updated on the Safety Review Board's investigation daily. [54] ¶¶ 165, 811, 814.

Plaintiffs also allege that Muilenburg set up a daily call with Boeing's internal investigation team, and was briefed in real time, sometimes twice daily, by Boeing's chief engineer on the investigation's findings. [54] ¶ 169. Plaintiffs allege that Muilenburg "knew in real time" that MCAS could overpower pilot controls, that MCAS could not successfully be countered using existing procedures, that Boeing failed to perform certain safety testing relating to repeated MCAS activation, and that the FAA had directed Boeing to make significant software updates to the 737 MAX. [54] ¶ 811. Boeing's chief engineer knew on November 6 that there was "no way" for pilots to control the electric trim stabilizer and that MCAS could "overpower the pilots' ability to react using the electric trim stabilizer." [54] ¶ 170. It is reasonable to infer that Muilenburg also knew on November 6 that there was no way for pilots to combat MCAS. Plaintiffs also allege that by mid-November, Muilenburg knew that

15

MCAS would need to be redesigned and reinstalled because it was an airplane safety issue. [54] ¶ 813.

These new allegations raise a strong inference that Boeing and Muilenberg knowingly, or at least recklessly, told flight crews to follow existing procedures when they knew the procedures did not sufficiently address MCAS activation. *Seeks v. Boeing Co.*, 752 F.Supp.3d 992, 1020 (N.D. Ill. 2024). The amended complaint sufficiently states a strong inference of scienter by Boeing and Muilenburg in making the existing procedure statements after the Lion Air crash. *See id.*

Plaintiffs must also allege a causal connection between defendants' fraudulent conduct and plaintiffs' alleged losses. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 338 (2005). The notice pleading standard of Rule 8 governs allegations of loss causation. Fed. R. Civ. P. 8(a); *Dura Pharm.*, 544 U.S. at 346. Plaintiffs can satisfy this element by pleading facts that show when the truth regarding an alleged misstatement emerged—referred to as corrective disclosure—the price of the company's shares declined as a result. *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 612 n.5 (7th Cir. 2020); *Dura Pharm.*, 544 U.S. at 346–47. These corrective disclosures need not be a mirror image of previous misstatements. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009) (corrective disclosure "need not precisely mirror the earlier misrepresentation"); *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("fact-for-fact" disclosure not required to establish loss causation). A plaintiff need only plead that defendant's misstatement is "at least one

16

plausible cause of the economic loss." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 618 (7th Cir. 2011).

Plaintiffs have now adequately alleged that Muilenburg and Boeing deceived investors with respect to the functionality of the MCAS system and the adequacy of the information provided to pilots to address erroneous MCAS activation in the aftermath of the Lion Air crash. So, they must allege that Boeing's stock prices fell when information became available to the market that revealed the inadequacy of information provided to pilots regarding MCAS and the inaccuracy of information on MCAS functionality. I previously found that the release of the Forkner messages corrected Boeing's prior statements that pilots had all the necessary information to adequately address an erroneous MCAS activation, that Boeing had no basis to issue new guidance, and that MCAS only functioned during non-normal flight. *Coll. Equities Ret. Fund*, 2023 WL 6065260, at *25. That conclusion still stands, and applies to Muilenburg and Boeing's statements about MCAS in the aftermath of the Lion Air crash.

Plaintiffs also argue, again, a "materialization of the risk" theory. [88] at 46, 48. As I found before, this is "not a legal doctrine or anything special as a matter of fact," and the phrase "adds nothing to the analysis." *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010). Plaintiffs also argue the same eight additional corrective disclosures they did previously, and which I found did not connect to the circumstances that earlier materially false statements concealed or misrepresented. *Coll. Equities Ret. Fund*, 2023 WL 6065260, at *24. Plaintiffs did not add any new

17

allegations to most of the alleged corrective disclosures I already considered. *See* [54] ¶¶ 854–923. They did add that securities analysts were surprised by Boeing's July 24, 2019, announcement that it may halt production of the 737 MAX, but this additional allegation still does not connect the alleged disclosure to Boeing's and Muilenburg's misrepresentations about existing procedures. [54] ¶ 912.

And plaintiffs' arguments focus on what the *Seeks* court held, without arguing how the other disclosures corrected the false statement that existing procedures were sufficient to address MCAS and resulted in a loss. So, as before, plaintiffs have adequately alleged that the release of the Forkner messages corrected Boeing's prior statements that pilots had all the necessary information to address an erroneous MCAS activation. This is the sole corrective disclosure for statements 17–18, 20–22, 24, 26, 28, 30. These statements are actionable and may proceed. [54] ¶¶ 491–92, 494–98, 500.

## B. Theories previously allowed to proceed (Statements 45–47, 53–54, 66, 69, 74, 77–78, 81, 83–86, 89)

Some of plaintiffs' allegations survived the last motion to dismiss. Those statements remain actionable, for the same reasons they were actionable last time. *Id.* at \*13–15 (statements 45–47, 54), \*17–19 (statements 53, 66, 69, 74), \*21–23 (statements 77–78, 81, 83–86, 89), \*24–25 (loss causation); [54] ¶¶ 513–14, 518, 528, 530, 537, 541–42, 544, 546–50; [88-1] statements 45–47, 53–54, 66, 69, 74, 77–78, 81, 83–86, 89. Defendants do not argue otherwise.

IV.    Statements 90–341

In their second amended complaint, plaintiffs add another 251 allegedly false or misleading statements Boeing made related to the 2024 Alaska Airlines accident. None are actionable.

A.    **General statements on safety and quality at Boeing (90–96, 102, 105–06, 108–10, 117–19, 122–26, 130–33, 137, 139–40, 145, 155–60, 162–63, 165–66, 174, 176–79, 188–89, 191, 202, 204, 215–19, 221–22, 224, 233, 236, 238, 240–42, 265, 268–71, 273, 282–85, 289, 291, 305, 307, 314, 325–26)**

Plaintiffs allege that statements Boeing, Boeing's then-CEO Calhoun, and then-CFOs Smith and West made on safety and quality at Boeing were materially false or misleading. First, Calhoun said in earnings calls and on a CNBC appearance that the 737 MAX is a safe plane. [54] ¶¶ 556, 559–60, 711; [88-1] statements 93, 96, 273. For the same reasons applicable to similar statements, these statements are immaterial and nonactionable. *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *7.

Defendants also made repeated comments about Boeing's "focus" on "returning the 737 MAX to service safely," on "safely get[ting] this thing back in the air," and other statements talking about getting the 737 MAX safely into the air again or "progressing toward" the safe return to service of the 737 MAX. [54] ¶¶ 554, 557, 564, 568, 585, 568, 585–88, 597–98, 604–05, 630–31, 641–42, 650–51; [88-1] statements 91, 94, 102, 106, 113, 117–18, 122–23, 131–32, 162–63, 176, 189. Plaintiffs' allegations about why defendants' statements are misleading do not address the particular statements about returning the 737 MAX to service and generally allege that Boeing's comments about a commitment to safety were misleading when the company's safety and quality control practices were still woefully deficient. *See* [54]

19

¶ 563. But this explanation does not actually address the statements Boeing made. It is plaintiffs' burden to plead with particularity, and they failed to do so.

Even if it were misleading to say Boeing was focused on getting the 737 MAX into the air safely, the statements are not material. They are vague and aspirational, constituting nonactionable puffery. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (citation omitted). After the FAA grounded the 737 MAX, Boeing had every incentive to get the 737 MAX recertified and flying again. No reasonable investor would find the statements important to the total mix of information available and they are not actionable. *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). And even if the statements were materially misleading, plaintiffs' allegations fail to give rise to a strong inference of scienter, as discussed below.

Calhoun also made statements that Boeing believed it would deliver the "safest airplane in the sky." [54] ¶¶ 555–56, 559; [88-1] statements 92–93, 96. These statements consist of "soft information," including "predictions and matter of opinions." *City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005). They are puffery, the type of "loosely optimistic statements" that are nonactionable. *See id.* at 669–70.

Calhoun, Smith, and Boeing made statements that Boeing was holding itself to the highest standards of safety and quality and had a total commitment to safety. [54] ¶¶ 555, 574–75, 606, 664, 707, 715; [88-1] statements 92, 110, 133, 215, 269, 283. Calhoun, Smith, West, and Boeing also repeatedly made statements touting safety,

20

quality, and stability as Boeing's priority and focus, and that Boeing had a culture of safety, quality, and stability. [54] ¶¶ 552–53, 555, 558, 568, 570, 573, 568, 586–88, 597–98, 600, 605, 608, 610–11, 618, 620–23, 626–27, 633, 638, 643–45, 649, 653, 659, 661, 664–68, 670, 672–74, 678, 686, 688–90, 700, 703, 708–09, 711, 714–17, 722, 738, 745, 754; [88-1] statements 90, 92, 95, 106, 108–09, 117–18, 122–23, 125, 132, 137, 139, 145, 155–60, 165, 174, 177–79, 188, 191, 202, 204, 215–19, 221–22, 233, 238, 240–42, 265, 268, 270–71, 273, 282–85, 289, 305, 314, 326. These statements are vague, aspirational, and puffery. *City of Monroe*, 399 F.3d at 669–70. They are the "kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace," such that no reasonable investor could find them important in the total mix of information. *Id.*

Calhoun's statement that there was "nothing in that [recertification] process that scares us with respect to the safety of the planes" is classic puffery. [54] ¶ 567; [88-1] statement 105. And Calhoun and Boeing's statements about their confidence in the safety of the plane, in Boeing's long-term future, in production stability, and in a safe product line are also nonactionable opinions. [54] ¶¶ 591–92, 603, 634, 700; [88-1] statements 119, 130, 166, 265.

Smith, Calhoun, West, and Boeing's comments about Boeing investing in, making decisions with a focus on, being focused on, and prioritizing safety, quality, innovation, stability, and transparency are all forward-looking. [54] ¶¶ 599–600, 610–11, 678, 716, 725, 753; [88-1] statements 124–25, 139, 233, 284, 291, 325. Forward-looking statements are subject to the PSLRA's safe harbor. 15 U.S.C. § 78u-

21

5(c). The safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if either (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," § 78u-5(c)(1)(A)(i); or (2) "the plaintiff fails to prove" that the officer who made or approved the statement had "actual knowledge … that the statement was false or misleading." § 78u-5(c)(1)(B). Plaintiff's allegations do not raise a strong inference that Smith, Calhoun, West, and Boeing *knew* that Boeing was not investing in, making decisions with a focus on, or prioritizing safety, quality, innovation, stability, and transparency.

Similarly, defendants' comments that Boeing "will": increase production with safety in mind, bring rates back in stable fashion, continue to take necessary time to ensure quality are forward-looking. [54] ¶¶ 601, 634, 638, 738; [88-1] statements 126, 166, 174, 305. So are their statements that Boeing "has" to get stability and to continue to prioritize stability, and that production rates "had" to come in stable form. [54] ¶¶ 676, 684, 740; [88-1] statements 224, 236, 307. Plaintiffs have not alleged that defendants knew these statements were false when they made them. And statements about compliance efforts are puffery where they are "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources.'" *Singh*, 918 F.3d at 64. That is precisely the kind of statements alleged here—vague affirmations of policies and decisions prioritizing values. They are nonactionable.

22

Plaintiffs also allege that Calhoun's statement that the resolution Boeing reached with the Department of Justice "is a serious reminder to all of us how critical our obligation of transparency to regulators is," is materially misleading. [54] ¶ 612; [88-1] statement 140. But plaintiffs do not explain how this is false or misleading. Even if it were, I find that this statement is immaterial puffery. *City of Monroe*, 399 F.3d at 669–70.

Calhoun also told Fox Business News that "[t]here are a lot of things we can do to tidy up our processes, our procedures, and our disciplines to make sure it never happens again. But with respect to culture, people weren't making trades—oh, let's … we gotta lower cost if we, we can trade safety away for that. That's not what happened." [54] ¶ 566; [88-1] statement 104. Plaintiffs' explanation for why this statement is false or misleading does not address this specific statement. [54] ¶ 571. But even if they had made an argument, this statement is a nonactionable opinion and is immaterial because it would not have mattered in the mix of information known to investors. This statement was made in the aftermath of two crashes and articles revealing problems with MCAS, the discovery that Muilenburg and Boeing had misled the FAA, and a congressional investigation; in context, a reasonable investor could look at all the information to determine whether that was true, and it would not affect their decision to invest.

Plaintiffs say that Boeing's press release explaining the recommended actions of Boeing's Board of Directors' Committee on Airplane Policies and Procedures and Calhoun's statement that the accidents have created significant changes inside

23

Boeing, and that Boeing had taken a magnifying glass to everything they do were materially false or misleading because it was misleading for defendants to discuss Boeing's renewed commitment to safety when the company's safety and quality control practices were still woefully deficient. [54] ¶¶ 591–92, 594, 648, 656; [88-1] statements 119, 188. But plaintiffs do not allege that Boeing did not implement the specific recommendations described in the press release, or make any changes, nor that Boeing did not take "a magnifying glass to everything [they] do." The statements were not false or misleading. Even if the statements were misleading, though, plaintiffs have failed to adequately plead scienter or loss causation for these statements, as explained below.

Finally, plaintiffs allege that defendants' responses to quality issues with materials from Boeing's suppliers were materially misleading. In April 2023, Calhoun and Boeing told the public that issues with fuselages were not an immediate safety of flight issue, that the issue was isolated, and that there were no safety implications. [54] ¶¶ 722, 724–26, 729; [88-1] statements 289–92, 295. In October 2023, when there were issues in an aft pressure bulkhead, Boeing again assured the public that it was not an immediate safety of flight issue and the in-service fleet could continue operating safely. [54] ¶ 746; [88-1] statement 315. On an earnings call, Calhoun said that the fuselages had been "gone over with a microscope." [54] ¶ 750; [88-1] statement 318. These statements were materially misleading because there *were* safety implications, and eventually, those implications were realized when issues with fuselages eventually contributed to the Alaska Airlines accident. But still,

24

plaintiffs failed to allege scienter for these statements, as explained below. They are not actionable.

**B.** **Statements about new safety and reporting processes at Boeing (92, 103, 107–08, 110–12, 119-21, 123, 130, 132–33, 138, 142, 145, 156, 158, 160–61, 164, 166, 175, 177, 192, 203, 216, 218, 225, 234–36, 263–64, 270, 282, 284–89, 302, 314, 317)**

Plaintiffs also allege that statements that Boeing made regarding its newly implemented safety and reporting processes were materially misleading. They say that defendants' statements about setting up reporting structures, safety initiatives, and creating safety representatives are materially misleading because Boeing's safety and quality control practices were woefully deficient. [54] ¶¶ 555, 565, 570, 574–75, 582–84, 591–93, 598, 603, 605–06, 609, 615, 618, 621, 623, 627–28, 632, 634, 643, 654, 665–66, 668, 677–79, 685, 698–99, 708, 714, 716–20, 722, 745, 749; [88-1] statements 92, 103, 108, 110, 112, 119–20, 123, 130, 132–33, 138, 142, 145, 156, 158, 160–61, 164, 166, 177, 192, 216, 218, 225, 234, 237, 263–64, 270, 282, 284–89, 314, 317.

Plaintiffs say that Boeing's statements that it has and enforces a strict no retaliation policy are misleading because Boeing employees were in fact retaliated against. [54] ¶¶ 639–40, 647, 717, 721; [88-1] statements 175, 285. They also say that West's statements that Boeing made "solid progress against" its goals of safety, quality, and stability was materially misleading because Boeing's safety and quality control practices were still woefully deficient. [54] ¶¶ 660, 663; [88-1] statement 203.

I agree with plaintiffs that these statements are materially misleading to the extent that Boeing's safety and reporting structures were implemented in name only

and did not substantively change the safety and reporting culture at Boeing. They are material because, in the wake of two plane crashes, investors would look to Boeing to make real changes to ensure the safety of the airplanes being produced by Boeing. But plaintiffs fail to adequately plead scienter for these statements, as explained below.

Plaintiffs also allege that despite Boeing's assertions that it had implemented new safety and quality control policies, it did not do so. Boeing's 2020 proxy explained that Calhoun had asked Boeing's employees to focus on a number of priorities, including delivering safe products, improving quality performance, restoring production health, and developing new processes to improve safety. [54] ¶ 577; [88-1] statement 111. The proxy also laid out Boeing's "Director Qualification Criteria," and "risk oversight" responsibilities. [54] ¶¶ 578–79; [88-1] statement 111. Boeing also published "values," which said that Boeing would "Eliminate traveled work: Rework has a negative effect on productivity and first-time quality, so we will strive to eliminate it in all aspects of our business, from engineering design to the factory floor to the office environment." [54] ¶ 595; [88-1] statement 121. Boeing published its Safety Management System, which "require[d Boeing's] unyielding commitment" to the Safety Management System and laid out nine further commitments to safety and quality at Boeing. [54] ¶ 681–82; [88-1] statement 235. Finally, Boeing published new codes of conduct, including one for its Board members. The Board code of conduct said directors "shall continue to promote ethical behavior and take steps to ensure that"

Boeing continued to encourage reporting and inform employees that Boeing would not allow retaliation for good-faith reporting. [54] ¶ 735; [88-1] statement 302.

But these affirmations of policy are either too vague or are purely aspirational (and so are puffery). *See Singh*, 918 F.3d at 63 (representations in a Code of Ethics and in SEC Form 10-K statements puffery unless compliance mechanisms described in "confident detail."). Plaintiffs particularly emphasize Boeing's statements about traveled work, but Boeing's statements are loosely optimistic: "we will *strive* to eliminate it." [54] ¶ 595 (emphasis added). These statements were not specific enough to influence the total mix of information. Even if these statements were misleading, however, plaintiffs fail to allege scienter, and so defendants' statements about Boeing's safety and reporting processes are nonactionable.

### C. Statements about recertification and bringing airplanes back into service (106–07, 143, 233, 254)

Plaintiffs allege that some statements made by defendants about the recertification process and bringing the 737 MAX planes back into service were materially false or misleading. For example, plaintiffs allege that Calhoun's statements that Boeing's process of bringing Boeing's airplanes back into the air was "methodical, systematic, and disciplined" are materially misleading because Boeing's safety and quality control practices were deficient. [54] ¶¶ 568, 571, 678, 680; [88-1] statements 106, 233. Plaintiffs have also alleged whistleblower testimony and reporting that production safety and quality was not improving at Boeing, and that in February 2021, the FAA found that Boeing's production safety and quality performance had *regressed* in some ways. [54] ¶¶ 365, 922. A reasonable investor

27

would want to ensure the process by which airplanes were certified and built was methodical, systematic, and disciplined, to ensure there were no further problems with Boeing airplanes. But though these statements were materially misleading, plaintiffs have failed to adequately allege scienter, as discussed below.

Calhoun also made comments about the recertification process for the 737 MAX, and said the process was a "process like I've never seen before: thorough, exhaustive testing every step of the way." [54] ¶ 569; [88-1] statement 107. On an earnings call, Calhoun said that "following one of the most rigorous certification efforts in aviation history, we're confident in the safety of our [737 MAX] airplane." [54] ¶ 616; [88-1] statement 143. These statements were materially misleading because Boeing officials coached test pilots in the MCAS simulator testing contrary to testing protocol during the recertification process. [54] ¶¶ 20, 321, 828. A reasonable investor would want to know that the recertification process was not sound. But these statements are not actionable. Plaintiffs have not alleged Calhoun's scienter or loss causation for statement 107. And no reasonable investor would rely on statement 143. Calhoun made the statement *after* it was revealed that Boeing had coached test pilots; it was revealed in the December 2020 Senate report, and Calhoun's comment was made in January 2021. [54] ¶¶ 20, 321, 616. The total mix of information available to investors indicated that the recertification process may not have been the most rigorous in aviation history. Calhoun's statement saying otherwise, would, to a reasonable investor, be puffery.

Calhoun also told investors on a 2022 earnings calls that Boeing was "on a turnaround" and had "made very important progress with our regulators." [54] ¶ 696; [88-1] statement 254. Plaintiffs do not make allegations about why this particular statement is false or misleading. In any case, this statement is puffery. It is not actionable.

**D.      Statements about production rates**

Plaintiffs allege that Calhoun, Smith, West, and Boeing repeatedly misled investors regarding Boeing's production rates. None of these statements are actionable.

> *1.      Statements about planes already produced/delivered (141, 162–63, 176–77, 180, 189–90, 200–01, 220, 222–23, 233, 239, 240, 252, 272–73, 289–90, 315)*

Plaintiffs say that Boeing, Calhoun, and West's statements about the rates of production, plane deliveries, and number of flights and hours flown were materially misleading because Boeing's production rates were "dependent on practices that sacrificed safety and quality in favor of production speed and profit." [54] ¶¶ 614, 619, 630–31, 641–43, 646, 650–52, 657–58, 671, 673–75, 678, 687, 694, 710–11, 722, 724, 746; [88-1] statements 141, 162–63, 176–77, 180, 189–90, 200–01, 220, 222–23, 233, 239, 252, 272–73, 289–90, 315. But plaintiffs do not allege that the production rate was false. And even if Boeing was sacrificing safety and quality, it does not contradict the rate at which the planes were being produced. These statements were not materially false or misleading. Even if they were, plaintiffs have not alleged scienter or loss causation in connection with these statements.

Plaintiffs also say that Calhoun's statements that the 737 MAX fleet was performing well and had safely returned to service was false. [54] ¶¶ 657, 688, 711; [88-1] statements 200, 240, 273. But at the time Calhoun made those statements, the fleet had been flying without incident for nearly three years or longer. There is no allegation that the statements were false. And even if the statements were misleading because of the production quality issues that plaintiffs allege, they still fail to allege scienter or loss causation in connection with these statements.

And in an earnings call, Calhoun told investors that Boeing was "seeing increased stability and quality performance within our own factories, but we're working to get the supply chain caught up to the same standards." [54] ¶ 748; [88-1] statement 316. Plaintiffs have alleged whistleblower testimony and reporting that production safety and quality was not improving at Boeing, and that the FAA found that Boeing's production quality had actually regressed in some areas. [54] ¶¶ 365, 922. Calhoun's statement was misleading. But in context, the misstatement is not material. Calhoun made this comment after Boeing discovered issues in an aft pressure bulkhead from its supplier. It is clear that in context, Calhoun was explaining to investors that there were issues in the supply chain with their suppliers that need to be addressed. The additional comments about increased stability and quality performance in Boeing's factories, though misleading, would not meaningfully add to the mix of information important to investors in that context. But even if the statements were material, plaintiffs still fail to plead scienter or loss causation for this statement.

30

### 2. *Statement about resuming operations (163)*

Calhoun told investors in an April 2021 earnings call that 165 countries had "approved the resumption of 737 MAX operations." [54] ¶ 631; [88-1] statement 163. But that's not false, and plaintiffs' arguments for why the rest of the statement is misleading do not apply to this portion of the statement. Statement 163 is not actionable.

### 3. *Statements about future production schedules (144, 162, 176, 180, 189–90, 201, 220, 222, 239, 241, 243–44, 252–53, 266–67, 272, 289–90, 293–94, 303–06, 315)*

Plaintiffs also allege that Smith's, Calhoun's, West's, and Boeing's statements discussing their expectation of future production rates were materially misleading, again because Boeing's production rates were "dependent on practices that sacrificed safety and quality in favor of production speed and profit." [54] ¶¶ 617, 630, 641–42, 646, 650–52, 658, 671, 673–74, 687, 689, 691–92, 694–95, 701–02, 710, 722, 724, 727–28, 736–39, 746; [88-1] statements 144, 162, 176, 180, 189–90, 201, 220, 222, 239, 241, 243–44, 252–53, 266–67, 272, 289–90, 293–94, 303–06, 315. These statements were forward-looking, and plaintiffs have not adequately alleged that defendants *knew* that the production rates would not be able to safely be achieved. These statements are not actionable.

31

### E.    Submissions to the SEC

#### 1.    *Statements identical to those already dismissed (97, 100–01, 115–16, 128, 135–36, 152–54, 167, 181–82, 193–94, 206–08, 226–27, 245–46, 256–57, 275–77, 296–97, 308–09, 319–20, 330–31)*

I previously dismissed any claims based on certain statements made in Boeing's SEC submissions as immaterial. *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *23. For the same reasons I dismissed theories based on the 2017–2019 Form 10-K statements, I also dismiss theories based on the identical statements made in Boeing's 2020–2023 10-K forms. [54] ¶¶ 772, 777; [88-1] statements 97, 152, 208, 277 (commercial aircraft required to comply with FAA regulations); [54] ¶¶ 769–70; [88-1] statements 100, 115, 128, 135, 153, 167, 181, 193, 206, 226, 245, 256, 275, 296, 308, 319, 330 (person signing report has reviewed it, affirms it's true, and is responsible for establishing and maintaining disclosure controls and procedures); [54] ¶¶ 767–68; [88-1] statements 101, 116, 136, 154, 182, 194, 207, 227, 246, 257, 276, 297, 309, 320, 331 (CEO and CFO have evaluated disclosure controls and procedures and have concluded they are effective).

#### 2.    *Codes of Conduct (98, 151, 209, 281, 332)*

Plaintiffs say that Boeing incorporated its codes of conduct in its SEC filings. [54] ¶¶ 774–77; [88-1] statements 98, 151, 209, 281, 332. They argue it was materially misleading for defendants "to discuss Boeing's purported culture of encouraging employees to raise concerns without fear of retaliation when, in fact, Boeing employees were discouraged from raising safety and quality control concerns and those that did were retaliated against." [54] ¶ 778. The employee code of conduct and the Board code of conduct were aspirational on their faces. *See Retail Wholesale &*

32

*Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1276 (9th Cir. 2017) ("[A] code of conduct is inherently aspirational."). Codes of conduct, "which amount to general declarations about the importance of acting lawfully and with integrity, fall squarely within" the puffery category. *Singh*, 918 F.3d at 63. They are not actionable statements.

Boeing's ethical business conduct guidelines are a closer call. The guidelines say that "the Boeing Code of Conduct clearly states that retaliation against employees who come forward and raise concerns will not be tolerated. If an employee feels he or she has been retaliated against, there are several reporting channels available, including contacting a manager, Ethics Advisor, Human Resources representative, or the law department." [54] ¶ 776. Plaintiffs say this is materially misleading because in practice, whistleblowers were retaliated against, and the processes for reporting were more theory than practice. [54] ¶ 778. I agree with plaintiffs that these statements were misleading. The statements are also material, because in the wake of two crashes, investors would want to ensure that if there were issues known in planes, that Boeing employees could come forward to report without fear of retaliation. But plaintiffs fail to allege scienter and loss causation for these statements, so they are not actionable.

> 3. *Risk disclosures (99, 114, 127, 134, 146–48, 150, 169–73, 183–87, 195–99, 210–14, 228–32, 247–51, 258–62, 278–80, 298–301, 310–13, 321–24, 333–35)*

Boeing also included risk disclosures in its SEC filings. It disclosed that there may be "operational challenges impacting the production system for one or more of

[their] commercial aircraft programs [that] could result in production delays and/or failure to meet customer demand for new aircraft." [54] ¶¶ 779–80, 783, 786, 789, 792, 794, 796, 799; [88-1] statements 99, 114, 127, 134, 148, 171, 185, 197, 212, 230, 249, 260, 279, 299, 311, 322, 334. Boeing also disclosed the risk of legal proceedings and government investigations, including the deferred prosecution agreement it had entered into, and the risk of litigation, government inquiries, and investigations, including an SEC investigation. [54] ¶¶ 781–82, 784–88, 790–93, 795–98, 800; [88-1] statements 146–47, 149–50, 169–70, 172–73, 183–84, 186–87, 195–96, 198–99, 210–11, 213–14, 228–29, 231–32, 247–48, 250–51, 258–59, 261–62, 278, 280, 298, 300–01, 310, 312–13, 321, 323–24, 333, 335.

Risk disclosure statements in SEC filings are inherently forward-looking. *Bondali v. Yum! Brands, Inc.*, 620 Fed.Appx. 483, 491 (6th Cir. 2015). These statements are "not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results." *In re FBR Inc. Sec. Litig.*, 544 F.Supp.2d 346, 362 (S.D.N.Y. 2008). "Risk disclosures like the ones accompanying 10-Qs and other SEC filings … warn an investor of what harms *may* come to their investment. They are not meant to educate investors on what harms are currently affecting the company." *Bondali*, 62 Fed.Appx. at 491 (emphasis in original). Even so, the disclosure statements here warn both of what is *currently* affecting the company and how that may harm investors in the future. This is precisely what the risk disclosures ought to do, and so are not misleading.

34

Plaintiffs argue that the risk disclosures were misleading because the risk had already materialized. But Boeing acknowledged in these statements risks that had already materialized and also warned of continuing or future impacts from those materialized risks. The statements were not misleading.

### 4. Statements about safety (145, 205, 255, 274, 295, 336)

Boeing's SEC filings also stated that "safety, quality, and integrity" (and later added "sustainability") were "at the core of how Boeing operates," and said it provides "several channels for all employees to speak up, ask for guidance, and report concerns related to ethics or safety violations." [54] ¶¶ 618, 662, 712, 759; [88-1] statements 145, 205, 274, 336. The first part of the statement regarding safety, quality, integrity, and sustainability, is nonactionable puffery. The second part regarding reporting processes, was materially misleading but, as explained below, was not supported with allegations of scienter or loss causation.

Boeing's Form 10-Q filed in October 2022 stated that "[w]ith safety as our primary focus, we continue to work to meet all current regulatory requirements to support certification." [54] ¶ 697; [88-1] statement 255. This is puffery.

Finally, Boeing filed a Form 10-Q in April 2023 that disclosed that a fuselage supplier notified it of a non-standard manufacturing process used on two fittings of certain 737-7, 737-8, and 737 military derivative aircraft. [54] ¶ 729. Boeing said that there was "not an immediate safety of flight issue and the in-service fleet can continue operating safely." [54] ¶ 729; [88-1] statement 295. This statement was not false or misleading. In context, Boeing was assuring investors that the problem with the supply chain was limited, and plaintiffs do not allege otherwise. Instead, plaintiffs

35

allege that the statement was misleading because Boeing's safety and quality control practices were still woefully deficient, and that Boeing did not properly oversee its suppliers to ensure quality control. [54] ¶ 734. But that reasoning is attenuated from the statement and its context and does not allege that the particular statement was false. Even if it were false, however, plaintiffs do not sufficiently allege scienter or loss causation for this statement.

None of defendants' statements regarding safety in Boeing's SEC filings are actionable.

### F. Post-Alaska Airlines accident statements

Finally, plaintiffs allege that statements that Calhoun, West, and Boeing made in the aftermath of the Alaska Airlines accident were materially misleading. Calhoun, West, and Boeing assured the public that their full focus was on strengthening quality at Boeing, on safety and quality, on building transparency and accountability, and on developing a comprehensive safety strategy. [54] ¶¶ 754–58, 761–64; [88-1] statements 326–29, 337–41. These statements were all vague, forward-looking, and aspirational. Plaintiffs have not alleged that Calhoun, West, and Boeing knew their statements were false. The accident was the third accident involving a Boeing airplane. Investors knew that Boeing had been receiving parts with issues from their suppliers. No reasonable investor would take Boeing's vague affirmations of safety and quality as meaningful to the total mix of information available. Statements 326–29 and 337–41 are not actionable.

36

Boeing also said it continued to cooperate with the FAA following the accident. [54] ¶ 755; [88-1] statement 327. Plaintiffs do not allege that this particular statement was false or misleading. It is not actionable.

## G. Scienter

Plaintiffs do not allege that Calhoun or Smith knew about the safety and quality issues in production. They do allege that "the regulatory, safety, and quality control reforms that Defendants implemented in the wake of the Lion Air and Ethiopian Airlines crashes required Defendants – as the most senior members of Boeing's management – to be apprised of all safety and quality control issues at the Company and report on those issues to Boeing's Board of Directors." [54] ¶ 822. Plaintiffs allege that defendants Muilenburg and Calhoun would receive all safety reports and potential safety reports generated by Boeing's Operation Safety Program and Enterprise Product & Services Safety Organization. [54] ¶ 822. Plaintiffs allege that Muilenburg, Smith, Calhoun, and West specifically and repeatedly told the market that they were closely monitoring the safety and quality control issues at Boeing after the Lion Air and Ethiopian Airlines crashes. [54] ¶ 841. That these executives were responsible for Boeing's safety and quality control practices, and repeatedly said so, plaintiffs allege, is further evidence of their scienter. [54] ¶ 845.

But plaintiffs do not identify and plead that Muilenburg, Smith, Calhoun, and West were aware of the specific problems in the safety and quality control processes at each Boeing facility. Plaintiffs allege that "there were numerous safety and quality control problems at Boeing between 2019 and 2023 that were reportedly caused by managers pushing 737 MAX airplanes out the door before they were ready in an effort

37

to meet the production deadlines set by senior management." [54] ¶ 385. But there is no allegation that senior management knew that local managers were taking shortcuts or engaging in unsafe practices to meet deadlines. Indeed, plaintiffs' allegations include that the FAA found there was a failure to follow approved manufacturing processes and a failure to keep proper quality control documentation—indicating there *were* changes and approved processes, and there was little or no record these processes were not being followed. [54] ¶ 969. And there are no allegations about knowledge on specific dates; plaintiffs rely on a theory that because the problems were pervasive, and defendants said they were personally responsible for safety and quality control at Boeing, that they must have known all along. But this is too vague under the PLSRA standard, which requires plaintiffs "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Because there are no allegations that Muilenburg, Smith, Calhoun, or West knew about specific or even widespread issues when they made each of their statements about safety, plaintiffs have not adequately pleaded scienter.

## V.   Conclusion

For the foregoing reasons, defendants' motion to dismiss, [86], is granted in part and denied in part. Plaintiffs may proceed on their 10(b)(5) claims against defendants Boeing and Muilenburg as to statements 17–18, 20–22, 24, 26, 28, 30, 45–47, 53–54, 66, 69, 74, 77–78, 81, 83–86, and 89. The claims based on statements 1–16, 19–20, 23, 25, 27, 29, 31–44, 47–52, 55–65, 67–68, 70–73, 75–76, 79–80, 82, 87–

38

88, 90–341, and all claims against Smith, are dismissed with prejudice.[3] Boeing and Muilenburg shall answer the complaint by April 28, 2026. The parties shall file a joint status report with a proposed case schedule on May 5, 2026.

ENTER:

_____
Manish S. Shah
United States District Judge

Date: 3/31/2026

---

[3] *See Lazarou v. Am. Bd. of Psych. & Neurology*, 158 F.4th 854, 865 (7th Cir. 2025) (district court may dismiss with prejudice when the plaintiff has had the opportunity to amend complaint and fails to do so, and does not establish any proposed amendment that would cure the deficiencies identified in the earlier complaint.). Plaintiffs have had an opportunity to cure the deficiencies in their complaint and failed to do so. They also fail to establish any proposed amendment to cure the identified deficiencies. Although there are newly alleged statements in the second amended complaint, dismissed here for the first time, further amendment would be futile. There is no reason to think that the theories can be improved after all the time spent by plaintiffs in multiple cases and jurisdictions poring over every Boeing utterance.